**MANATT, PHELPS & PHILLIPS, LLP**
Schuyler G. Carroll
Russell E. Potter (*pro hac vice* forthcoming)
Thomas A. Whittington (*pro hac vice* forthcoming)
7 Times Square
New York, NY 10036
Tel: (212) 790-4500
Email: scarroll@manatt.com
rpotter@manatt.com
twhittington@manatt.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**COLD SPRING ACQUISITION, LLC,**<br><br>Debtor. | Chapter 11<br><br>Case No. 25-22002 (SHL) |

**DECLARATION OF MARTIN A. CAUZ IN SUPPORT OF DEBTOR'S
CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Martin A. Cauz pursuant to 28 U.S.C. § 1746, under penalty of perjury, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

2. I am the Chief Restructuring Officer ("**CRO**") of Cold Spring Acquisition, LLC, doing business as Cold Spring Hills Center for Nursing & Rehabilitation, (the "**Debtor**"), a New York limited liability company with an office located in Spring Valley, New York. I was appointed as CRO on December 26, 2024. In that limited period of time, I have worked

diligently to fully familiarize myself with the Debtor's operations, capital structure and finances, as well as many of the problems facing the Debtor.

3. I am knowledgeable and familiar with the Debtor's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of this chapter 11 case (the "**Chapter 11 Case**"). Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtor or the Debtor's advisors, or my opinion, which itself would be based on my experience, knowledge, and information concerning the Debtor's operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4. I have more than twenty-five years of experience providing professional services to companies, including over 20 years of experience as a Restructuring & Turnaround professional. Over my career, I have worked with companies ranging from startups to those with over $1 billion in revenue and my experience spans across various industries including the senior living industry. I have provided companies with expertise in strategic planning, cash management, turnaround management, refinancing of debt, negotiation, and solution facilitation. I have been involved in numerous situations, both domestic and internationally.

5. I have served as Chief Executive Officer of an operator of ten skilled nursing facilities and I am currently the Chairman of the Board of Petersen Healthcare, a skilled nursing home operator of over 80 facilities which is in Chapter 11. My experience with Senior Living and Skilled Nursing Facility Operators spans over a decade with five different operators that collectively owned and operated over 130 facilities/communities with over 12,900 beds/units and all of these operators were experiencing some type of financial distress.

I. **THE DEBTOR'S STRUCTURE AND BUSINESS AND THE REASONS FOR FILING THESE CHAPTER 11 CASES**

A. **Business Operations**

6. The Debtor operates a skilled nursing and rehabilitation facility in Woodbury,

New York, with 588 beds (the "**Senior Care Facility**"). The Debtor employs approximately 500 people. The Senior Care Facility provides long-term care and rehabilitative services to many senior patients. In particular, the Senior Care Facility provides hospice, dementia care, medical needs, as well as short- and long-term rehabilitation care. The Senior Care Facility also runs a senior day program. In 2023 the Senior Care Facility had approximately $75.5 million of annual gross revenue.

   **B.**  **Corporate Structure**

   5.  The Debtor is a New York limited liability company formed in July 2014. The Debtor is the manager of the Senior Care Facility.

   **C.**  **Capital Structure and Debt**

   7.  The Debtor's capital structure is reasonably simple. It has no secured debt and no public debt. Rather, its obligations are unsecured debt resulting from the trade debt to its landlord, vendors, employees, unions, taxes, professionals and others.

   **1.**  *Unsecured Debt*

Trade Debt

   8.  The Debtor has substantial unsecured indebtedness. Specifically, the Debtor is obligated to its trade creditors in excess of $20,000,000.

Rent

   9.  In addition, the Debtor also owes approximately $21,803,468 to its landlord, Cold Spring Realty Acquisition LLC ("**Realty**"), which holds a judgment in that amount against the Debtor. Bent Phillipson, Avi Phillipson's father, is a member of Realty. Realty is thus an insider of the Debtor. The Debtor has not paid full rent to Realty since approximately 2016. Since that time, however, the Debtor has paid Realty a lesser amount, which has varied from month to month, but no payments have been made since the first quarter of 2024.

Union

   10.  The Debtor owes substantial sums to the various union funds. As described below, the Debtor disputes many of these payments, but the union funds assert claims in excess

of $15,000,000.

Residents

11.   The Debtor also owes its residents a total of approximately 1,200,000. These are funds deposited by or on behalf of the residents for their personal needs. The Debtor holds these funds in a separate account in trust for the residents. The Debtor asserts and has always treated these funds as property of the residents, not property of the Debtor.

**II.   THE EVENTS LEADING TO THE CHAPTER 11 FILINGS**

12.   Several events have led to the Debtor commencing this Chapter 11 case.

13.   Covid had a devastating effect on nursing homes in the State of New York as the Governor forced nursing homes to accept Covid positive admissions. Further, the elderly population had a very high death rate from Covid, depleting the nursing home population. The Debtor survived Covid but was greeted with an investigation by the Medicaid Fraud Control Unit of the New York State Attorney General's office (the "**AG**"). This investigation was costly to the Debtor and required the payment of significant attorney fees.

