**MANATT, PHELPS & PHILLIPS, LLP**
Schuyler G. Carroll
Russell E. Potter (admitted *pro hac vice*)
Thomas A. Whittington (admitted *pro hac vice*)
7 Times Square
New York, NY 10036
Tel: (212) 790-4500
Email: scarroll@manatt.com
      rpotter@manatt.com
      twhittington@manatt.com

*Proposed Counsel to the Debtor
and Debtor-in-Possession*


*Proposed Counsel to the Debtor and
Debtor-in-Possession*

**Hearing Date:**
**February 19, 2025 at 2:00 P.M. (EST)**

**Objection Deadline:**
**February 12, 2025 at 5:00 P.M. (EST)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
In re:

Cold Spring Acquisition, LLC,[1]

          Debtor.
-----------------------------------------------------X

Chapter 11

Case No. 25-22002 (SHL)

## APPLICATION FOR ORDER AUTHORIZING THE RETENTION OF CAPITAL HEALTH CONSULTING, LLC, AS INDEPENDENT HEALTHCARE MONITOR

Cold Spring Acquisition, LLC (the "Debtor") respectfully states as follows in support of this Application for an Order substantially in the form attached hereto as Exhibit A, authorizing the retention and engagement of Capital Health Consulting, LLC ("CHC") as an independent healthcare monitor ("IHM"), pursuant to an Agreement to Engage Independent Health Monitor, dated May 3, 2024, between the Debtor and CHC, submitted in accordance with Section 327(a) of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), Rule 2014

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: Cold Spring Acquisition, LLC (4415).

and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"): In support of the Application, the Debtor respectfully states as follows:

**Relief Requested**

1.      The Debtor seeks entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), authorizing the retention of CHC, an independent healthcare monitor for the matters described herein, effective as of the Petition Date, pursuant to Section 327(a) of the Bankruptcy Code.

2.      In support of the relief requested herein, the Debtor relies upon and incorporates by reference the *Declaration of Lisa Wickens-Alteri in Support of Debtor's Application for Order Authorizing the Retention of CHC Health Consulting, LLC, as Independent Healthcare Monitor* (the "Wickens-Alteri Declaration"), a copy of which is attached hereto as Exhibit B.

**Jurisdiction and Venue**

3.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over the Chapter 11 Case and this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered January 31, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  The Debtor consents to this Court entering a final order in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief requested herein are section 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1.

**Background**

6.      On January 2, 2025 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is authorized

to continue to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No committee, trustee or examiner has been appointed herein.

7.      The Debtor operates a 588-bed skilled nursing and rehabilitation facility in Woodbury, New York (the "Senior Care Facility").  Additional information regarding the Debtor, including its business operations, corporate and capital structure, and the events leading to the commencement of this case is set forth in the *Declaration of Martin A. Cauz in Support of Chapter 11 Petition and First Day Papers* (the "First Day Declaration") filed with this Court on the Petition Date.

**Scope of CHC's Services**

8.      In connection with the New York Attorney General's State Court special proceeding against Debtor and others, the Attorney General requested appointment of an Independent Health Monitor and recommended CHC. The New York State Supreme Court entered an order appointing CHC, and tasked CHC with the following:

    a)      Being on-site at the Senior Care Facility no less than 10 calendar days per month.

    b)      Visiting and inspecting the Senior Care Facility, reviewing documents regarding the Senior Care Facility, overseeing healthcare operations at the Senior Care Facility, ensuring that the Senior Care Facility improves healthcare outcomes for its residents, and ensuring that the Senior Care Facility and Debtor comply with the health care reforms set forth below.

    c)      Overseeing the Senior Care Facility operations and making recommendations regarding compliance with P.H.L. §§ 2803-c, 2803-d and 2895-b, 42 C.F.R. §§ 483.35, 80(c), 10 N.Y.C.R.R. §§ 412.14, 413.13, and other relevant healthcare regulations, including 10 N.Y.C.R.R. §§ 415.3, 415.5(h), 415.12(a)(3), 415.12(c), 415.12(i), 415.13(a), 415.15, 415.26(c), and 415.29; 18 N.Y.C.R.R. § 515.2; and 42 C.F.R. §§ 483.70(c), 483.25(b), 483.10(a), 483.24(b), 483.25, 483.35, 483.60 and 483.80.

d)      Making recommendations including but not limited to:

i.      Ensuring that the Senior Care Facility consistently operates with sufficient staffing of Certified Nurse Aids, Licensed Practical Nurses, and Registered Nurses to provide all required care to the Senior Care Facility's existing residents and any proposed new admissions and/or readmissions when appropriate to maintain sufficient staffing.

ii.     The Senior Care Facility's response to quality-of-care issues, which shall include an assessment of:

a.      The Senior Care Facility's ability to identify the problem;

b.      The Senior Care Facility's ability to determine the scope of the problem, including but not limited to whether the problem is isolated or systemic;

c.      The Senior Care Facility's ability to conduct a root cause

analysis;

d.      The Senior Care Facility's ability to create an action plan to respond to the problem;

e.      The Senior Care Facility's ability to execute the action

plan;

f.      The Senior Care Facility's ability to monitor and evaluate

whether the assessment, action, plan, and execution of that plan

was effective, reliable, and thorough.

iii.    Whether the Senior Care Facility residents receive care in

accordance with:

a.      Professionally recognized standards of care;

b.      Federal and New York State laws and regulations;

c.      The New York State Department of Health, Centers for Disease Control, Centers for Medicare and Medicaid Services, and the New York Office of the Medicaid Inspector General, directives and other guidance; and

       d.     The Senior Care Facility's own policies, providing said policies are clinically appropriate, and if they are not, identifying clinically appropriate policies.

       iv.     Ensuring resident's rights, health and safety are protected consistent with applicable statutes and regulations during any planned or actual transfers from the Senior Care Facility.

9.     Pursuant to the state court order, the Debtor and CHC entered into an Agreement to Engage Independent Health Monitor, made as of May 3, 2024 (a copy of which is attached hereto as <u>Exhibit C</u> (the "<u>IHM Agreement</u>").  Paragraph "2" of the IHM Agreement provides:

> Contracting Party [the Debtor] agrees to pay CHC the amounts as set forth on Schedule 4 hereto for any work performed by CHC.  CHC shall invoice Contracting Party for services on a monthly basis and Contracting Party shall pay CHC within fifteen (15) calendar days of receiving CHC's invoice.  All invoicing shall be transmitted electronically.  Any contractors or consultants who are not employees of CHC will be paid for their services by CHC directly.  The Contracting Party agrees not to contract directly with any CHC vendor or consultant at any time during the Term and for a minimum of 24 months following the termination of the Term.   Any payments that are late more than 10 calendar days will be subject to six (6) % interest rate per year.

A copy of the budget to be annexed as Schedule 4 to the IHM Agreement, agreed to by the Debtor and CHC is annexed hereto as <u>Exhibit D</u>.  CHC has performed its obligations under the IHM Agreement since it was entered into and, at the request of the Debtor, CHC has continued to render services to the Debtor after the commencement of this Chapter 11 case on the Petition Date.  CHC has been paid for all services rendered through and including December 31, 2024 and is not a pre-petition creditor in this case. [2]

10.     In order to comply with the state court order and enhance the Debtor's ability to better service its residents, the Debtor seeks to continue the retention of CHC as IHM pursuant to the terms of the IHM Agreement and Schedule 4 thereto.  The Debtor believes that it is in the

---

[2] There is presently an unpaid invoice for January services in the amount of $38,000, which the Debtor proposes to pay upon an order authorizing CHC's retention being entered.

best interests of the Debtor, creditors, and the bankruptcy estate for CHC to continue rendering IHM services to the Debtor and its residents.

### No Duplication of Services

11.     A Patient Care Ombudsman (PCO) has been appointed in this case and CHC's president has spoken with and is cooperating fully with the PCO, and will continue to do so.  Also, the Debtor has retained and may retain additional professionals during this case and CHC will work cooperatively with such professionals.

12.     CHC's services as IHM will not be duplicative with those of the PCO or any professionals retained by the Debtor.  The IHM will support the PCO in monitoring the quality of patient care, and not interfere with the PCO's duties. CHC's services are necessary to comply with the state court order appointing an IHM in the NY Attorney General's State Court special proceeding against Debtor. Furthermore, the IHM's role, in addition to monitoring patient care, encompasses regulatory compliance and other functions with which the PCO is not tasked under 11 U.S.C. § 333(b).

### CHC's Rates and Billing Practices

13.     The Debtor seeks authority to retain CHC consistent with prepetition practice and the IHM Agreement, at the hourly rates discussed below, as of January 1, 2025, payable monthly, as provided in the IHM Agreement, and subject to an order of the Court allowing final compensation to CHC.   CHC's hourly rates are designed to compensate CHC fairly for the work of its professionals and to cover fixed and routine overhead expenses.  CHC's rates being charged to the Debtor are the same rates CHC charges non-debtor clients.   Hourly rates vary with the experience and seniority of the individuals assigned and are subject to periodic adjustments to reflect economic and other conditions. CHC estimates approximately 64 hours will be necessary on a monthly basis to fulfill its duties as CHC.  Following are the range of rates charged by CHC:

| President Lisa Wickens-Alteri | $400 |
|---|---|
| Staff Consultants | $125 |

14.     In addition to the hourly billing rates set forth herein, CHC customarily charges its clients for identifiable, non-overhead expenses incurred and will charge such expenses to the Debtor consistent with prepetition practices.