14.   The AG investigation of and crusade against for profit nursing homes led into multiple lawsuits against scores of nursing homes, principals of nursing homes and nursing home vendors. One of those lawsuits was a petition filed on December 22, 2022 in the Supreme Court of the State of New York, Nassau County against the Debtor and 28 other defendants. The lawsuit was accompanied by a smear campaign of press releases, announcements and "leaks" to the press.  The petition, among other things, alleged fraud, financial improprieties, neglect and mistreatment of residents. The smear campaign continued and continues, financially undermining the Debtor. Despite this campaign, in court the AG failed to provide evidence sufficient to even withstand an equivalent of a summary judgment motion by debtor.

15.   On March 15, 2024, Justice Lisa A. Cairo of the New York State Supreme Court (Nassau County) issued a final decision on the merits of the AG's petition against the Debtor, denying nearly all of the relief sought and dismissing the balance of the petition. Of course, the

AG has appealed the decision requiring payment of additional attorneys' fees. The only relief granted against the Debtor was the appointment of an independent health monitor ("**IHM**"). Justice Cairo issued a finding that the AG was unable to prove fraud or any financial impropriety by the Debtor.

16. On a monthly basis since April 2024, the IHM has issued reports to the New York State Supreme Court. All of the reports have indicated adequate staffing and that the residents are well taken care of. The reports have pointed out the financial crisis that the Debtor finds itself in as the result of the negative publicity arising from the AG's suit.

17. The AG's petition had the immediate and prolonged impact of reducing the admissions of the most profitable patients, Medicare patients. Thereafter, all new admissions were greatly reduced. The effect of the litigation and the smear campaign was overwhelming. The Debtor lost numerous residents and potential new residents were hesitant to move in. By April 2024 there were only 423 residents, a census level making it impossible to operate without large losses.

18. In April 2024 the Debtor filed a closure plan with the New York Department of Health ("**DOH**"), while simultaneously searching for a purchaser. By mid-May 2024, the plan had been approved, but the Debtor elected not to commence the closing process as it held out hope that the facility could be transferred to a new operator instead.

19. By September 2024 the resident census had fallen below 350, where it has remained.

20. In September 2024 a potential buyer was found. An application was made to the DOH for the buyer to be appointed as a receiver pending the approval of a complete sale. In or around that month, the DOH told counsel for the Debtor that the DOH would not review a receivership application and oversee a closure simultaneously. On September 26, 2024, the DOH sent a letter to the Debtor unilaterally declaring the closure plan "withdrawn" and claiming that the closure plan that had been accepted months prior had in fact "not . . . been finalized."

21. From September to December, the Debtor struggled along hoping that the buyer's

receivership application would be approved. It has yet to be approved.

22. On December 16, 2024, the Debtor notified DOH that it was contemplating an emergency evacuation of the facility in order to avoid having resident census in excess of the Debtor's financial ability to provide care.

23. On December 20, 2024, the Nassau County Supreme Court (Justice Cairo) entered a temporary restraining order prohibiting the Debtor from "implementing or engaging in a plan to evacuate and/or otherwise involuntarily discharge or transfer its approximately 300 residents . . . on the basis that Cold Spring Hills' payroll or any other financial obligation cannot be met."

24. That breaking point was reached due to recent imposition of additional restrictions on the Debtor's operating income—specifically, the CPLR § 5222 restraining notices applied on the Debtor's cash receivables by the 1199SEIU National Benefits Funds (the "**Fund**") in October 2024, which took full effect in or around November 2024.

25. As a result of the AG's actions and the Debtor's financial difficulties, the Debtor fell behind on numerous obligations including required payments the Fund. In August 2023, the Fund sent a termination notice to the Debtor, but after negotiations and preliminary motion practice in Nassau County Supreme Court before Justice Cairo, the Fund withdrew the notice without requiring immediate payment.

26. Following mandatory arbitration, the Fund obtained judgments (the "**Judgments**") against the Debtor for unpaid benefits provided. Currently those judgments total $6,355,047.56.

27. In or around April 2024, the Fund sent another notice of termination, which would be effective as of April 22, 2024 unless further payments were made.

28. The Debtor determined that it could obtain equivalent health benefits for its employees in the private marketplace for one-third of what it was being asked to pay to the Fund. The Debtor thereafter advised the Fund that it was unable to make payment and attempted, in order to save over 500 union jobs, to negotiate alternate relief from paying the Fund based upon

purchase of benefits in the private market. Those negotiations failed, the Fund terminated benefits in or around April 2024, and the Debtor obtained equivalent health benefits in the private marketplace going forward.

29. Since April 2024, health benefits have been obtained in the private market for a fraction of what was paid to the Fund. Despite private market insurance being provided, the Fund continues to invoice the Debtor for Fund benefits and it appears the Fund will seek to obtain arbitration awards for health benefits it has not provided. Despite all of the above and large losses, the Debtor continued to make payroll and cover essential expenses until last month.