15.     CHC will apply to the Court for final allowance of compensation and reimbursement of expenses for reasonable professional services performed and expenses incurred after the Petition Date in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable orders of the Court.  CHC will render monthly invoices to the Debtor which will be reviewed and paid by the Debtor on a monthly basis. All payments made by the Debtor to CHC during this Chapter 11 case shall be subject to entry of an order of the Court allowing final compensation to CHC.

## **Applicable Authority**

16.     The Debtor seeks authority to retain CHC as the IHM under section 327 of the Bankruptcy Code, which provides that a trustee (or debtor or debtor in possession, by virtue of sections 1101(1) and 1107(a)), subject to court approval—

> may employ one or more attorneys, accountants, appraisers, auctioneers, or *other professional persons,* that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a) (emphasis added).

17.     Section 330 of the Bankruptcy Code provides that "the court may award to…a professional person employed under section 327…reasonable compensation for actual necessary services."  11 U.S.C. § 330.  Further, section 330(a)(3) of the Bankruptcy Code provides that "[i]n determining the amount of reasonable compensation to be awarded to… [a] professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including the time spent on such services; [and] the rates charged for such services."

*Id.* The Debtor submits that the rate outlined in paragraph 13 meet the "reasonableness" standard in section 330 of the Bankruptcy Code.

18.     CHC's retention is being sought pursuant to the provisions of §§ 327(a) and 330 of the Code.  CHC will be paid in accordance with the IHM Agreement and budget, and rates set forth above and in the annexed Wickens-Alteri Declaration, and subject to final application for compensation and an order of this Court allowing final compensation to CHC.  Accordingly, the Debtor believes that CHC's retention on the terms and conditions proposed herein is appropriate and should be approved.

## **Notice**

19.     Notice of this Motion will be provided to: (i) the United States Trustee; (ii) those persons who have formally appeared and requested notice and service in this case pursuant to Bankruptcy Rules 2002 and 3017; (iii) the New York State Attorney General, (iv) the New York State Department of Health and (v) counsel to the official committee of unsecured creditors.

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtor respectfully requests entry of the Proposed Order and such other and further relief as is just and proper.

Dated:  February 5, 2025
New York, New York

**MANATT, PHELPS & PHILLIPS, LLP**

*/s/ Schuyler G. Carroll*
Schuyler G. Carroll
Russell E. Potter (admitted *pro hac vice*)
Thomas A. Whittington (admitted *pro hac vice*)
7 Times Square
New York, NY 10036
Tel: (212) 790-4500
scarroll@manatt.com
rpotter@manatt.com
twhittington@manatt.com

*Proposed Counsel to the Debtor*
*and Debtor-in-Possession*

**<u>Exhibit A</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                                    Chapter 11

Cold Spring Acquisition, LLC,[1]                          Case No. 25-22002 (SHL)

                        Debtor.
------------------------------------------------------X

## ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF CHC HEALTH CONSULTING, LLC AS INDEPENDENT HEALTHCARE MONITOR

Upon the application (the "Application")[2] of Cold Spring Acquisition, LLC (the "Debtor") for entry of an order authorizing the retention of an independent healthcare monitor, pursuant to the Agreement to Engage Independent Health Monitor, made as of May 3, 2024 (a copy of which is attached hereto as Exhibit C (the "IHM Agreement") and as more fully set forth in the Application; and upon the Wickens-Alteri Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having found that venue of the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that notice and opportunity for a hearing on the Application were appropriate under the circumstances and no other notice need be provided; and the Court having determined that the relief sought in the Application is in the best interests of the Debtor, its creditors, and all parties in interest, and that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    The Application is GRANTED as set forth herein.

---

1 The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Cold Spring Acquisition, LLC (4415).

2 Capitalized terms used but not defined in this Order shall have the meanings ascribed to them in the Application.

2.      Pursuant to section 327(a) of the Bankruptcy Code, Bankruptcy Rules 2014 and

2016, and Local Rules 2014-1 and 2016-1, the retention of CHC Health Consulting, LLC ("CHC"),

as Independent Healthcare Monitor, pursuant to the terms of the IHM Agreement, as modified by

this Order, is authorized.

3.      Pursuant to 11 U.S.C. Sections 105(a), 327(a), 328, and 331, that CHC shall be

authorized to be paid by the Debtor the fees provided for in the IHM Agreement and the budget

included therein, plus reimbursement of direct expenses related to its employment in this case,

during each month of its employment in this case, provided that CHC shall not be paid its monthly

fee and reimbursement of expenses until two (2) business days following the date that CHC.

through the Debtor's counsel, files with this Court and serves on the Office of the U.S. Trustee by

email, CHC's monthly statement for the month for which it seeks payment, containing a list of the

individuals at CHC, and their respective titles, who provided services during such monthly period,

their respective ordinary billing rates, the aggregate hours spent by each individual, and a

reasonably detailed breakdown of the disbursements incurred for which reimbursement is sought

(collectively, the "Requisite Information").

4.      CHC shall apply for final compensation for professional services rendered and

reimbursement of expenses incurred in compliance with sections 330 and 331 of the Bankruptcy

Code and the applicable provisions of the Bankruptcy Rules, the Local Rules and any applicable

procedures and orders of the Court, and all fees and expenses paid by the Debtor to CHC shall be

subject to entry of an order of this Court approving such fees and expenses.

5.      CHC, shall provide at least ten (10) business days' notice to the Debtor, the United

States Trustee, and any statutory committee appointed in this Chapter 11 Case before implementing

any increases in the rates set forth in the Application and such notice shall be filed with the Court.

6.      Notwithstanding any provision in the Bankruptcy Rules to the contrary, the terms and conditions of this Order are immediately effective, as of January 1, 2025, and enforceable upon its entry.

7.      The Debtor is authorized to take all reasonable actions necessary to effectuate the relief granted in this Order in accordance with the Application.

8.      This Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**IT IS SO ORDERED.**

Dated: _____, 2025
        White Plains, New York

_____
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Wickens-Alteri Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                                          Chapter 11

Cold Spring Acquisition, LLC,[1]
                                                                Case No. 25-22002 (SHL)
                        Debtor.
------------------------------------------------------X


**DECLARATION OF LISA WICKENS-ALTERI IN SUPPORT OF APPLICATION
FOR AN ORDER AUTHORIZING THE RETENTION OF
CAPITAL HEALTH CONSULTING, LLC, AS INDEPENDENT HEALTH MONITOR**

I, Lisa Wickens-Alteri, hereby declare that the following statements are true and correct to
the best of my knowledge after due inquiry as described herein:

1.      I am the President of Capital Health Consulting, LLC ("CHC"), and I will lead CHC
in the engagement with Cold Spring Acquisition, LLC (the "Debtor").  As the officer of CHC
responsible for fulfilling CHC's obligations as IHM, I have been actively involved in monitoring
patient care under the IHM order entered by the New York Supreme Court.  I and another member
of the CHC team are consistently onsite, review the resident records, assess resident incidents, review
care delivery, and meet with residents regularly.  I have visited the Debtor's Senior Care Facility
more than 80 times and have written and filed reports as required.

1.      I submit this declaration (this "Declaration") in support of the application (the
"Application")[2] by Cold Spring Acquisition, LLC (the "Debtor") for authority to retain CHC as
Independent Healthcare Monitor ("IHM").

2.      All facts set forth in this Declaration are based upon my personal knowledge or my
review of relevant documents.  To the extent any information disclosed herein requires amendment

---

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number, is: Cold
Spring Acquisition, LLC (4415).

[2] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to such terms in the
Application.

1

or modification as additional party-in-interest information becomes available to CHC, a supplemental declaration will be submitted to this Court reflecting such amended or modified information.

## Scope of Services

3.     In connection with the New York Attorney General's State Court special proceeding against Debtor and others, the Attorney General requested appointment of an Independent Health Monitor and recommended CHC. The New York State Supreme Court entered an order appointing CHC, and tasked CHC with the following:

a)     Being on-site at the Senior Care Facility no less than 10 calendar days per month.

b)     Visiting and inspecting the Senior Care Facility, reviewing documents regarding the Senior Care Facility, overseeing healthcare operations at the Senior Care Facility, ensuring that the Senior Care Facility improves healthcare outcomes for its residents, and ensuring that the Senior Care Facility and Debtor comply with the healthcare reforms.

c)     Overseeing the Senior Care Facility operations and making recommendations regarding compliance with P.H.L. §§ 2803-c, 2803-d and 2895-b, 42 C.F.R. §§ 483.35, 80(c), 10 N.Y.C.R.R. §§ 412.14, 413.13, and other relevant healthcare regulations, including 10 N.Y.C.R.R. §§ 415.3, 415.5(h), 415.12(a)(3), 415.12(c), 415.12(i), 415.13(a), 415.15, 415.26(c), and 415.29; 18 N.Y.C.R.R. § 515.2; and 42 C.F.R. §§ 483.70(c), 483.25(b), 483.10(a), 483.24(b), 483.25, 483.35, 483.60 and 483.80.

d)     Making recommendations including but not limited to:

i.     Ensuring that the Senior Care Facility consistently operates with sufficient staffing of Certified Nurse Aids, Licensed Practical Nurses, and Registered Nurses to provide all required care to the Senior Care Facility's existing residents and any proposed new admissions and/or readmissions when appropriate to maintain sufficient staffing.

ii.     The Senior Care Facility's response to quality-of-care issues, which shall include an assessment of:

a.     The Senior Care Facility's ability to identify the problem;

b.     The Senior Care Facility's ability to determine the scope of the problem, including but not limited to whether the problem is isolated or systemic;

   c.  The Senior Care Facility's ability to conduct a root cause

analysis;

   d.  The Senior Care Facility's ability to create an action plan to
respond to the problem;

   e.  The Senior Care Facility's ability to execute the action plan;

   f.  The Senior Care Facility's ability to monitor and evaluate
whether the assessment, action, plan, and execution of that plan was effective,
reliable, and thorough.

  iii.  Whether the Senior Care Facility residents receive care in accordance

with:

   a.  Professionally recognized standards of care;

   b.  Federal and New York State laws and regulations;

   c.  The New York State Department of Health, Centers for
Disease Control, Centers for Medicare and Medicaid Services, and the New York
Office of the Medicaid Inspector General, directives and other guidance; and

   d.  The Senior Care Facility's own policies, providing said
policies are clinically appropriate, and if they are not, identifying clinically
appropriate policies.

  iv.  Ensuring resident's rights, health and safety are protected consistent
with applicable statutes and regulations during any planned or actual transfers from
the Senior Care Facility.