30. In or around October 2024, the Fund served a series of nine restraining notices (the "**Restraining Notices**") on the DOH to enforce the Judgments. The DOH recognized the Restraining Notices as applicable to Medicaid reimbursement funds held by DOH and owed to the Debtor as compensation for the Debtor's past services to residents of the Debtor. Without these funds the Debtor was unable to make payroll or cover necessary expenses.

31. Under 42 U.S.C. § 1395g(c), DOH is not permitted to assign Medicare and Medicaid reimbursement funds to a non-provider in the first instance unless a court contemporaneously orders it. The Fund has not sought such relief. Thus, the primary effect of the Restraining Notices is to restrain payments to Debtor. They do not authorize DOH to pay the reimbursement funds out to the Fund directly without a court order. The Restraining Notices are now dissolved as a result of the chapter 11 filing and the effect of the automatic stay.

32. Following negotiations between the Debtor and the Fund, $1,000,000 of the Debtor's Medicaid funds were released on November 26, 2024 to cover payroll. On December 9, 2024, the Debtor moved the Supreme Court for the County of New York for relief from the Restraining Notices as they impaired the Debtor's ongoing operations. On December 10, 2024, the Supreme Court ordered that that week's payroll expenses of $1.14 million should be released by DOH "upon [the Debtor] demonstrating to [the Fund] and DOH that [the Debtor] has obtained an undertaking in the sum of $1,140,000.00."

33. The Debtor, however, was unable to fund the undertaking. Thus, lacking funds to

operate, the Debtor began to plan an emergency evacuation of the Facility. Notice of the emergency evacuation was provided to the DOH and termination letters were sent to over 500 employees.

34. On December 18, 2024 the AG moved by Order to Show Cause before the Supreme Court for Nassau County for a "Temporary Restraining Order To Prevent Illegal Evacuation Of Residents And Nonpayment Of Staff At Cold Spring Hills Nursing Home." A hearing was held on December 19, 2024 and continued on December 20, 2024.

35. On December 20, 2024 the court issued an order which, inter alia, provided as follows:

> Respondents [the Debtor] be restrained from implementing or engaging in a plan to evacuate and/or otherwise involuntarily discharge or transfer its approximately 300 residents at Cold Spring Hills, on the basis that Cold Spring Hills' payroll or any other financial obligation cannot be met, until further order of the Court; and it is further
>
> Ordered that pending hearing of the instant application, Cold Spring Acquisition LLC arrange for transfer of funds necessary to Cold Spring Hills such that Cold Spring Hills can meet its Thursday, December 19, 2024 payroll obligations, and continuing weekly thereafter, such that its employees can continue to provide care to the residents of Cold Spring Hills, until further order of the court.

36. In light of all of these developments and the impending deadlines combined with the absence of funds to comply with the December 20, 2024 Order, the Debtor has determined that it has no alternative but to commence this case under chapter 11.

### III. PROPOSED STRATEGY TO EMERGE FROM CHAPTER 11

37. The Debtor intends to use these Chapter 11 Cases to obtain breathing space, unlock cash flow that is presently being restrained and evaluate its path moving forward. The Debtor is hopeful that the DOH will promptly approve the appointment of a temporary receiver, but in the absence of prompt approval, the Debtor will have no alternative but to begin to evacuate the facility in an orderly fashion, complying, if possible with the December 20, 2024 Order until such time as approval can be obtained from the DOH for sale of the Facility and the appointment of a temporary receiver to operate the Facility. Because of the urgent nature of this

filing, the Debtor only engaged bankruptcy counsel less than 2 weeks ago to assist with this Chapter 11 Case (and all forthcoming motions). The Debtor has not yet had an opportunity to fully explore the strategic alternatives that may be available, but will explore all available alternatives to ensure uninterrupted safe care for its residents and patients and to maximize value for its stakeholders.

IV.     **EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS**

38.     Contemporaneously with the filing of this Declaration, the Debtor has filed several first day motions (each, a "**First Day Motion**" and, collectively, the "**First Day Motions**"),[1] seeking relief that the Debtor believes is necessary to enable it to avoid immediate irreparable harm and to efficiently administer its estate with minimal disruption and loss of value during this Chapter 11 Case and ensure the safety and health of its residents and patients. The Debtor requests that the relief requested in each of the First Day Motions be granted as critical elements in ensuring the maximization of value of the Debtor's estate.

39.     I have reviewed each of the First Day Motions and believe that the relief requested in each of the First Day Motions is absolutely necessary to avoid immediate irreparable harm and ensure the safety and health of its residents and patients. I have reviewed each of the First Day Motions and the factual statements set forth therein. I confirm that the each of factual statements in each of the First Day Motions is true and correct to the best of my knowledge and belief. I adopt each of the factual statements set forth therein as my own, as if each were fully set forth herein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct in all respects.

Dated:  January 2, 2025
        Myrtle Beach, South Carolina

                                            /s/ Martin A. Cauz
                                            Martin A. Cauz
                                            Chief Restructuring Officer

---

[1] Capitalized terms used but not defined in the discussion of a particular First Day Motion, shall have the meaning ascribed in such First Day Motion.