  4.  Pursuant to the state court order, the Debtor and CHC entered into an Agreement to

Engage Independent Health Monitor, made as of May 3, 2024 (a copy of which is attached hereto

as <u>Exhibit C</u> (the "IHM Agreement"). Paragraph "2" of the IHM Agreement provides:

> Contracting Party [the Debtor] agrees to pay CHC the amounts as set forth on
> Schedule 4 hereto for any work performed by CHC. CHC shall invoice Contracting
> Party for services on a monthly basis and Contracting Party shall pay CHC within
> fifteen (15) calendar days of receiving CHC's invoice. All invoicing shall be
> transmitted electronically. Any contractors or consultants who are not employees of
> CHC will be paid for their services by CHC directly. The Contracting Party agrees
> not to contract directly with any CHC vendor or consultant at any time during the
> Term and for a minimum of 24 months following the termination of the Term. Any

payments that are late more than 10 calendar days will be subject to six (6) % interest rate per year.

A copy of the budget to be annexed as Schedule 4 to the IHM Agreement, agreed to by the Debtor and CHC is annexed hereto as <u>Exhibit D</u>. CHC has performed its obligations under the IHM Agreement since it was entered into and, at the request of the Debtor, CHC has continued to render services to the Debtor after the commencement of this Chapter 11 case on the Petition Date. CHC has been paid for all services rendered through and including December 31, 2024 and is not a pre-petition creditor in this case. [3]

5. In order to comply with the state court order, the Debtor seeks to continue the retention of CHC and CHC seeks to continue providing IHM services to the Debtor and the residents of the Debtor's Senior Care Facility.

## **CHC's Connections**

6. CHC has no connections to any party in interest other than those listed in Schedule 2 annexed hereto. CHC has determined that all such representations have been in matters unrelated to the Debtor and this case.[4]

## **CHC 's Disinterestedness**

7. I am advised that to be retained as IHM, CHC must be a "disinterested person", meaning that CHC: (i) is not a creditor, equity security holder, or an insider of the Debtor; (ii) is not, and was not, within 2 years before the date of the filing of Debtor's Chapter 11 case, a director, officer, or employee of Debtor; and (iii) does not have an interest materially adverse to the interest of the bankruptcy estate or of any class of creditors or equity security holders, by reason of any direct

---

[3] There is presently an unpaid invoice for January services in the amount of $38,000, which the Debtor proposes to pay upon an order authorizing CHC's retention being entered.

[4] CHC will conduct a periodic review of its files on an ongoing basis as it becomes aware of new Potential Parties-in-Interest. To the extent any information CHC disclosed requires amendment, modification, or supplementation as additional information becomes available, CHC will submit a supplemental declaration to the Court.

or indirect relationship to, or in connection with, or interest in, the debtor, or for any other reason. Based on this definition, I believe that CHC and I are both "disinterested" and qualified to serve as IHM of Debtor's Nursing Home.  CHC will supplement this Declaration if any facts or circumstances are discovered that require additional disclosure.[5]

## No Duplication of Services

8.     CHC understands that the Debtor has retained and may retain additional professionals during this case and agrees to work cooperatively with such professionals to avoid any duplication of services.

9.     CHC's services as IHM will not be duplicative with those of the Patient Care Ombudsman (PCO).  The IHM will support the PCO in monitoring the quality of patient care, and not interfere with the PCO's duties.  CHC's services are necessary to comply with the state court order appointing an IHM in the New York Attorney General's State Court special proceeding against Debtor.  Furthermore, the IHM's role, in addition to monitoring patient care, encompasses regulatory compliance and other functions with which the PCO is not tasked under 11 U.S.C. § 333(b).

## CHC's Rates and Billing Practices

10.     CHC's hourly rates are designed to compensate CHC fairly for the work of its professionals and to cover fixed and routine overhead expenses.  Hourly rates vary with the experience and seniority of the individuals assigned and are subject to periodic adjustments to reflect economic and other conditions. CHC estimates approximately 64 hours will be necessary on a monthly basis to fulfill its duties as IHC.  Following is the range of rates charged by CHC:

---

[5]  As disclosed to the State Court on December 1, 2024 in connection with the NY Attorney General's State Court special proceeding against Debtor and others, effective January 1, 2025, CHC is owned 50% by Lisa M. Wickens-Alteri and 50% by AF CHC Holdings LLC, which is owned 100% by the law firm, Abrams Fensterman, LLP ("AF"). In the State Court special proceeding, AF was counsel for defendants Esther Farkovits, a 25% member of Debtor, and her father, Benjamin Landa, and B&L Consulting, LLC.  Farkovits, Landa, and B&L were active parties in the State Court proceeding when it was removed to Bankruptcy Court.  I have been advised that AF previously represented Debtor in connection with Debtor's acquisition of the Nursing Home in 2016 but has not represented Debtor since January of 2022.   Finally, Patrick Formato, an executive partner at AF, is a co-manager of CHC but Lisa M. Wickens-Alteri is the CEO and manages the day to day operations of CHC.  Neither Mr. Formato nor anyone else affiliated with AF, has had and will not have any involvement in CHC's performance of its obligations as IHM.  I do not believe that any of the foregoing facts renders CHC or me not "disinterested" for purposes of appointment as IHM.

| President Lisa Wickens-Alteri | $400 |
|---|---|
| Staff Consultants | $125 |

11.     In addition to the hourly billing rates set forth herein, CHC customarily charges its clients for identifiable, non-overhead expenses incurred and will charge such expenses to the Debtor consistent with prepetition practices.

12.     Consistent with prepetition practice, CHC requests to be retained, pursuant to the IHM Agreement and the budget agreed to with the Debtor, with monthly payments of its hourly rates plus reimbursement of out-of-pocket expenses incurred on behalf of the Debtor for the preceding calendar month, commencing January 1, 2025, subject to approval by the court of a final fee application. CHC will provide the Debtor with monthly invoices detailing the services rendered in the preceding calendar month by tenth of an hour with the applicable billing rates and total dollar amount and details of all reimbursable expenses incurred in the preceding calendar month on behalf of the Debtor, and will file a final application for allowance of compensation and reimbursement of expenses for reasonable professional services performed and expenses incurred after the Petition Date in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable orders of the Court.

13.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 5th day of February, 2025.

/s/ Lisa Wickens-Alteri
Lisa Wickens-Alteri

6

## Schedule 1

### List of Potential Parties-in-Interest

**Debtor**

Cold Spring Acquisition, LLC

**Landlord**

Cold Spring Realty Acquisition, LLC

**Pre-petition lender**

Philipson Family, LLC
Bent Philipson

**DIP lender**

CHACQDIP, LLC

**Counsel for DIP Lender**

Daniel B. Besikof
Partner
Lowenstein Sandler LLP

**CRO**

Martin A. Cauz
Beechwood Associates

**Equity Holders**

Rochel David
Esther Farkovits
Leah Friedman
Joel Leifer
Estate of Deborah Philipson
Avi Philipson

**Special Litigation Counsel for Debtor**

Paul J. Kremer
Partner
Benesch Friedlander Coplan & Aronoff
LLP

**Special Labor Counsel for Debtor**

Josh Zuckerberg
Partner
Pryor Cashman LLP

**Special Litigation Counsel for Debtor**

Ira Lipsius
Counsel
Lipsius Benhaim LLP

**Special Healthcare Counsel for Debtor**

Judith Eisen
Partner
Garfunkel Wild LLP

**Government Entities**

NY State Department of Health
NY Attorney General
Department of Health and Human Services
Centers for Medicare and Medicaid Services

**Office of the United States Trustee**

Andrea B. Schwartz

**Counsel to 1199 National Benefit Fund**

Jessica Apter
Ryan Barbur
Partners
Levy Ratner, LLP

**Counsel for NY State Department of Health**

Kathy Marks

**Counsel for NY Attorney General**

Paul Mahoney
Christina Pinnola
Alee Scott

**HUD Lender**

Greystone

**Counsel to HUD Lender**

Jill Nicholson
Partner
Dentons

**Debtor's Key Employees**

Edline Severe Joseph – Administrator

**Debtor's Financial Services Support**

Ventura Services, LLC d/b/a Philosophy
Care Centers
Helena (Chaya) Bernstein – Controller
Mo Krigsman
Daniel Schaffer
Nehal Patel
The Graph Group
Graph MGA, LLC
Graph Management, LLC
Matthew Bachrach
Rachel Friedman
Signature Care Consulting

**Debtor's Litigation Support**

Sean Garner
Reliable Health Systems

**Debtor's Bank**

Metropolitan Commercial Bank

**Independent Healthcare Monitor**

CHC Health Consulting LLC
Lisa Wickens-Alteri

**Proposed Receiver/Buyer**

Jay Zelman, 378Sywood LLC

**Counsel to Proposed Receiver/Buyer**

Edward H. Burnbaum, Esq.
Partner
NBC Law

**Creditors**

1199 National Benefit Fund;
- Laverne James
American Health Benefit Trust
- Tammy Alanzo
- Health Facility Assessment Fund AD
- Jerome Alaimo
Specialty Rx Inc.
- Shimon Rosenberg
- Joel Zupnick
Comprehensive Care Solutions LLC
- Mark Kalmanowitz
Garfunkel Wild, P.C.
- Darrin Dowd
- Judy Eisen
- Andrew Schulson
Fresenius Medical Care
- Lacey Lawrence
AMBMCS Consulting Inc.
- Ms. R. Bienenfeld
- Ira Lipsius
KMK Associates
Isaac Akerman
Ultracare of Manhattan
- Kass Abcede
Reliable Health Systems LLC
- Sindi Qirici
Allstate Administrators
- Tammy Alanzo
Gallagher Bassett Services, Inc.
- Carmen D'Agostino
IV PICC Midline Service
- Ruth Tayag
Schwartz Sladkus Reich Greenberg Atlas LLP
- Jason Atlas
Milenia Health Benefit
- Tammy Alanzo
Five Star Staffing Solutions LLC
- Joe Schlussel
Graph Mga LLC
- Yair Zakai
Combined Insurance Company of America
Amwins Group Benefits, LLC
Legal Shield

**Creditors (continued)**

Prudent Consulting
- Isaac Weiner

Standard & Preferred Insurance Company, LLC

**Personal Injury Plaintiffs**

Carolyn Andreola
Yasmine Ashimole
Kathleen Barbara
Bartolotta Grace
Robert Bennett
Barbara Bento
Richard Billups
Emma Block
Maureen Bollinger
Bette Cachel
Edward Cody
Marlene Culotta
Miriam Cusicanqui (Herrera)
Joseph DeMartino
Marietta Dinnella
Janice-Summons Ezell
Virginia Ferraro
Arthur Firmbach
James Ford
Scott Garrison
Camille Germaine
Mary Giannino
Sheila Gillespie
Stacie Green
Gail Hain
Richard Hanson
Diane Hoban
Vincent Imperial
Altagracia Irizarry
Lorraine Kalleberg
Christina Kim
Theresa LaFonte
Pierre Lorins
Walter Luszczyk
Jorge Manzanilla
Michael Massetti
Richard McCloud
James McCormick
Lawrence McCourt
Kathleen McGreevey

Edward McKee
Sheryl Mendelson
Lorraine Mierzejewski
Theodore Muschio
John Muzio
Joan Orr
Margaret Parsons
Erminio Pastore
Lori Pesapane
Benito Picinic
Rose C. Rizzo
Elizabeth Rosenthal
Stuart Schisel
Neal Schwartz
Genaidi Gary Shafer
Ted Shapiro
Jeannine Stimpfel
William Thompson
Paula Tomasello
Judy Torres
Rudolph Tscherne
Chaterine Virone
Anthony Walsh
Kathleen Wieckhorst

**Counsel to Personal Injury Plaintiffs**

Kenneth Oliver, Dorf Nelson & Zauderer LLP

Robert Cristiano, Wilson Elser Moskowitz Edelman & Dicker LLP

Lori Semlies, Wilson Elser Moskowitz Edelman & Dicker LLP

Brian Alebiosu, Wilson Elser Moskowitz Edelman & Dicker LLP

Michael Janes, Rubin Paterniti Gonzalez Rizzo Kaufman LLP

James Makris, Sheeley LLP

Mairead Maguire, Sheeley LLP

Scott Frycek, Lewis Johs Avallone Aviles LLP

**<u>Counsel to Personal Injury Plaintiffs (continued)</u>**

Greg Mondelli, Lewis Johs Avallone Aviles LLP

Phil Dorn, Kaufman Borgeest & Ryan LLP

Keith Kaplan, Kaufman Borgeest & Ryan LLP

Gonzalo G. Suarez, Kaufman Borgeest & Ryan LLP

Joseph Furlong, Tromello McDonnell & Kehoe

**<u>Schedule 2</u>**
**Connections List**

| Matched Entity | Relationship To Debtor | Relationship To CHC |
|---|---|---|
| Esther Farkovits | Member | Represented by partial indirect owner Abrams Fensterman LLP as respondent in *New York v. Cold Spring Acquisition, et al.* |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**<u>Exhibit C</u>**

**IHM Agreement**

**AGREEMENT TO ENGAGE**
**INDEPENDENT HEALTH MONITOR**

This ("Agreement") is made as of this 3rd day of May, 2024, between **Cold Spring Acquisitions, Inc. (d/b/a Cold Spring Hills Nursing and Rehabilitation)** ("Contracting Party" or the "Facility") and **Capital Health Consulting** ("CHC") to be engaged as an Independent Health Monitor ("IHM").

**WHEREAS,** Cold Spring Acquisitions, Inc. (d/b/a Cold Spring Hills Nursing and Rehabilitation)is a New York corporation, having offices at 378 Syosset-Woodbury Road, Woodbury, NY 11797; and

**WHEREAS,** CHC is a duly organized as an Limited Liability Company ("LLC"), having an address at 136 State Street, Albany, NY 12207; and

**WHEREAS,** Contracting Party wishes to engage CHC for the sole purpose of performing the duties and responsibilities of an IHM as required under the Decision and Order issued on March 15, 2024 in State of New York v. Cold Spring LLC, et al. , Index No. 617702/2022 (Sup. Ct. Nassau County (the "Court") (the "Merits Decision") and  as set forth herein and in the Order Appointing Independent Healthcare Monitor by the Court on April 12, 2024 (the "IHM Order");

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth below, the parties agree as follows:

1. **Professional Independent Review Services.**  From the date of this Agreement until such time that the Court or a Party terminates this Agreement pursuant to paragraph "7" herein, CHC shall provide services as set forth in Schedule 1 hereto.

   a.  It is understood that Schedule 1 sets forth the duties and responsibilities of CHC to undertake the services of the IHM, and that Schedule 1 was drafted in accordance with the powers and duties conferred upon CHC in the IHM Order.

   b.  CHC will retain the services of qualified individuals in performing the services of an IHM as set forth on Schedule 2 as such schedule may be amended in writing from time to time; provided, however that any such individuals shall comply with the terms hereof.  All individuals retained in relation to this engagement shall execute Compliance Acknowledgments as required to ensure independence, confidentiality, HIPAA work force training and confirm that there are no conflicts of interests relating to the Contracting Party and shall be disclosed to the Contracting Party prior to commencing work on this engagement. The Contracting Party shall be responsible for ensuring all such documents and any conflict review is conducted by the Contracting Party.  Such Compliance Acknowledgments shall be completed prior to commencement of services hereunder.  Compliance Acknowledgments shall be in the form set forth on Schedule 3 hereto.  Any dispute over the qualifications of individuals retained to perform services in relation to this engagement will be subject to the dispute procedures of paragraph 25-26 of the IHM Order.

1

c.   Contracting Party shall fully and promptly cooperate with CHC and any workforce of CHC qualified under paragraph 1(b) above, and shall ensure that all its employees, agents, officers, and members do the same.

d.   Contracting Party shall provide CHC and any of its workforce qualified under paragraph 1(b) above, with 24-hour remote access to all of the EMR necessary for the IHM to perform Services. CHC's "access" rights are further defined in paragraph 20 of the IHM Order, which Contracting Party agrees to abide by.

e.   CHC shall make all recommendations in writing and submit the same by email to the counsel for the Contracting Party, the Administrator of the Contracting Party, the designated Attorney General Office attorney, as per the IHM Order paragraphs 16 and 30.

2.   <u>Compensation</u>. Contracting Party agrees to pay CHC the amounts as set forth on Schedule 4 hereto for any work performed by CHC. CHC shall invoice Contracting Party for services on a monthly basis and Contracting Party shall pay CHC within fifteen (15) calendar days of receiving CHC's invoice. All invoicing shall be transmitted electronically. Any contractors or consultants who are not employees of CHC will be paid for their services by CHC directly. The Contracting Party agrees not to contract directly with any CHC vendor or consultant at any time during the Term and for a minimum of 24 months following the termination of the Term. Any payments that are late more than 10 calendar days will be subject to six (6) % interest rate per year.

3.   <u>Compliance</u>.

a.   Notwithstanding any other provision of this agreement, CHC shall not be responsible for ensuring that any resident care services provided within the licensed facilities of the Contracting Party comply with all pertinent provisions of federal, state and local statutes, rules and regulations.

b.   Each Party shall retain and make available, upon request, for a period of six (6) years from the date that the IHM Order is no longer in effect, any documents, records, information, work papers or data of any type used to prepare or support any deliverable required under the terms of the Decision, including any books, documents and records which are necessary to certify the nature and extent of the costs thereof when requested by the Court.

c.   The parties agree to cooperate in meeting any requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) as they may apply to (1) the implementation of the Proposal (e.g., to assure restricted access regarding electronic records and appropriate firewalls preventing unauthorized access by third parties) and/or (2) any required status as a Business Associate as defined thereunder and shall execute a Business Associate Agreement to this effect in the form set forth on Schedule 5 hereto. All individuals and/or entities used by CHC hereunder who are not designated as CHC workforce (i.e., non-employees of CHC) shall sign Exhibit "A" to the Business Associate Agreement before performing any

2

services which involve access to or retention of Protected Health Information (PHI).

d.      CHC represents and warrants that neither CHC nor any staff members or individuals and/or entities contracted to perform services under this Agreement are ineligible individuals, i.e., sanctioned or excluded on the NHS OIG List of Excluded Individuals/Entities (LEIE), the GSA Excluded Party Listing System (EPLS), or the New York State List of Restricted, Terminated or Excluded Individuals or Entities.

e.      CHC represents: (1) neither CHC nor any subcontractor for this engagement are excluded from participation under any federal health care program, as defined under 42 U.S.C. sec 1320a-7b(f), for the provision of items or services for which payment may be made under a federal health care program; (2) CHC has not arranged or contracted (by employment or otherwise) with any employee, contractor or agent that CHC knows or should know are excluded from participation in any federal health care program; and (3) no final adverse action, as such term is defined under 42 U.S.C. sec 1320(a)-7(e)g has occurred or is pending or threatened against CHC for this engagement or to their knowledge against any employee, contractor or agent engaged to provide items or services under this Agreement (collectively "Exclusions/Adverse Actions"). CHC, during the term of this Agreement, shall notify the Contracting Party of any Exclusions/Adverse Actions within thirty (30) days of learning of any such Exclusions/Adverse Actions and provide Contracting Party with the basis of the Exclusions/Adverse Actions.

4.      <u>Insurance</u>. At CHC's own expense, CHC will maintain liability insurance policies for claims arising in connection with services provided by CHC under this Agreement including, without limitation, general liability, professional liability, workers' compensation, employer's liability and errors and omissions coverage. Upon request, CHC will furnish a certificate of such insurance to Contracting Party,

5.      <u>CHC Status</u>. It is agreed that CHC, in performing responsibilities under this Agreement, is acting as an independent contractor for all purposes. Nothing in this Agreement shall be construed as creating a partnership, joint venture, employment relationship, agency, legal representation, or other relationship between Contracting Party and CHC or between the State of New York (including the New York Attorney General's Office) and CHC for any purpose, including, but not limited to, unemployment insurance benefits, Workers' Compensation benefits, employee benefits, expense reimbursement, vicarious liability, professional liability coverage, or indemnification. Neither Contracting Party nor CHC shall have the right, power, or authority to obligate or bind the other in any manner not specified in this Agreement. CHC hereby warrants and represents that it's not acting as an agent of the State of New York or the New York Attorney General's Office in connection with this engagement or the performance of CHC's duties under the IHM Order.

6.      <u>No Limitation on Other Services</u>. CHC is free to provide professional services to other clients, provided that such services do not interfere with the performance of services under this Agreement, are not adverse to the interests of Contracting Party, and CHC does not

3

reveal any confidential or proprietary information obtained in the course of rendering services.

7. <u>Termination of Agreement</u>. This Agreement is in effect until terminated upon an order of the Court. Notwithstanding the foregoing sentence, the Agreement may be terminated by the parties or a party, subject to the Court's prior approval, on the following conditions:

    a. Contracting Party may terminate this Agreement with cause, upon 30 days' written notice. For purposes of this Agreement, "cause" shall mean (1) failure to perform the material terms of this Agreement after receipt of a 10-day written notice outlining the terms of non-compliance and referencing the specific sections of this Agreement that have been listed; (2) violation of any laws or any conditions that precludes CHC from performing its obligations under this Agreement; or (3) CHC's bankruptcy or financial insolvency that precludes it from performing services under this Agreement.

    b. This Agreement may be terminated by mutual written consent of the parties.

    c. This Agreement shall terminate upon the earlier of the appointment of a receiver under Public Health Law Section 2810 or the approval by the Public Health and Health Planning Council of a change of ownership of the Facility.

The effective date of any such termination will be established as part of a transition plan and with the prior written approval of the Court and the effective date for any termination will be no less than 30 days from the Court's approval. Upon the termination of this Agreement, the Contracting Party shall only be liable to CHC for any outstanding invoices or services rendered prior to the effective date of its termination of this Agreement. CHC agrees to cooperate in a transition plan between CHC and the proposed replacement IHM.

8. <u>Confidential Information</u>.

    a. The parties hereby agree to keep the terms of this Agreement confidential and shall not disclose such terms except as may be required by law. To the extent that any litigation results in (i) the need to disclose the terms of this Agreement or (ii) the need to disclose Confidential Information (as defined herein), the parties agree to request that the appropriate Court or tribunal maintain all such disclosure under seal pursuant to a confidentiality agreement between the parties. Confidential Information shall include the terms of this Agreement and any information which the Contracting Party providing such information, in its reasonable discretion, considers to be confidential and proprietary or sensitive to such Party, whether such information (a) is disclosed orally or, in writing, in any medium, and/or (b) was provided on, before, or after the effective date hereof. Confidential Information shall include, but not be limited to such confidential and proprietary information included in business records and plans; financial statements; patient lists and records; patient and treatment protocols; medical procedures and volumes; insurance mix and reimbursements; customer lists and records; trade secrets; technical information; products; product design information; pricing structure;

4

costs; computer programs and listings; source code and/or object code; copyrights and other intellectual property. Confidential Information shall further include any information or summaries prepared or derived by CHC and/or its employees or contractors hereto which contains any Confidential Information of the Contracting Party. Notwithstanding the foregoing, Confidential Information shall not be deemed to include any information that (a) was known to CHC prior to receipt from the Contracting Party (other than as a result of a disclosure made directly or indirectly in violation of this Agreement); (b) was lawfully obtained by CHC from a third party who is not known by the Contracting Party to be under any obligation of confidentiality; (c) is or becomes publicly available other than as a result of a violation of this Agreement; or (d) was or is independently developed by CHC without using or referring to Confidential Information of the Contracting Party and without violating the Contracting Party's obligations hereunder.

b.     CHC shall maintain strict confidentiality of all information both oral and written obtained or developed pursuant to this Agreement. Upon expiration of this Agreement, CHC shall retain any Confidential Information as may be required to fulfill obligations under the Decision for a period of six (6) years but shall not disclose same except as required by law, or by the IHM Order.

c.     Notwithstanding any confidentiality obligations under this Agreement, the parties may disclose information in order to comply with any filing, administration of this Agreement, or dispute-resolution requirements of the IHM Order (e.g., paragraph 25 through 26 of the IHM Order).

9.     <u>Indemnification</u>. The Contracting Party agrees to indemnify, defend and hold CHC, its affiliates, directors, officers, members, managers, employees, independent contractors, attorneys and agents (collectively, the "Indemnified Party") harmless from and against any and all liability, claim, loss, damage or other expense of any kind whatsoever, including but not limited to reasonable attorneys' fees ("Loss") arising from or related to any claim by any third party asserted against the Indemnified Party, arising from or related to the Indemnified Party's performance of Services under this Agreement, except to the extent such liability, claim, loss, damage or other expense arises from intentional wrongdoing and/or reckless acts of CHC.

10.    <u>Limitation of Liability</u>. In no event shall the Indemnified Party, as defined in this Agreement, be liable to Contracting Party or any of its employees, agents, contractors, officers, or Governing Body for any indirect, punitive, special, exemplary, incidental or consequential damages (including loss or disclosure of data, data recovery or reconstruction, service interruption, breach response, lack of compliance, revenue, profits, use or other economic advantage, or losses resulting from erasure, damage, destruction or other loss of data or the cost associated with recovering such information) arising out of or in any way connected with the Services or this Agreement. Contracting Party agrees that any claim against the Indemnified Party or cause of action related to this Agreement, or any Services, must be filed no later than 180 days after the events underlying the claim, cause of action or any alleged error are discovered or could reasonably have been discovered by Contracting Party. Further, Contracting Party agrees that failure to assert a

5

claim or bring a cause of action within this 180-day limitations period will forever bar the Contracting Party's right to further pursue a claim arising out of the same error, circumstances, or events. The maximum aggregate liability of Indemnified Party arising out of or relating to this Agreement or the Services under any theory of liability (including without limitation tort, contract, strict liability or any other legal or equitable theory) will not exceed the amount of Fees paid to the Indemnified Party during the 180-day period preceding the Loss provided, however, that Indemnified Party's liability for intentional wrongdoing shall not be limited under this paragraph.

11.    Choice of Law, Venue, and Jurisdiction. This Agreement shall be interpreted, construed, and governed by and under the laws of the State of New York. The exclusive venues of all actions brought concerning any matters relating to or arising from this Agreement are the federal and state courts of New York having jurisdiction over claims arising in Nassau County, and CHC consents to the jurisdiction of these courts.

12.    Notices. All notices, requests, demands, and other communications pursuant to this Agreement shall be in writing and shall be deemed to have been duly given and effective on delivery, if hand delivered, or two (2) business days after mailing, if mailed, postage paid, by certified or registered mail, return receipt requested, to the parties intended or its assignee, at the following addresses or any other address provided in writing to the other party:

Contracting Party:

Cold Spring Acquisitions, Inc. d/b/a Cold Spring Hills
Nursing and Rehabilitation
378 Syosset-Woodbury Road
Woodbury, NY 11797

With copies to:

Garfunkel Wild, P.C.
111 Great Neck, New York – 6th Floor
Great Neck, New York 11021
Attention: Judith A. Eisen, Esq.
Electronic Mail Address: jeisen@garfunkelwild.com


Independent Health Monitor:

Capital Health Consulting
136 State Street
Albany, NY 12207


Where copies are required to be provided to the Court under the IHM Order, all notices to CHC shall also be copied to the Court, **in electronic format only**.

6

13.    Amendments. Unless as provided in paragraph 1, this Agreement may not be modified, revised, altered, or extended in any manner, or superseded except by an instrument in writing signed by the parties.

14.    Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument representing the agreement of the parties.

15.    Non-Waiver. The failure of any of the parties to enforce any provision or provisions of this Agreement shall not be in any way construed as a waiver of any provision or provisions, nor shall it prevent said parties from subsequently enforcing each and every other provision of this Agreement.

16.    Severability. If any provision or clause of this Agreement or the application thereof to any parties is held to be invalid by a court of competent jurisdiction, then such provision shall be severed therefrom, and such invalidity shall not affect any other provision of this Agreement, the balance of which shall remain and have its intended full force and effect.

IN WITNESS WHEREOF, the parties hereto, by authorized representatives, have duly executed this Agreement on the date first hereinabove written.

Capital Health Consultin, LLC

By: _____

Title: President & CEO

Cold Spring Acquisition, Inc. d/b/a Cold Spring
Hills Nursing and Rehabilitation

By: _____

Title: MANAGING MEMBER

7

## SCHEDULE 1

### SERVICES

CHC shall provide the following work and services to the Contracting Party (the "Services"):

A.  Monitor and provide input concerning the Contracting Party's compliance with New York State Public Health Law §§ 2895-b. (Nursing Home Staffing Levels), 2803-c (Rights of Patients in Certain Medical Facilities) 2803-d (Reporting Abuses of Persons Receiving Care or Services in Residential Health Care Facilities) and the governing regulations (10 NYCRR Part 415) as deemed appropriate by IHM.  Any monitoring required per the IHM Order shall occur for no less than 10 calendar days per month, on a schedule mutually agreed to by the parties.    At no time will CHC provide legal opinions or determinations concerning the Contracting Party's compliance with any law, regulation, or guideline.

B.  Visit and inspect the Contracting Party's facility at any time, review all documents regarding the Contracting Party, assist and provide consulting to the Administrator and the Governing Body of the Contracting Party about the healthcare outcomes for the Contracting Party's residents and compliance with healthcare reforms, as set forth in the IHM Order.  At no time will CHC provide legal opinions concerning the Contracting Party's compliance with any law, regulation, or guidelines.

C.  Monitor the Contracting Party's operations, and provide recommendations regarding compliance with PHL 2803-c, 2803-d and 2895-b, 42 CFR 483.35 and 483.70(c), 10 NYCRR 412.14 and 413.13, and the regulations cited in the IHM Order, paragraph 10.

D.  Make recommendations to the Contracting Party on how to improve healthcare outcomes, compliance regarding staffing requirements, quality-of-care issues. All objections by Contracting Party to recommendations of CHC shall be made in accordance with paragraph 23 of the IHM Order.

E.  Attend meetings, as deemed appropriate by IHM, including but not limited to weekday morning meetings convened to review quality of care issues; family council meetings; corporate compliance meetings held quarterly; and monthly quality assurance meetings. Meetings can be in-person or remote, as decided by the parties.

F.  Participate in any closure planning process, as per paragraph 29 of the IHM Order.

4885-4679-8511v.4

## SCHEDULE 2

**LIST OF CHC STAFF**

## SCHEDULE 3

## COMPLIANCE ACKNOWLEDGEMENT

By signing this statement I acknowledge that I have been engaged as a part of the workforce of Capital Health Consulting ("CHC"), either as an employee and/or an independent contractor of CHC and that I will be subject to, and will agree to adhere to, all policies and procedures set forth in the agreement appointing CHC as the Independent Health Monitor (IHM) for Cold Spring Hills Nursing and Rehabilitation ("CSH"), including all the exhibits and related agreements to the Agreement, such as the Business Associate Agreement. I further acknowledge, represent and agree to the following compliance standards:

A.      I will abide by all conflict of interest policies which are applicable to CSH or required as part of my services by CSH.

B.      I shall not have, nor have I had in the past, any additional business relationships or engagements, beyond the proposed IHM engagement, with CSH.

C.      Prior to providing services, I will attend all required orientations and submit any necessary information and/or consents as may be required by CSH. This includes, but is not limited to the following: Review and orientation as to all appropriate rules and regulations relating to CSH, including New York State statutes and regulations concerning the Medicaid program, resident rights, resident abuse, mistreatment or neglect and confidentiality.

D.      Prior to providing services in connection with the CSH engagement and annually thereafter, I will have received, read and agreed, by a signed acknowledgement of receipt, to be legally bound by the policies and procedures of CSH as set forth in the Business Associate Agreement, and to all applicable requirements under the Health Insurance Portability and Accountability Act ("HIPAA"). CSH will ensure that I receive any such annual training or documents for affirmation and acknowledgment. I agree not to use, disclose, publish, share, or otherwise divulge any information held by CSH, CSH, or relating to any resident, patient or family member, without the express written consent of CHC and CSH, except as required by law.

Print Name Lisa Wickens- Alteri

Signature _____

Date May 3, 2024

10

## SCHEDULE 4

## COMPENSATION

# SCHEDULE 5

## BUSINESS ASSOCIATE ADDENDUM

This Business Associate Addendum (Addendum) supplements and is made a part of the Business Agreement (as defined below) which was executed by and between <u>Cold Spring Hills Nursing and Rehabilitation</u> (hereinafter "Covered Entity" and <u>Capital Health Consulting</u> (hereinafter "Business Associate")

### BACKGROUND:

A.   The purpose of this Addendum is to comply with, and satisfy certain standards and requirements of the Health Insurance Portability and Accountability Act of 1966, its related regulations (45 C.F.R. parts 142 and 160-164), as well as any amendments or official guidelines promulgated thereunder (hereinafter. "HIPAA").

B.   The Covered Entity entered into a service agreement/s (hereinafter "Business Agreement") which may include the disclosure of certain information to the Business Associate and/or access to information, some of which may constitute protected health information (PHI), as that term is defined under HIPAA and hereinafter, for the Business Associate's access, receipt and/or use in providing services to the Covered Entity. This service agreement is referred to in this Addendum as the "Business Agreement".

C.   The Covered Entity is considered to be a "Covered Entity" under HIPAA. As a Covered Entity, the Covered Entity is required to ensure that the Business Associate enter into this Addendum to protect the privacy and confidentiality, and provide for the security, of PHI which may be disclosed to the Business Associate.

### AGREEMENT:

NOW THEREFORE, the parties agree to the following:

### Section 1 —General Obligation and Definitions:

1.1    Generally, in order to carry out its functions under the Business Agreement, the Business Associate will he required to have access to PHI maintained by the Covered Entity. Business Associate shall My comply with all obligations imposed on Business Associates under the HIPAA Privacy Rule regarding HIPAA Business Associate's use, disclosure or creation of PHI received from, or created or received by, the Business Associate on behalf of the Covered Entity.

1.2    Terms used, but not otherwise defined in this Addendum, will have the same meaning as those terms in 45 CFR Parts 160 and 164. The following definitions shall apply to this Addendum:

"HITECH Act" shall mean the Health Information Technology for Economic and Clinical Health, passed as part of the American Recovery and Reinvestment Act of 2009 (ARRA). This term also includes all regulatory issuances and guidelines as published. by the

12

Secretary and incorporated by reference therein, including the security breach notification requirements of 45 CFR Part 164, Subpart D.

"Individual" shall have the same meaning as the term "individual" in 45 CFR 164.501 [i.e. the person who is the subject of protected health information] and includes any person/s who qualify as a personal representative in accordance with 45 CFR 164.502(g).]

"Information" shall mean any "health information", whether oral, electronic or recorded in any form or medium, provided and/or made available by the Covered Entity (Covered Entity) to the Business Associate, and has the same meaning as the term "individually identifiable health information" as defined by 45 CFR 160,103.

"Parties" shall mean the Covered Entity and Business Associate.

"Privacy Rule" shall mean the Standards for privacy of individually Identifiable Health Information as per 45 CFR Parts 160 and 164.

"Protected Health Information" (PHI) as defined in 45 CFR 164.501 and shall include "electronic" PHI.

"Secretary" shall mean the Secretary of the Department of Health and Human Services or Office of Civil Rights (OCR)/or agents.

## Section 2— Scope of Permitted Uses and Disclosures:

2.1    Business Associate shall use and/or disclose PHI only as specified in the Business Agreement, or permitted or required by this Addendum, or otherwise as required by law.

2.2    Business Associate may disclose PHI to, and permit the use of PHI by, its employees, contractors, agents or other representatives only if and to the extent directly related to, and necessary for, the performance of the services for or on behalf of the Covered Entity. Disclosure of PHI to, and use of PHI by, the Business Associate is subject to Sections 3 and 5 below.

2.3    Business Associate represents and warrants that it shall request from the Covered Entity no more than the minimum PHI necessary to perform the services.

2.4    Business Associate shall not use or disclose PHI in a manner:

(a)    inconsistent with the Covered Entity's obligations under HIPAA,

(b)    that would violate the HIPAA Privacy Rule if disclosed or used in such a manner by the Covered Entity.

(c)    to third parties, including contractors, subcontractors and agents, for the proper management and administration of the Business Associate's operations or to carry out the Business Associate's responsibilities unless the Business Associate complies with this Addendum, including specifically Sections 2.2 and 5.1 hereof

13

and further (A) obtains reasonable assurances from the persons to whom PHI is disclosed that such parties will hold such PHI in confidence to be used and further disclosed only as required by law and (B) that such parties shall notify the Business Associate of any instances of which it is aware in which the confidentiality of the PHI has been breached as more fully set forth herein below.

2.5     Enhanced Security Standards. In addition to the requirements and obligations set forth hereinabove, the Business Associate agrees to comply with the prohibitions which apply to Covered Entity as to the uses of PHI as well as the requirements relating to security and privacy made applicable to the Covered Entity under Part 1 of Subtitle D of the HITECH Act, including, the following:

(a)     To the extent Business Associate accesses, maintains, retains, modifies, records, stores, destroys, or otherwise holds, uses or discloses unsecured PHI, as defined in the HITECH Act, upon discovery of a security incident or breach pertaining to unsecured PHI, notify the Covered Entity of such breach within forty eight (48) hours of the Business Associate's discovery thereof and comply with the terms of Section 4 below;

(b)     Comply with the "Minimum Necessary" requirements of Section 13405 of the HITECH Act when using or disclosing PHI or when requesting PHI from a covered entity, as defined in the HIPAA Privacy Standards set forth at 45 CFR Part 164, which shall include the requirements of the Secretary's "Minimum Necessary" Guidance when enacted;

(c)     Except to the extent permitted in Section 13405(d)(2) of the HITECH Act, not directly or indirectly receive remuneration in exchange for any PHI relating to an individual unless pursuant to a valid authorization by the individual, his or her personal representative, in compliance with 45 CFR Section 164.508 and that includes a specification as to whether the PHI can be further exchanged for remuneration by the entity receiving the individual's PHI;

(d)     Business Associate shall comply with all applicable federal and state laws relating to privacy, security and confidentiality of the information provided to Business Associate under this Addendum, Prior to any direct communications with any patients (or duly authorized representative) of the Covered Entity, the Business Associate will notify the Covered Entity and will provide an opportunity to the Covered Entity for coordination of notice, including a reasonable time to provide for the form and content of such notice.

(e)     Comply with all laws, rules and regulations regarding limitations on marketing and fundraising communications which prohibit such communications unless expressly authorized by the individual as required by law and upon consent by the Covered Entity.

14

2.6     Comply with the following re-disclosure, amendment and accounting requirements:

(a)     Upon the request of the Covered Entity for PHI of an individual which was disclosed to the Business Associate pursuant to this Agreement, make available to the Covered Entity such PHI within ten (10) days of the Covered Entity's request for same;

(b)     Upon receipt from the Covered Entity of a written amendment to an individual's PHI, immediately incorporate such amendment to the individual's PHI maintained by the Associate;

(c)     Document disclosures of PHI as would be required for the Covered Entity, under the HIPAA Privacy Standards as set forth at 45 CFR Part 164, to respond to a request by an individual, his/her personal representative, for an accounting of disclosures of PHI;

(d)     Upon the request of the Covered Entity for an accounting of disclosures made by the Associate of an individual's PHI, provide the Covered Entity, within twenty (20) days of such request, with such an accounting which shall include the date of the disclosure, the name of the entity or person who received the PHI and, if known, the address of such entity or person, a brief description of the PHI disclosed and a brief statement of the purpose of the disclosure that reasonably informs the individual of the basis for the disclosure, or such documentation in lieu of such statement as permitted by 45 CFR Section 164.528 as same currently provides or may hereinafter be amended;

(e)     Upon the request of an individual from whom the Business Associate has received PHI from the Covered Entity, his/her personal representative, except where access to PHI may be denied to a personal representative in accordance with 45 CFR Section 164.502, as same currently exists or may hereinafter be amended, or pursuant to an authorization complying with the requirements of 45 CFR Section 164.508, as same currently exists or may hereinafter be amended, provide access (on notice to Covered Entity and in cooperation with Covered Entity) to the individual's PHI for inspection and/or copying to such individual, his/her personal representative or authorized individual;

(f)     Make appropriate disclosures when required by the Secretary of the United States Department of Health and Human Services or his/her designee under 45 CFR Part 160, Subpart C, to investigate or determine the Associate's compliance with 45 CFR Part 164, Subpart E: and

(g)     Disclose to the Covered Entity or the individual or his/her designee as necessary to satisfy the Covered Entity's obligations under 45 CFR Section 164.524(c)(2)(ii) and (3)(ii) with respect to the individual's request for an electronic copy of PHI and/or to satisfy the Covered Entity's legal responsibilities under State and Federal

15

law as directed by the Covered Entity and pursuant to the required time limitations imposed by law.

## Section 3— Safeguards for the Protection of PHI:

3.1    Business Associate represents and warrants that it shall implement and maintain appropriate security safeguards to ensure that PHI is not used or disclosed by Business Associate in violation of this Addendum. Business Associate further represents that only those employees or agents who have a need to know or need to have access to PHI will be provided such access or knowledge of PHI.

3.2    Business Associate will assure compliance with all Privacy Rule and HITECH Act workforce training requirements with regard to its employees and shall further assure that all contractors, agents or entities which possess or create PHI as required under this Addendum execute a written PHI Confidentiality Addendum described in Section 5 below.

3.3    To the extent the Business Associate creates, receives, maintains or transmits electronic PHI on the Covered Entity's behalf, the Business Associate further agrees to: (i) implement or maintain administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of such electronic PHI as required by 45 CFR Part 164, Subpart C, including but not limited Sections 164.308, 164.310, 164.312 and 164.316; (ii) ensure that any agent, including a subcontractor, to whom the Business Associate provides such information agrees to implement reasonable and appropriate safeguards to protect such electronic PHI; and (iii) report to the Covered Entity any security incident.

3.4    The Business Associate will ensure proper training and safeguards are in place so that disclosure of PHI is limited to the "minimum necessary" as defined under the HITECH Act and the Privacy Rule, including the standards set forth in 45 CFR 164.514 which require that:

(a)    when using or disclosing protected health information or when requesting protected health information from another covered entity; a covered entity must make reasonable efforts to limit protected health information to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request.

(b)    limiting any request for protected health information from the Covered Entity to that which is reasonably necessary to accomplish the purpose for which the request is made, and when requesting such information from other covered entities.

(c)    For a request that is made on a routine and recurring basis, a covered entity must implement policies and procedures (which may be standard protocols) that limit the protected health information requested to the amount reasonably necessary to accomplish the purpose for which the request is made.

(d)    For all other requests, a covered entity must: (A) Develop criteria designed to limit the request for protected health information to the information reasonably necessary to accomplish the purpose for which the request is made; and (B) Review -requests for disclosure on an individual basis in accordance with such criteria.

16

(e)    For all uses, disclosures, or requests to which the requirements in paragraph (d) of this section apply, a covered entity may not use, disclose or request an entire medical record, except when the entire medical record is specifically justified as the amount that is reasonably necessary to accomplish the purpose of the use, disclosure, or request.

3.5    Unless otherwise permitted under 45 CFR Part 164, Subpart E, the Associate shall not sell PHI, For purposes of this Agreement, a sale of PHI is defined at 45 CFR Section 164.502(c)(ii),

## Section 4— Reporting and Mitigating the Effect of Unauthorized Uses or Disclosures:

4.1    Business Associate will report in writing, using the "Security Incident Report" (attached Exhibit "A"), to the Covered Entity's Privacy Officer, as soon as practicable and in all events no later than forty-eight (48) hours after the Business Associate learns or obtains knowledge of any use and/or disclosure of PHI that is in violation of this Addendum (Violation), including that by contractors, agents or other third parties. Such notice shall include the identification of each individual whose unsecured PHI has been, or is reasonably believed by the Business Associate to have been, accessed, acquired or disclosed during such breach and such other additional information as shall allow Covered Entity to meet its notification obligations under the HITECH Act

4.2    Business Associate will immediately mitigate, to the extent practicable, any harmful effect that is known to Associate of a use or disclosure of PHI by Associate in violation of the requirements of this Agreement.

4.3    The Business Associate is not in compliance with the standards Sections 2 and 5 herein where it knows of a pattern of activity or practice of its workforce and/or contractor, agents or third party entities that constituted or constitutes a material breach or violation of the obligation under this Addendum, unless the Business Associate takes reasonable steps to cure the breach or end the violation, as applicable, and, if such steps were unsuccessful, it must terminate its engagement or use of such workforce member and/or contractor, agent or third party entity for purposes of any work or services under the Business Agreement. Notice of all mitigation and actions taken with regard to the matters set forth herein must be provided to the Covered Entity as soon as the Business Associate becomes aware of a violation by workforce members or such third parties.

## Section 5— Use by and Disclosure to Subcontractor, Agents, and Representatives:

5.1    Prior to disclosing any PHI to any subcontractor, agent, or other representative or other third party that is authorized to receive, use, or have access to PHI under the Agreement, Business Associate shall require such person's to agree, in writing, to adhere to the same restrictions and conditions on the use and/or disclosure of PHI that apply to the Business Associate under this Addendum as well as the Business Associate's own internal procedures established pursuant to Section 3.1 hereinabove. (Third party agreements referred to in this section shall be known as "PHI Confidentiality Addenda" and shall be in the form set forth on Exhibit "B" annexed hereto and incorporated herein.) Such PHI Confidentiality Addenda shall identify the Covered

17

Entity as a third-party beneficiary with rights of enforcement in case of any violations that apply to the Business Associate under this Addendum.

5.2     Business Associate will also assure compliance with all Privacy Rule and HITECH Act workforce training requirements with regard to all contractors, agents or entities which possess or create PHI as required under this Addendum through the PHI Confidentiality Addendum.

5.3     Business Associate shall require notice of a use or disclosure Violation of PHI by contractors, or agents or other third parties, and mitigation to the greatest extent possible, of any deleterious effects known (or reasonably should be known) through of through the PHI Confidentiality Addendum.

5.4     A copy of all written PIE Confidentiality Addenda obtained by the Business Associate shall be provided to the Covered Entity within five days of execution to be maintained with this Addendum,

## Section 6- Audit, Inspection and Enforcement:

6.1     Business Associate agrees to make its internal practices, facilities, systems, books, records, and policies and procedures relating to the use and disclosure of PHI, available to the Covered Entity or at the request of the Secretary, in a reasonable time and manner designated by the Covered Entity or Secretary, for monitoring compliance with the Privacy Rule. The fact that the Covered Entity has the right to inspect the Business Associate's internal practices, facilities, systems, books, records, and policies and procedures, does not relieve the Business Associate of its responsibility to fully comply with this Addendum, whether or not it exercises such right. Additionally, the Covered Entity's failure to detect any unsatisfactory practice/s does not constitute acceptance of such practice or waive the Covered Entity's enforcement rights.

6.2     Business Associate will promptly remedy any violation of this Addendum found by the Covered Entity or its own internal review-processes, and certify the same in writing.

6.3     Business Associate further agrees to make its internal practices, facilities, systems, books, records and policies and procedures, relating to the use and disclosure of PHI available to the HESS, OCR and/or its agents for the purpose of enforcing the provisions of this Addendum and the Privacy Rule.

6.4     Business Associate shall conduct or allow Covered Entity (or its agent) to conduct reviews of the Business Associate's compliance with this Agreement and will assist the Covered Entity and cooperate in any risk assessments, inquiries or other due diligence required to ensure proper compliance with the obligations set forth in this Addendum and with State and Federal law.

## Section 7- Term and Termination:

7.1     This Addendum shall become effective on the effective date indicated and shall continue in effect while the Agreement remains in force and thereafter with respect to those obligations intended to survive the termination of this Addendum. The terms of the Agreement and Addendum relevant to the Privacy Rule shall terminate when all of the PHI is destroyed or

18

returned to the Covered Entity, or, if it is infeasible to return or destroy PHI, protections are extended to such information in accordance with the termination provisions in this section.

7.2    Termination by the Covered Entity – Subject to the Court's approval, the Covered Entity may immediately terminate the Agreement if the Covered Entity makes the determination that the Business Associate has breached a material term of this Addendum, Alternatively, at the sole discretion of the Covered Entity, the Covered Entity may provide the Business Associate with written notice, of the existence of the material breach and allow the Business Associate thirty (30) days to cure the material breach. In the event the Business Associate fails to cure the material breach within the allocated time-frame, the Covered Entity may immediately terminate the Agreement.

7.3    Effect of Termination - Upon termination of the Agreement or this Addendum, the Business Associate shall return all PHI, whether in paper, microfiche or electronic form, to the Covered Entity within fifteen (15) days of receipt of notice of any termination hereunder and shall recover any PHI in the possession of its subcontractors, agents, or representatives and return such PHI to the Covered Entity. The Business Associate shall return to the Covered Entity or destroy all such PHI, plus all other PHI in its possession, and shall retain no copies. If the Business Associate believes that it is not feasible to return or destroy the PHI as described above, the Business Associate shall notify the Covered Entity in writing. The Business Associate will assure that any written compliance obtained from subcontractors or agents or other third parties under Section 5 above shall include the same obligations regarding the return or destruction of records as maintained herein. If it is determined to be non- feasible to return all PHI, the Business Associate shall be obligated to maintain such documentation for a period of six (6) years from the date of such termination.

7.4    Upon receipt of PHI pursuant to this section and/or upon notice of destruction or alternative maintenance thereof as allowed by the Covered Entity, the Business Associate shall also provide a certification stating that it has retained no copies of such PHI and that it has destroyed all copies thereof, whether existing in electronic, paper or other form, Certifications shall also be provided from any subcontractors or agents who are provided access or PHI under section 5.1 above.

7.5    If the Business Associate determines that it cannot comply with Section 7.4 above, it shall notify the Covered Entity in writing as follows: (i) that the Business Associate has determined that it will not be able to return or destroy the PHI in its possession, or in the possession of any contractor, subcontractor, agent or other third party and (ii) state the specific reasons for such determination. If the Covered Entity agrees, at its sole discretion, that the Business Associate cannot return or destroy the PHI, the Business Associate shall ensure, in writing, that any and all protections, limitations and restrictions contained in this Addendum will be extended to any PHI retained after the termination of the Agreement and/or Addendum, and that any further uses and/or disclosures shall be restricted.

7.6    Notwithstanding anything herein to the contrary, the Business Associate shall retain and maintain any such PHI required to be so retained and maintained under HIPAA/HITECH Act statutory and regulatory provisions, subject to all applicable Privacy and Security rules.

7.7    Upon termination of the Business Agreement and/or this Addendum, the Business Associate prepare and forward to the Covered Entity an accounting as described above for all disclosures of PHI per individual made during the six (6) year period ending with the date of termination that have not been provided in previous accountings.

**Section 8 — General Provisions:**

8.1    Good faith — The parties agree to exercise good faith in the performance of this Addendum.

8.2    Survival — The respective rights and obligations of the Business Associate and Covered Entity under the provisions of this Addendum shall survive termination of the Business Agreement indefinitely.

8.3    No Third Party Beneficiaries - Except as provided in Section 5.1, nothing express or implied in this Addendum is intended to confer, nor shall anything herein confer, upon any person other than the Patties and the respective successors and permitted assigns of the Patties, any rights, remedies, obligations, or liabilities whatsoever.

8.4    The parties agree to indemnify, defend and hold harmless each other and their respective employees, directors, subcontractors, and agents from and against all claims, actions, damages, losses, liabilities, fines, penalties, costs or expenses (including without limitation reasonable attorneys' fees) suffered by the indemnified party arising from or in connection with any breach of this Addendum, or any negligent or wrongful acts or omissions in connection with this Addendum, or any violation of HIPAA, by the indemnifying party or by its employees, directors, officers, subcontractors, or agents. The parties' indemnification obligations shall survive the expiration or termination of the Agreement and this Addendum.

8.5    Notices - Any notice to be given under this Addendum to a Party shall be made via Registered Mail, Return Receipt Requested at its known business address, or to such other address as shall hereafter be specified by notice from the Party. Any such notice shall be deemed given when so delivered to or received at the proper address.

8.6    Addendum Part of Agreement - This Addendum is incorporated by reference and made a part of the Business Agreement.

8.7    Inconsistencies - If any terms of the Addendum conflict with or are inconsistent with the terms of the Business Agreement, the terms of this Addendum will prevail. Any changes or additional terms required by HIPAA or State law shall he deemed to be a part of this Addendum upon five (5) days written notice by the Covered Entity of such changes and/or additional terms along with a citation to the law, regulation or policy memorandum requiring such change or addition. Any ambiguity in this Addendum shall be resolved to permit Covered Entity lo comply with the Health Insurance Portability and Accountability Act of 1996 and/or the HITECH Act as it is interpreted by the Secretary.

20

IN WITNESS WHEREOF, each of the undersigned has caused this Addendum to be duly executed and effective as of May _____, 2024.

**Cold Spring Acquisitions, Inc.**
**d/b/a Cold Spring Hills Nursing**
**and Rehabilitation**

By: _____

Print Name:  AVI PHILIPSON

Title:  MANAGING MEMBER

Date:  5/03/2024

**Capital Health Consulting**

By: _____

Print Name:  Lisa M. Wickens-Alteri

Title:  President & CEO

Date:  May 3, 2024

21

**<u>Exhibit D</u>**

**Budget for the IHM Agreement**

| ITEM | Estimated Monthly Hours/cap | Estimated additional hours | Travel Costs (mileage) | Lodging & Meals | Totals |
|---|---|---|---|---|---|
| Initial Phase (2-6mos) | **112-128hrs. (3-4 days)/month @125/hour for CHC staff/consultants**<br><br>**$500/Lisa ONSITE Rate Discounted to $400 for Client**<br>*One overlap day.* | | **Approximately 600/week/ 2400/month at IRS mileage rate** | **Average $200-250/stay Average 4-6month** | **$12k-14k/month CHC Team**<br>**$12,k-19k        Lisa**<br>$24k-33K time.<br>$1,608 mileage<br>$800-1000 hotel<br>~500 meals<br><br>**36,000.00/month**<br><br>**+ OFFSITE TIME**/Calls/policies Resident monitoring (EMR)/ Investigations/calls with Facility/Court/Government<br><br>**38,000.00 monthly retainer** |
| Working Phase | **64 hours/month @125/hour for CHC staff/consultants**<br><br>**$500/Lisa ONSITE Rate Discounted to $400 for Client**<br>*No overlap day. Staff will discuss via video/phone.* | **Up to 32 hours**<br><br>*cap per monthly retainer will be at 64 hours- additional hours may be needed and will be discussed with Facility CONTACT* | **Approximately 400/week/ 1600/month at IRS mileage rate** | **Average $200-250/stay Average 2-4month** | **$8K/month  CHC Team**<br>**$12k-16K    Lisa**<br>**20K-24K**<br>~$1608<br>$600-$750<br>$375/meals<br><br>**31,000 /month onsite**<br>+ OFFSITE TIME/Calls/policies Resident monitoring (EMR)/ Investigations/calls with Facility/Court/Government<br>$2000 offsite<br>**33,000.00/month** |
| Exit Phase | **48-64 hours/month @125/hour for CHC staff/consultants.** | **Up to 32 hours** | **Approximately 400/week/ 1600/month at IRS mileage rate** | **Average 1x/month** | **$6k-$8k/month CHC team**<br>**$8K-$10K   Lisa**<br>**14K-18K**<br>`1400 |

| | | | | |
|---|---|---|---|---|
| | **$500/Lisa ONSITE Rate Discounted to $400 for Client**<br>*No overlap day. Staff will discuss via video/phone.* | *Cap as same as above.* | | | 250<br>90<br>**$19,740.00**/month onsite Resident monitoring (EMR)/ Investigations/calls with Facility/Court/Government/ Transition Plan<br>$5000 offiste<br>**$24,740.00** |
| | | | | |