UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

In re:                                                    Chapter 11

Cold Spring Acquisition, LLC,

                Debtor.                          Case No. 25-22002 (SHL)

------------------------------------------------------X

**COMBINED ORDER (A) APPROVING APPOINTMENT OF 378SYWOOD LLC AS RECEIVER AND (B) (I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE PRIVATE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR OUTSIDE THE ORDINARY COURSE OF BUSINESS TO 378SYWOOD LLC, AS BUYER, (II) AUTHORIZING SALE OF ASSETS FREE AND CLEAR OF ALL LIENS AND INTERESTS, AND (III) GRANTING RELATED RELIEF**

Upon consideration of the (A) *Motion For Order Authorizing Debtor to Enter into and Perform Agreement Providing for Appointment of Temporary* (the "**Receiver Motion**") [Docket No. 39] and (B) *Motion for an Order (I) Approving Asset Purchase Agreement and Authorizing the Private Sale of Substantially All of the Assets of The Debtor Outside The Ordinary Course of Business, (II) Authorizing Sale of Assets Free And Clear of All Liens And Interests, And (III) Granting Related Relief* (the "**Sale Motion**" and, together with the Receiver Motion, the "**Motions**")[1] [Docket No. 40] of the above-captioned debtor and debtor in possession (the "**Debtor**") pursuant to sections 102, 363, 365, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order (this "**Order**"):

    (a)    authorizing the Debtor to enter into the "Receiver Agreement," appointing 378SYWOOD LLC as a Temporary Receiver (the "**Receiver**") under New York State Public Health Law § 2810, a copy of which is annexed hereto as **Exhibit 1** (the "**Receiver Agreement**"),

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement or the Receiver Agreement, as applicable.

(b)      authorizing and approving the "Asset Purchase Agreement," dated as of December 18, 2024, between the Debtor, as seller, and 378SYWOOD LLC, as purchaser (together with its successors, designees, and permitted assigns under the Purchase Agreement, the "**Buyer**", a copy of which is annexed hereto as **Exhibit 2,** including all amendments thereto, the "**Purchase Agreement**"),

(c)      authorizing and approving the private sale of the Purchased Assets to the Buyer pursuant to the Purchase Agreement (the "**Sale**") free and clear of all claims, liens, interests, and encumbrances,

(d)      authorizing and approving the assumption and assignment of the Assumed Contacts to the Buyer, if any, and

(e)      granting related relief;

and the Debtor having determined that the highest and otherwise best offer for the Purchased Assets was made by the Buyer pursuant to the Purchase Agreement and the Court having conducted a hearing on March 20, 2025 (the "**Hearing**"), at which time all parties in interest, including 1199SEIU United Healthcare Workers East (the "**Union**"), were offered an opportunity to be heard with respect to the entry into the Receiver Agreement and the Sale, including the Modified CBA (defined below), and to consider the approval of the Motions and the Court having considered: (i) the *Declaration of Martin A. Cauz in Support of Debtor's Chapter 11 Petitions and First Day Pleadings* (the "**Cauz Declaration**") [Docket No. 2], the *Declaration of Judith Eisen* (the "**Eisen Declaration**") [Docket No. 42], the *Declaration of Eliezer Jay Zelman (*the "*Buyer Declaration*") [Docket No. 83], and the *Declaration of Joseph Tomaino (*the "**Tomaino Declaration**") [Docket No. 85]; (ii) the Motions and any objections thereto, (iii) the arguments of counsel made, and evidence adduced, related thereto, and (iv) the record of the Hearing; all parties in interest having been heard, or having had the opportunity to be heard, regarding the Debtor's entry into the Receiver Agreement, approval of the Purchase Agreement, and the Sale and other transactions contemplated by the Receiver Agreement and the Purchase Agreement; and it appearing that the relief requested in the Motions is in the Debtor's best interests, its estate, its

creditors, and other parties in interest; it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT**:[2]

### I.    Jurisdiction and Statutory Predicates

A.    This Court has jurisdiction over the Motions and over the Debtor's property, including the appointment of the Receiver, Purchased Assets to be sold, transferred, and conveyed pursuant to the Purchase Agreement, pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this Chapter 11 Case and the Motions in this District and Court is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The Debtor's rights, title and interest in the Purchased Assets constitute property of the Seller's bankruptcy estate and title thereto is vested in the Debtor's bankruptcy estate within the meaning of section 541(a) of the Bankruptcy Code.

C.    The statutory bases for the relief requested in the Motion and provided for herein are sections 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

D.    This Order constitutes a final order within the meaning of 28 U.S.C. §158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court finds that there is no just reason for delay in the implementation of this Order and directs entry of judgment as set forth herein.

E.    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this Chapter 11 Case pursuant to Bankruptcy Rule 9014.

---

[2] All findings of fact and conclusions of law announced by the Court at the Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

II.    **Notice**

F.    As evidenced by the affidavits or certificates of service previously filed with the Court, demonstrated by the evidence presented at, and based on the representations of counsel at the Hearing, due, proper, timely, adequate, and sufficient notice of the Motions, the Hearing, the Sale, has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, to each party entitled to such notice, including, as applicable: (1) counsel to CSHACQDIP, LLC, as the DIP Lender; (2) Buyer's counsel; (3) the U.S. Trustee; (4) all persons known or reasonably believed, after reasonable inquiry, to have asserted a lien, encumbrance, claim, or any other interest in any of the Purchased Assets; (5) the Securities and Exchange Commission; (6) the Internal Revenue Service; and (7) all parties set forth in the Debtor's master service list and creditor matrix in this Chapter 11 Case, which lists include (i) parties that had filed a notice of appearance and demand for service of papers in the Chapter 11 Case, including Counsel for the Union; (ii) holders of the 20 largest unsecured claims against the Debtor (on a consolidated basis); (iii) the Office of the United States Attorney for the Southern District of New York; (iv) the Office of the Attorney General of New York; (v) New York State Department of Health and (vii) the Centers for Medicare and Medicaid Services. The notice described herein, and in the Motions, was good, sufficient, and appropriate under the circumstances, and reasonably calculated to reach and apprise all known and unknown holders of liens, claims, and encumbrances, and no other or further notice of the Motions, is, or shall be, required. Further, a reasonable opportunity to object to and to be heard regarding the relief granted by this Order has been afforded to parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

III.    **Purchase Agreement and Receiver Agreement**

G.     Pursuant to the Receiver Agreement as more fully set forth therein, the Debtor seeks authority to enter into the Receiver Agreement appointing the Receiver.

H.     Pursuant to the Purchase Agreement and as more fully set forth therein, the Buyer has offered to purchase the Purchased Assets in exchange for assumption of the Assumed Liabilities and allowing the Debtor to retain ownership and all other rights to all amounts due (or that come due in the future) to the Debtor, including without limitation all accounts receivable, created, earned or accrued at any time prior to the Receivership Appointment Date (the "**Pre-Receiver AR**").

### IV.    Debtor's Business Judgment & Best Interests of Estate

I.     The Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Motions and provided for herein.  The Debtor's pre-petition marketing for the Purchased Assets afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Purchased Assets.  The Debtor's determination to enter into the Receiver Agreement and Purchase Agreement constitutes a valid and sound exercise of the Debtor's business judgment.  The terms contained in the Purchase Agreement constitute the highest and best offer for the Purchased Assets and will provide a greater recovery for the Purchased Assets than would be provided by any other available alternative.  The Debtor's determination to proceed by means of a private sale and that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtor's business judgment. No other entity or group of entities has presented a higher or otherwise better offer to the Debtor to purchase the Purchased Assets for greater economic value to the Debtor's estate than the Buyer in light of the Receiver appointment.

J.       The appointment of the Receiver, consummation of the transactions contemplated in the Purchase Agreement, and the Sale must be approved, must occur promptly to preserve the value of the Purchased Assets and maximize value for the Debtor's bankruptcy estate.

## V.       Compelling Circumstances for a Prompt Sale

K.       Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated. The Debtors have demonstrated compelling circumstances for a private sale outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code in that, among other things, the prompt consummation of the Sale to the Buyer is necessary and appropriate to maximize recoveries for the Debtor's estate.   Time is of the essence in consummating the Sale and the transactions contemplated in the Purchase Agreement.

## VI.      Good Faith

L.       The Receiver Agreement, Purchase Agreement, and the Sale were non-collusive, proposed and executed in good faith as a result of arms'-length negotiations, and were substantively and procedurally fair to all parties.

M.       The Buyer is purchasing the Purchased Assets in good faith and is a good-faith Buyer within the meaning of section 363(m) of the Bankruptcy Code, and, therefore, is entitled to the full protections of that provision, including in the event that this Order or any portion hereof is reversed or modified on appeal; and otherwise has proceeded in good faith in all respects in connection with the sale of the Purchased Assets in that (i) the Buyer recognized that the Debtor was free to deal with any other party interested in acquiring the Purchased Assets; (ii) all consideration to be made or otherwise provided by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been adequately

disclosed,[3] (iii) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (iv) the negotiation and execution of the Receiver Agreement and Purchase Agreement, including the Sale contemplated thereby, were at arms'-length and in good faith.

N.      The Debtor, the Buyer, and the Buyer's agents, representatives, and affiliates have not engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.  The Buyer participated in the sale process in good faith and has not acted in a collusive manner with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets.

**VII.    <u>Free and Clear</u>**

O.      The sale of the Purchased Assets to the Buyer in accordance with the Purchase Agreement will be, as of the Closing Date, a legal, valid, and effective transfer of such assets, and vests or will vest the Buyer with all right, title, and interest of Debtor to the Purchased Assets free and clear of all Liens, Interests and/or Claims (as defined below) accruing, arising or relating thereto any time before the Closing Date except for the Assumed Liabilities.

P.      The Purchaser would not have entered into the Purchase Agreement and the Receiver Agreement would not be executed, thus adversely affecting the Debtor, its estate, and its

---

[3] As set forth in the Buyer Declaration, other agreements related the Receiver Agreement and Purchase Agreement, including but are not limited to the (x) "Purchase and Sale Agreement," dated December 18, 2024 (the "**<u>Real Estate PSA</u>**") between non-debtor Cold Spring Realty Acquisition, LLC, (the "**<u>RE Seller</u>**")  and  non-debtor Woodbury Heights Rehabilitation Center Realty LLC, (the "**<u>RE Purchaser</u>**"), pursuant to which a non-debtor affiliate of the RE Seller has agreed to sell, transfer, and assign to the RE Purchaser certain real property (the "**<u>Real Estate</u>**"), which contains Cold Spring Hills Center for Nursing and Rehabilitation (the "**<u>Nursing Home</u>**"), a 588 bed skilled nursing facility and adult day care program, and (y) simultaneously with the execution and delivery of the Real Estate PSA, the RE Seller, as landlord, Debtor, as assignor, and Buyer, as assignee, have entered into an Assignment, Assumption and Amendment of Lease (the "**<u>Lease Assignment</u>**") to, among other things, assign the tenant interest in the Lease Agreement for the Nursing Home from the Debtor, as assignor, to Buyer, as assignee. The Lease Assignment does not take effect until the commencement of the receivership period under the Receivership Agreement.

creditors, if the Sale were not free and clear of all Liens, Interests and Claims, with the exception

of Assumed Liabilities.

VIII.    **Section 363(f) is Satisfied**

Q.      The Debtor may sell the Purchased Assets free and clear of all Liens, Interests

and/or Claims (except for the Assumed Liabilities) against the Debtor, its bankruptcy estate, or

any of the Purchased Assets because, in each case, one or more of the standards set forth in section

363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Each Lien, Interest and/or Claim (other

than an Assumed Liability) that is attached to the Purchased Assets to be transferred on the Closing

Date: (i) is subject to release or discharge under applicable non-bankruptcy law, (ii) is held by an

entity that has consented to the Sale or is deemed to have consented to the Sale; (iii) constitutes a

lien against some or all of the Purchased Assets and the price at which such property is to be sold

under the Purchase Agreement is greater than the aggregate value of all liens on such property,

(iv) is the subject of a bona fide dispute, or (v) is held by an entity that could be compelled in a

legal or equitable proceeding to accept money satisfaction of such encumbrance.

R.      Those holders of Liens, Interests and/or Claims against the Debtor, its bankruptcy

estate, or any of the Purchased Assets who did not object, or who withdrew their objections, to the

Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the

Bankruptcy Code.  Those holders of Liens, Interests and/or Claims who did object fall within one

or more of the other subsections of section 363(f) of the Bankruptcy Code.

VII.    **Collective Bargaining Agreement**

S.      The Debtor and the Buyer have agreed, and as specified in the Purchase Agreement,

Buyer recognizes that the Union is the bargaining agent for Buyer Employees (as defined in the

Purchase Agreement) and Buyer has reached an agreement with the Union on a modified

Collective Bargaining Agreement ("**Modified CBA**"), the material terms of which are set forth in the Memorandum of Understanding ("**MOU**").  The existing Collective Bargaining Agreement between the Debtor and the Union is not, and will not be, an Assumed Contract.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    **Relief Granted.** The relief requested in the Motions, and the transactions contemplated thereby and by (i) the Receiver Agreement and (ii) the Purchase Agreement, are APPROVED as set forth in this Order and on the record of the Hearing, which is incorporated herein as if fully set forth in this Order, and the Sale contemplated by the Purchase Agreement is APPROVED.

2.    **Objections Overruled.**  Any and all objections and responses to the Motions that have not been withdrawn, waived, settled, or resolved, are hereby overruled and denied on the merits. All reservations of rights have been noted on the record of the Hearing.   Notice of the Motions, the Receiver appointment, the Hearing, and the Sale was fair and equitable under the circumstances, and complied in all material respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

3.    **Compliance with the Bankruptcy Code**. The Receiver Appointment, the Purchase Agreement and the consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.

4.    **Receiver Appointment**.  The Receiver Agreement, including all other ancillary documents, and all of the terms and conditions thereof, and the Receiver appointment contemplated thereby, are hereby approved in all respects and the Debtor is authorized to enter into the Receiver Agreement.  The rights, duties and obligations of the Receiver from and after the

date the Receiver is appointed (the "**Receiver Appointment Date**") is set forth in the Receiver Agreement and, for the avoidance of doubt, the Receiver is not, and shall not, have responsibility for any Liens, Interests or Claims of the Debtor or its estate arising before the Receiver Appointment Date. The Receiver is not a mere continuation of the Debtor or its estate, and there is no continuity, no common identity, and no continuity of enterprise between the Receiver and the Debtor. The Receiver is not holding itself out to the public as a continuation of the Debtor. The Receiver is not a successor to the Debtor or the Debtor's estate by reason of any theory of law or equity, and the appointment of the Receiver does not amount to a consolidation, merger, or de facto merger of the Receiver or the Debtor.

5.  **Approval of Purchase Agreement.**  The Purchase Agreement, including all other ancillary documents, and all of the terms and conditions thereof, and the Sale contemplated thereby, are hereby approved in all respects.

6.  **Closing Conditions**.  Notwithstanding anything to the contrary in this Order, the Buyer shall not be required to close the Sale under the Purchase Agreement unless and until (i) the conditions precedent to Closing set forth in the Purchase Agreement have been satisfied, or waived in writing by Buyer, in accordance with the Purchase Agreement; (ii) the Receiver has been appointed; (iii) the Buyer and the Union have entered into the Modified CBA, or if the Modified CBA has not been finalized, the parties have agreed to be bound by the terms of the MOU, and (iv) the transactions contemplated in the Real Estate PSA have been consummated. In accordance with the Purchase Agreement, the Buyer's obligation to effect the Closing of the Purchased Assets shall also be subject to obtaining all approvals required by applicable law to be obtained from any Governmental Entity to consummate the transactions contemplated in the Purchase Agreement, which shall have been received or obtained on or prior to the Closing Date; specifically including,

but not limited to, Buyer shall have obtained non-contingent final approval from PHHPC and the

Commissioner of DOH for Buyer to become the licensed operator of the Nursing Home and the

Business.

7.      **Authorization**.  Pursuant to section 363(b) of the Bankruptcy Code, the Debtor,

acting by and through their existing agents, representatives, and officers, are authorized and

empowered to take any and all actions necessary or appropriate to: (a) consummate and close the

Sale pursuant to and in accordance with the terms and conditions of this Order and the Purchase

Agreement; (b) transfer, convey, and assign all right, title, and interest to all Purchased Assets,

including any and all property, licenses, and rights to be conveyed in accordance with the terms

and conditions of this Order and the Purchase Agreement; and (c) execute and deliver, perform

under, consummate, and implement this Order, the Purchase Agreement, and all additional

instruments and documents that may be reasonably necessary or desirable to implement this Order,

the Purchase Agreement and the Sale, including any other ancillary documents, or as may be

reasonably necessary or appropriate to the performance of the obligations as contemplated by this

Order, the Purchase Agreement and any such other ancillary documents.

8.      **Binding Effect.** This Order will be binding in all respects upon the Debtor, its

bankruptcy estate, all creditors, all holders of equity interests in the Debtor, all holders of any

Liens, Interests and/or Claims against the Debtor, any and all alleged holders of Liens, Interests

and/or Claims against or on all or any portion of the Purchased Assets, all counterparties to any

executory contract or unexpired lease of the Debtor, the Buyer and all agents, representatives, and

affiliates of the Buyer, and any trustees, examiners, or other fiduciary under any section of the

Bankruptcy Code, if any, subsequently appointed in the Debtor's Chapter 11 Cases or upon a

conversion to chapter 7 under the Bankruptcy Code of the Debtor's case.  The terms and provisions

of the Purchase Agreement and this Order will inure to the benefit of the Debtor, its bankruptcy

estate, its creditors, the Buyer and all agents, representatives, and affiliates of the Buyer, and any

other affected third parties, including all persons asserting any Liens, Interests and/or Claims in

the Purchased Assets to be sold to the Buyer pursuant to the Purchase Agreement, notwithstanding

any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of

any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such

terms and provisions likewise will be binding.

9.      **<u>Free and Clear Sale</u>**.

a.      Pursuant to sections 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy

Code, upon the Closing Date and pursuant to and except as otherwise set forth in the Purchase

Agreement, the Debtor's rights, title and interests in and to the Purchased Assets will be transferred

to the Buyer free and clear of all encumbrances, claims, interests, and liens, including mortgages,

restrictions, covenants, easements, hypothecations, charges, indentures, loan agreements,

instruments, collective bargaining agreements, leases, licenses, options, deeds of trust, security

interests, other interests, conditional sale or other title retention agreements, pledges, and other

liens (including mechanics', materialman's, possessory and other consensual and non-consensual

liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets,

contracts, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration,

products liability, derivative and vicarious liability, transferee liability, alter-ego, environmental,

or tax, decrees of any court or foreign or domestic governmental entity, or charges of any kind or

nature, if any, against the Debtor or the Purchased Assets, including any restriction on the use,

voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising

in any way in connection with any agreements, acts, or failures to act, including any pension

liabilities, retiree medical benefit liabilities, liabilities arising under or related to the Internal Revenue Code, of the Debtor or any of the Debtor's predecessors or affiliates, claims, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (other than Assumed Liabilities) (collectively, the "**Liens, Interests and/or Claims**").

b.      For the avoidance of doubt, the term Liens, Interests and/or Claims, includes, without limitation, rights with respect to any Liens, Interests and/or Claim (1) that purport to give any party a right of setoff or recoupment against, or a right or option to affect any forfeiture, modification, profit-sharing interest, right of first refusal, purchase or repurchase writer option, or termination of, any of the Debtor's or the Buyer's interest in the Purchased Assets, or any similar rights; or (2) in respect of taxes, restrictions, rights of first refusal, charges of interest of any kind and nature, if any, and including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any of the attributes of ownership relating to, accruing, or arising at any time prior to the Closing Date, with the exception of Assumed Liabilities.

10.    **Valid Transfer**.

a.      On the Closing Date, this Order will be construed and will constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets, including any causes of action that are not Excluded Liabilities, or a bill of sale transferring good, valid, and marketable title in and to the Purchased Assets to the Buyer pursuant

to the terms and conditions set forth in this Order and the Purchase Agreement.  For the avoidance of doubt, Excluded Assets and Excluded Liabilities are not included in the Purchased Assets and such Excluded Assets and Excluded Liabilities shall remain property of the Debtor's estate. Excluded Liabilities shall remain with the Debtor's estate.

b.      Subject to the terms and conditions of this Order, the transfer of the Purchased Assets to the Buyer pursuant to the Purchase Agreement and the consummation of the Sale and any related actions contemplated thereby do not require any consents other than as may be specifically provided for in the Purchase Agreement and Receiver Agreement, constitute a legal, valid, and effective transfer of the Purchased Assets, and will vest the Buyer with all of the Debtor's rights, title, and interests in and to the Purchased Assets as set forth in this Order and the Purchase Agreement, as applicable, free and clear of all Liens, Interests and/or Claims of any kind or nature whatsoever (other than Assumed Liabilities).

c.      The Buyer will be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of Debtor constituting Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date as provided by this Order and the Purchase Agreement.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to the Buyer on account of the filing or pendency of this Chapter 11 Case or the consummation of the Sale.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale.

11.    **Provider Agreements.**

a.    Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins a governmental unit from taking any action under police and regulatory statutes, regulations or program requirements (including but not limited to Medicare and Medicaid participation requirements and environmental laws or regulations), and to enforce any associated liabilities for penalties, damages, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the Facility after the date of entry of this Order. Nothing contained in this Order or in the Asset Purchase Agreement shall in any way diminish the obligation of any entity, including the Debtors, to comply with environmental laws.

b.    Additionally, with respect to the United States and the State of New York, nothing in the APA, the Receivership Agreement, or any order approving the APA or Receivership Agreement shall release, nullify, preclude or enjoin claims, liabilities, rights, defenses or causes of action each may have under applicable non-bankruptcy law with respect to the applicable Medicare provider agreements ("**Medicare Agreements**") or the applicable Medicaid contracts ("**Medicaid Contracts**"), including, without limitation, all rights, claims, and defenses of and to setoff and recoupment under non-bankruptcy law with respect to the applicable Medicare Agreements or the applicable Medicaid Contracts and under section 553 of the Bankruptcy Code, and all such claims, liabilities, rights, defenses, and causes of action are preserved, including the United States' and the State of New York's police and regulatory power against the Debtor and any non-Debtor party, as well as any defenses that the Debtor or non-Debtor party may have with regard to such police and regulatory power.

c.    Further, nothing in this Order, the Purchase Agreement, the Receiver Agreement, or related documents authorizes the transfer or assignment of any governmental (a)

license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order shall relieve any entity from any obligation to address or comply with information requests or inquiries from any governmental unit as defined in 11 U.S.C. § 101(27) ("**Governmental Unit**").  Nothing in this Order shall affect any setoff or recoupment rights of any Governmental Unit.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

d.      Further, nothing in this Order, any other order, or any agreement related to the sale of the Purchased Assets shall be construed as authorizing the sale, transfer, or assignment of the applicable Medicare Agreements or the applicable Medicaid Contracts to the Buyer free and clear of successor liability for any liability arising from such Medicare Agreements or Medicaid Contracts, nor as restricting the United States' or the State of New Yorks' rights of setoff and recoupment arising under the Medicare Agreements and Medicaid Contracts. For the avoidance of doubt, the Medicare Agreements and Medicaid Contracts shall not be sold pursuant to section 363 of the Bankruptcy Code, but shall be assumed and assigned pursuant to section 365 of the Bankruptcy Code and all applicable Medicare and Medicaid statutes and regulations, the Anti-Assignment Act, and all applicable non-bankruptcy law, as applicable.

e.      For the avoidance of doubt, and without affecting the rights of the United States or State of New York, except as expressly set forth in the Purchase Agreement, as between the Debtor and the Buyer, the Buyer is only responsible for obligations in connection with the Medicare Agreements and Medicaid Contracts arising subsequent to the assumption of such contracts and agreements by the Debtor and assignment of the Medicare Agreements and Medicaid

Contracts to the Buyer in accordance with section 365 of the Bankruptcy Code, which will occur effective the Closing of the Sale. Nothing in this paragraph or Order shall relieve any party from any obligations under the Medicare Agreements and Medicaid Contracts under applicable nonbankruptcy law. Further, except as expressly set forth in the Purchase Agreement, the Receiver is not responsible for the obligations of the Debtor under the Medicare Agreements and Medicaid Contracts, and the Debtor is not assuming and assigning such agreements and contracts to the Receiver in such capacity.

12.    **Retention of Receivables by Debtor.**    Notwithstanding anything to the contrary contained herein, in the Receiver Agreement, the Purchase Agreement or any other agreement or document, the Debtor shall, without limitation, retain all ownership and other rights to all Pre-Receiver AR. For the avoidance of doubt, the Debtor shall, without limitation, retain all ownership and other rights to all Pre-Receiver AR, notwithstanding anything contained in Sections 1.12, 1.14, 2.7, 2.10, 2.12, 2.14, 3.2, 3.16, 4.3, 4.6 and Section 5.3 of Receiver Agreement,

13.    **Lien Release.**    Upon consummation of the Sale, if any person or entity (other than Greystone Funding Company LLC), that has filed financing statements, mortgages, mechanic's liens, lis pendens, or recorded real property interests, or filed any other documents or agreements evidencing Liens, Interests and/or Claims against or in the Purchased Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Liens, Interests and/or Claims that the person or entity has with respect to the Purchased Assets (unless otherwise assumed in, or transferred by, the Purchase Agreement), or otherwise, then: (a) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; and (b) the Buyer

is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, will constitute conclusive evidence of the release of all Liens, Interests and/or Claims in the Purchased Assets of any kind or nature; provided, that notwithstanding anything in this Order or the Purchase Agreement to the contrary, the provisions of this Order will be self-executing, and neither the Debtor nor Buyer, nor the Receiver, will be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order. For the avoidance of doubt, upon consummation of the Sale, the Buyer and/or the Receiver is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Order under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code.

14.    **No Interference**. Except to the extent included in Assumed Liabilities, all entities, including all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts and unexpired leases, customers, dealers and sale representatives, and trade or other creditors holding Liens, Interests and/or Claims of any kind or nature whatsoever against or in the Debtor and its bankruptcy estate or the Purchased Assets arising under or out of, in connection with, or in any way relating to, the Purchased Assets or the transfer of the Purchased Assets to the Buyer hereby, or the operation of the Debtor's business in connection with the Purchased Assets, are forever barred and estopped, from asserting any Liens, Interests and/or Claims of any kind or nature whatsoever arising (x) before the Receiver Appointment Date as against the Receiver or any property of the Debtors' estate in possession of

or operated by the Receiver and (y) prior to the Closing as against the Buyer and its permitted successors, designees, and assigns, or property, or the Purchased Assets. Following the Closing, no holder of Lien, Claim, and/or Interest in or against the Debtor and its bankruptcy estate or the Purchased Assets will interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to such Lien, Claim, and/or Interest or any actions that the Debtor and its bankruptcy estate may take in this Chapter 11 Case or any successor case.

15.    **No Successor Liability.**    By virtue of the Sale, to the extent allowed by applicable law and except as otherwise set forth in this Order, the Buyer (including its designees, successors, assigns, and affiliates) shall not be deemed or considered to (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor to the Debtor, including a "successor employer" for purposes of the Internal Revenue Code of 1986, the Employee Retirement Income Security Act of 1974 ("**ERISA**"), or other applicable laws; (b) have any responsibility or liability for any obligations of the Debtor, or any affiliate of the Debtor, based on any theory of successor or similar theories of liability; (c) have, *de facto* or otherwise, merged with or into any of the Debtor; (d) be an alter ego or a mere continuation or substantial continuation of any of the Debtor (and there is no continuity of enterprise between the Buyer and any Debtor), including within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule, or regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule, or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any of the Debtor or their respective estate.

16.    **No Responsibility.** For the avoidance of doubt, the Buyer shall not be responsible for any Liens, Interests and/or Claims and Excluded Liabilities (other than Assumed Liabilities in

the Purchase Agreement), including in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between the Debtor and its owner(s), (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors; (vi) liabilities arising under any Environmental Laws with respect to any assets owned or operated by the Debtor at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (ix) any Excluded Liabilities.

17.    **Assumption and Assignment.**    If the Buyer identifies any contract or unexpired lease that the Buyer wishes to designate as an Assumed Contract in connection with the Sale, the Buyer shall notify the Debtor and the Debtor shall provide notice to the non-Debtor counterparty of the intention to assume and assign such Assumed Contract to the Buyer, including an indication of the cure amount to be paid in connection with such assignment, if any, and such notice shall

provide an opportunity for the non-Debtor counterparty to object to such assumption and assignment.  In the event no objection is interposed, the assignment of the Assumed Contract shall be effective without further order of the court.  The assumption and assignment of such Assumed Contracts in connection with the Sale is hereby approved and in the best interests of the Debtor, its bankruptcy estate and creditors, and other parties in interest, it being understood that such Assumed Contracts, if any, are an integral part of the Purchase Agreement and the Sale and, accordingly, such assumption and assignment is reasonable and enhances the value of the Debtor's bankruptcy estate and satisfies the requirements of section 365 of the Bankruptcy Code.

18. **Collective Bargaining Agreement.** The Debtor is not assigning any Collective Bargaining Agreements to the Buyer, and the Debtor's existing Collective Bargaining Agreements are not Assumed Contracts.

19. **Employee-Related Liabilities.** Except as otherwise required by a Modified CBA, the Buyer shall have no liability to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of the Debtor. Except as otherwise required by a Modified CBA, Buyer shall have no liability with respect to any Collective Bargaining Agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which the Debtor is a party and relating to the Purchased Assets (including, without limitation, arising from or related to the rejection or other termination of any such agreement), and Buyer shall in no way be deemed a party to, successor to or assignee of any such agreement, and no employee of Buyer shall be deemed in any way covered by or a party to any such agreement and all parties to any such agreement are hereby enjoined from asserting against Buyer any and all claims arising from or relating to such agreement.

20.    **Additional Authorizations.** The Debtor, including the Debtor's officers and agents, is/are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Receiver Agreement, Purchase Agreement, and this Order.  The Debtor will be, and hereby are, authorized to take all such actions as may be necessary to effectuate the terms of this Order and the relief granted pursuant to this Order.  No consents or approvals, other than those expressly provided for in the Purchase Agreement or this Order, are required for the Debtor to consummate the Sale.

21.    **Limitation on Debtor's Actions**.  Absent the Buyer's express written consent, the Debtor shall not settle or otherwise resolve any existing or future litigation with any third party or any Governmental Entity other than any settlement pursuant to which (i) any liability thereunder will be an Excluded Liability, (ii) no payment from the Buyer or Receiver is sought or required, and (iii) no restrictions are placed on or affecting the Purchased Assets, the Receiver or the operation of the business.

22.    **No Fraudulent Transfer.**  The consideration provided by the Buyer to the Debtor pursuant to the Purchase Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and other applicable law within the meaning of section 544(b) of the Bankruptcy Code, under the laws of the United States, any state, territory, possession, or the District of Columbia. The Receiver Agreement and the Purchase Agreement were not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtor under the Bankruptcy Code or under any other applicable law.  Neither the Debtor nor the Buyer have entered into the Receiver Agreement or the Purchase Agreement, or are consummating the Sale with any fraudulent intent, or otherwise improper purpose prohibited by law.

23.     **Good Faith Buyer and Section 363(m) Protection**. The Sale is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale will not affect the validity of the Sale (including the assumption and assignment of the Assumed Contracts by the Buyer, if any, and the sale free and clear of all Liens, Interests and/or Claims), unless such authorization and consummation of such Sale are duly stayed pending such appeal.  The Buyer is an entity that has purchased the Purchased Assets in good faith, as contemplated in section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

24.     **No Collusion.**  As a good-faith purchaser of the Purchased Assets, the Buyer has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets, and therefore the sale of the Purchased Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

25.     **No Sub Rosa Plan**. Neither the Sale nor the Receiver appointment impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a liquidating plan or a plan of reorganization of the Debtor.   This Order does not constitute a *sub rosa* plan.

26.     **No Conflict.** Nothing contained in any plan of liquidation or reorganization, or order of any type or kind entered in this Chapter 11 Case, any subsequent chapter 7 or chapter 11 case of the Debtor, or any related proceeding subsequent to entry of this Order, will conflict with or derogate from the terms of this Order, the Receiver Agreement or the Purchase Agreement.

27.     **Failure to Specify**.  The mere failure to specifically include any particular provisions of the Receiver Agreement or Purchase Agreement, including any of the documents,

agreements, or instruments executed in connection therewith in this Order will not diminish or impair the efficacy of such provision, document, agreement, or instrument, it being the intent of this Court that the Receiver Agreement and Purchase Agreement and each document, agreement or instrument described therein be authorized and approved in its entirety.

28.    **Time Periods.**    All time periods set forth in this Order will be calculated in accordance with Bankruptcy Rule 9006(a).

29.    **Amendments and Waivers.**    The Receiver Agreement and Purchase Agreement and any related agreements, documents or other instruments (or any provision thereof) may be amended, supplemented, or waived by the parties thereto in accordance with the terms thereof without further order of this Court.

30.    **Non-Severable.**    The provisions of this Order are nonseverable and mutually dependent.

31.    **Debtor's Continued Ownership and Control of Pre-Receiver AR.** Notwithstanding anything to the contrary contained herein, the Purchase Agreement or the Receiver Agreement, all Pre-Receiver AR is an excluded asset and is not being purchased by the Buyer.  The Debtor shall retain all ownership and control of all Pre-Receiver AR.  Whenever the Buyer receives payment on any Pre-Receiver AR, the Buyer shall promptly transfer all Pre-Receiver AR to the Debtor within 3 business days of receipt.  The Debtor (and any of its agents) shall be entitled to take all actions it deems appropriate to facilitate the payment and collection of the Pre-Receiver AR.  The Debtor shall be entitled to review all records of payments to ensure all Pre-Receiver AR is paid to the Debtor and this Court will retain jurisdiction to hear and determine any dispute arising from this paragraph.

32.     **Terms of Order Control**.  The terms of this Order shall govern, to the extent of any inconsistencies between the terms of this Order and the Purchase Agreement, the Receiver Agreement, or any other document (a) approved in connection with the Motions or (b) entered into in connection with this Order, the Purchase Agreement, or the Receiver Agreement; provided that nothing controls the terms of documents not specifically approved by this Order or other orders entered by this court.

33.     **No Stay**. Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Order will not be stayed after the entry hereof, but will be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and will not apply.

34.     **Continuing Jurisdiction**. This Court will retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Receiver Agreement, and the Purchase Agreement, all amendments thereof, supplements thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale or the Receiver Appointment.

35.     **New Bank Accounts**.  In order to facilitate the transition of operations to the Receiver, the Debtor is hereby authorized to open new bank accounts at Metropolitan Commercial Bank ("**MCB**") and MCB is hereby authorized and directed to allow the Debtor to open such bank accounts.  Greystone shall be entitled to a lien and/or security interest in such accounts to the same extent, validity and priority as Greystone's lien and/or security interest in the Debtor's existing

accounts at MCB, provided, however, that nothing contained herein shall constitute an admission by the Debtor (or the Committee) of the validity, extent or priority of Greystone's liens.

Dated:  White Plains, New York
      March 20, 2025               **_/s/ Sean H. Lane_**
                                     **THE HONORABLE SEAN H. LANE**
                                     **UNITED STATES BANKRUPTCY JUDGE**

## **EXHIBIT 1**

**Receiver Agreement**

# RECEIVER AGREEMENT
## NURSING HOME

**AGREEMENT**, made this _____ day of _____2025, by and between COLD SPRING ACQUISITION, LLC d/b/a COLD SPRING HILLS CENTER FOR NURSING AND REHABILITATION (the "Home"); the NEW YORK STATE DEPARTMENT OF HEALTH, by its duly and lawfully authorized officials (the "Department"); and 378SYWOOD LLC, a New York limited liability company (the "Receiver").

## WITNESSETH:

**WHEREAS**, the Home is licensed to operate a 588-bed skilled nursing facility known as Cold Spring Hills Center for Nursing and Rehabilitation located at 378 Syosset-Woodbury Rd., Woodbury, New York 11797 (the "Facility"); and

**WHEREAS**, the real property on which the Facility is located is owned by Cold Spring Realty Acquisition, LLC ("Cold Spring Realty"); and

**WHEREAS**, on December 16, 2022, pursuant to Executive Law § 63(12), Petitioner, the New York State Office of the Attorney General, commenced a Special Proceeding against Cold Spring Acquisition and Cold Spring Realty, et al., Index No. 611709/2022, (the "Executive Law § 63(12) Special Proceeding"); and

**WHEREAS**, in the Executive Law § 63(12) Special Proceeding, on April 12, 2024, the Honorable Lisa A. Cairo ordered that an Independent HealthCare Monitor ("IHM") be implemented to protect the residents, and appointed Capital Health Consulting, Lisa Wickens-Alteri as principal, as the IHM at the Facility; and

**WHEREAS**, the IHM has been in place and making recommendations to protect the residents at the Facility since May 3, 2024, the date a contract between the Facility and the IHM was finalized; and

**WHEREAS**, on or about April 2023, it has been alleged that the Home stopped paying amounts it potentially owed to the 1199SEIU National Benefits Fund (the "Fund") for employee healthcare and related benefits; and

**WHEREAS**, between on or about September 12 and December 24, 2024, the Department received several restraining orders in civil cases commenced by the Fund that prohibited the Department from releasing any Medicaid funds to the Facility, due to the Fund's judgments against the Facility for unpaid employee benefits; and

**WHEREAS,** the Home asserts that it is currently insolvent; and

**WHEREAS**, bringing stability and certainty to the Home's staff by ensuring the Home will pay its weekly payroll will likely enable the Home to improve its staffing, including its RN supervisory staffing; and

**WHEREAS**, the Home has requested the Department to approve the assumption of the operation of the Facility by the Receiver, pursuant to the provisions of applicable laws, regulations, and this Agreement (the "Receivership"); and

**WHEREAS**, the Home recognizes that the Receiver is appointed with the approval of the Department as an interim operator, and the Home is desirous of, as promptly as possible, effectuating a full transfer of the operation of the Facility (including a leasehold interest in the equipment and in the property upon which the Facility is located); and

**WHEREAS**, the Home and the Receiver recognize that eliminating uncertainty regarding the Home's finances and ownership in a manner that ensures the Home complies with the law is in the best interests of the Home's residents;

**NOW, THEREFORE**, in consideration of the promises and covenants herein contained, it is mutually agreed by and between the signatories to this Agreement as follows:

## ARTICLE 1: RECEIVERSHIP

1.1.  The Home hereby confirms its request to the Department to approve the assumption of the operation of the Facility by the Receiver.

1.2.  The Receiver, having complied with all of the requirements of the Department, is hereby appointed as receiver of the Facility to commence its operations as Receiver at 12:01 a.m. on _____, 2025 (the date on which the Receiver is authorized to act as receiver of the Facility is hereinafter sometimes referred to as the "Receivership Date" or the "Effective Date").  The Receiver accepts the appointment as Receiver of the Facility and will execute this Agreement in the appropriate space provided at the end of this Agreement.  The Receiver shall accept the use and possession of the real property occupied by the Facility through a lease with a third party, and the use and possession of the equipment and all other tangible assets used by the Home in their then present "as is" physical condition. The Receiver shall maintain the conditions and fund operations and liabilities of the Facility including, future rental amounts of the Home only in the amount required to pay debt service on the Facility HUD insured loan, from the Facility's cash and accounts receivable, from dates of service after the inception of the Term of Receivership (as defined below), from institutional and private working capital loans, and from managing the payables and obligations of the Facility efficiently.  Eliezer Jay Zelman, as the authorized Member or Officer of the Receiver shall be the signatory, as Receiver, on the Home's payroll account for purposes of paying all payroll and payroll taxes for the employees of the Home during the Term of Receivership. The Receiver may fund as working capital sums necessary to cover the Facility's needs and expenses, to fund its obligations hereunder and in respect of the Receivership and to maintain the Facility in good repair. Any funding provided directly by the Receiver to the Facility during the Term of Receivership shall be documented as a loan from the Receiver to the Facility and repaid at usual commercial rates at a time or times when the Facility is capable. Nothing contained in this Agreement shall make the Receiver responsible for any claims, obligations, liabilities, costs or expenses howsoever arising or relating to any period prior to the Effective Date hereof, all of which shall, notwithstanding anything to the contrary, remain the responsibility and liability of the Home.

1.3.  Except as herein provided, the duration of appointment of the Receiver as receiver of the Facility shall be for a period of not more than eighteen (18) months from the Receivership Date, subject to renewal or extension or earlier termination as provided below (the "Term of Receivership").  The Department may, in its discretion, extend the duration of this Agreement until appointment of a new receiver acceptable to the Department or the issuance of an operating certificate to a new established operator.  The Home, provided the Receiver is in substantial compliance with the terms and conditions of this Agreement, shall join with the Receiver to seek Department approval to renew or extend this Agreement for a period or periods not to exceed an additional twelve (12) months.  Any such extensions shall be on the same terms and conditions as set forth herein or such other terms and conditions as may be agreed upon in writing by the parties, provided, however, subject to Section 1.9, that the duration of this Receivership may be terminated sooner if:

(i) anything in this Agreement to the contrary notwithstanding, the Department determines, in its sole discretion, that material deficiencies have occurred at the Facility during the Term of Receivership which warrant the removal of the Receiver;

(ii) the Receiver has been convicted of a crime;

(iii)  otherwise mandated by law;

(iv) upon the mutual written consent of the parties; or

(v)  the Department determines, with respect to matters other than deficiencies as set forth in clause (i) above, in its sole discretion, that the Receiver is not in substantial compliance with the terms and provisions of this Agreement; provided, however, that in such event, the Department will have provided the Receiver with written notification of the nature and extent of its non-compliance, and the Receiver has failed, in the Department's opinion, to make sufficient progress toward attaining compliance.

1.4.  The Receiver waives any right to a hearing under any section of the Public Health Law relative to revocation of an operating certificate, and agrees to surrender the

operating certificate issued to it upon the revocation of the operating certificate, expiration or termination of this Agreement, or expiration or termination of any extension thereof. Notwithstanding the foregoing, the Home agrees that, in the event a bona fide purchaser of the Facility, or a buyer under an asset purchase agreement, has pending an application for establishment under Section 2801-a of the Public Health Law (the "Establishment Application"), it will consent to extensions of the Receivership to the Receiver, subject to Department approval, including further renewals, if necessary, for as long as the Establishment Application is pending and has not been proposed for disapproval by the Public Health and Health Planning Council or the Department for any reason. Whether such Establishment Approval has been proposed for disapproval shall be determined by reference to the minutes of the applicable meeting of the Public Health and Health Planning Council ("PHHPC") and the Department's staff reports on the PHHPC agenda.

1.5.   The Receiver agrees that the Independent HealthCare Monitor (the "IHM") will remain in place:

(i)      during the pendency of this Receivership,

(ii)     during the pendency of an Establishment Application submitted to the PHHPC by a bona fide purchaser, and

(iii)    in the event the PHHPC approves an Establishment Application submitted by the Receiver or another bona fide purchaser, until such transaction closes.

1.6.    The Home agrees to promptly and diligently execute all documents necessary to transfer full possession and control of the operations of the Facility to the Receiver.

1.7.    The Home hereby waives any rights it may have under the Public Health Law, or otherwise, to terminate this Agreement or terminate the appointment of the Receiver as receiver except as expressly set forth in this Agreement.

1.8.    Provided that the Facility has a Title XIX provider agreement, the Receiver shall be reimbursed as an operator through the Medicaid program pursuant to 10 N.Y.C.R.R. Subpart 86-2.  The Department shall not be responsible for any expenses incurred by the Receiver and related to the operation of the Facility which are not reimbursed pursuant to Subpart 86-2 or by any other payor.

1.9.    The Home, in connection with the appointment by the Department of the Receiver, waives the right to terminate this Agreement or contest the appointment of the Receiver except for: (i) claims related to the Department's alleged failure to honor or its breach or default under this Agreement, or (ii) breaches or defaults by the Receiver.

1.10.   The parties agree that this Agreement shall not be terminated without the prior written approval of the Department.

1.11.   If, for any reason, this Agreement expires or is terminated, including but not limited to termination ordered by the Commissioner of Health for failure of the Receiver to operate the Facility in conformance with Titles 10 or 18 of the N.Y.C.R.R., the Medicare/Medicaid requirements for long term care facilities, the Public Health Law and/or this Agreement, the Home agrees that operation of the Facility will not revert to the control of the Home and/or its partners, but the Home within a reasonable period of time (not less than five (5) days) shall have the right to propose another voluntary receiver ("Substitute Receiver").  The appointment by the Home of a Substitute Receiver shall be subject to approval by the Department in the same manner.   The Home, the Department and the Substitute Receiver shall enter into a substitute receiver agreement similar to this Agreement. In the event that the Home does not propose a substitute receiver within the time period delineated by the Department, the Department may appoint a substitute receiver without the approval of the parties hereto or the need to petition the Supreme Court.  In the event that the Home timely proposes a receiver that the Department disapproves the Home may propose another substitute receiver within a reasonable time (not less than three (3) days). If the Department disapproves the second proposed receiver, it may appoint a substitute receiver without the approval of the parties hereto or the need to petition the Supreme Court. The expiration or termination of any substitute receiver agreement shall be governed by the

same procedure. The parties hereto agree that the Department may disapprove a proposed substitute receiver if, in the Department's sole discretion, such proposed substitute receiver has a familial relationship or past or present business or employment relationship with the Home. In the event the Substitute Receiver is terminated, or the substitute receiver agreement expires, the Department may appoint a third receiver without the approval of the parties hereto or the need to petition the Supreme Court.

1.12. Notwithstanding anything in this Agreement to the contrary, all accounts receivable, related to the period on or after Receivership Date, shall, upon collection, be used by the Receiver for the benefit of the Facility pursuant to the terms of this Agreement and consistent with all provisions of law. The use of the pre-Receivership Date accounts receivable and other assets shall be used to pay claims (as defined in Section 101(5) of the Bankruptcy Code), in accordance with the priorities set forth in Section 507 of the Bankruptcy Code.

1.13. The Receiver or the Home may apply to the Department for such rulings as from time to time they may deem necessary in delineating the extent of the authority of the Receiver.

1.14. The Receiver shall operate the business conducted at the Facility on and after the Receivership Date for its own account. Receiver shall solely be entitled to, and responsible for, all profits and losses and capital requirements of the business conducted at the Facility during the Term of Receivership in accordance with the terms and subject to the conditions set forth in this Agreement. The Receiver shall be entitled to all revenues accruing with respect to the operation of the business conducted at the Facility both prior to, at the election of the Receiver, and commencing with the Receivership Date and thereafter during the Term of Receivership. The Receiver shall be liable for all post-Receivership accounts payable and other liabilities, including taxes of all kinds (including but not limited to payroll, provider, income, and real property taxes), and employee severance and benefit obligations arising out of or relating to the operation of the business conducted at the Facility during the Term of Receivership. Notwithstanding the foregoing, any profit generated during the

Receivership shall be retained by Receiver, subject to the terms set forth in Section 2.8 of this Agreement.

## ARTICLE 2: <u>REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF RECEIVER</u>

The Receiver represents, warrants and agrees as follows:

2.1.   It shall not act as an agent of the Department nor represent or hold itself out as an agent for the Department in any matter nor shall it hold itself out as a political subdivision of the State.

2.2.   It shall not act as an agent of the Home, or any of its owners.

2.3.   It shall not act as an agent of the owners of the Facility, if different than that of the Home and its owners.

2.4.   It shall act in good faith and shall not delegate its duties and responsibilities to any other individual or entity, except that it may, on behalf of the Home, hire its own administrators and staff.

2.5.   It shall operate the Facility in substantial compliance with all applicable laws, rules and regulations, including, but not limited to, the requirements for participation in the Medicare/Medicaid programs, and any court order. The Receiver shall implement the recommendations of the IHM until such time that an Establishment Application is approved by PHHPC, and until such transaction closes.

2.6.   In its operation of the Facility as Receiver, the Receiver shall not engage in any practice that may result, directly or indirectly, in any financial gain to itself in its capacity as Receiver, except as expressly set forth herein. The Receiver shall be paid, and is authorized to withdraw, fees for services as Receiver in such amounts and at such times that will not impact the continued operation of the Facility, it being understood that (i) the total sum of such fees shall not exceed Four Hundred Eighty Thousand Dollars ($480,000) per year; (ii) such fees shall be satisfied by revenue from operation of the Facility during the Term of

Receivership; and (iii) the reimbursability of such fees shall be in accordance with 10 N.Y.C.R.R. Subpart 86-2.

2.7.    The Receiver shall hold the assets of the Home in trust for the Home and shall take no action which would result in diminution of the assets entrusted to it by the Home.  It is also agreed to by the parties that the Receiver shall not be responsible for any and all payables, liabilities or obligations of any kind incurred before the inception of the receivership and that those shall remain the responsibility of the Home which the Home shall pay in the ordinary course.  The Home shall have no right to any accounts receivable arising for services that occurred after inception of the Receivership and it shall make no collection efforts with regard to the same.

2.8.    In the event of the expiration or termination of the Receivership, the Receiver shall execute and deliver such assignments, reassignments, conveyances, releases and other documents as may be reasonably required to restore the parties to the status quo ante and to transfer the assets, liabilities and operations of the Facility, and divest itself of all incidents of ownership thereof to such person(s) or entities as the Home shall designate, subject to the approval of the Department.

2.9.    The Receiver, within ninety (90) days after the end of each calendar quarter, shall provide the Department and the Home with an accounting, performed in accordance with generally accepted accounting principles, consistently applied, of its operation of the Facility during the term of its Receivership.  Nothing herein contained shall be construed so as to limit the provisions of Paragraph 4.3 herein.  The provisions of this section shall survive the expiration or termination of this agreement.

2.10.    All funds generated for the services provided during the Term of the Receivership shall be retained by the Receiver and, except as otherwise provided in this Agreement, utilized to fund the Facility's operations and its obligations as provided under this Agreement.  Notwithstanding the foregoing, but subject to making payments necessary to ensure the health and safety of residents and only if the Receiver will have adequate operating funds both before and after the reimbursement, the Receiver may make priority

reimbursement distributions of funds necessary to reimburse the Receiver for any sums advanced/loaned directly or indirectly to the Facility or for its benefit for its operations including, but not limited to, for leasehold improvements ("Advances"). Any Advances shall be reflected in the accountings referred to in Paragraph 2.9 herein, in accordance with the provisions of that paragraph. Upon termination of the Receivership, after all liabilities incurred during the Term of Receivership have been paid, any remaining profit and funds shall be accounted for by the Receiver, and, subject to the approval of the Public Health and Health Planning Council, shall be paid to the Home unless otherwise agreed by the parties, and pursuant to and consistent with any applicable court order. Provided, however, that the Receiver may pay its pro rata share of any cash receipts assessment incurred during the Receivership Period.

2.11. It is acknowledged that the Home will not have an adequate remedy at law in the event of a breach or threatened breach by the Receiver of any of its obligations hereunder and the Home shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement, or to compel compliance with and enforce the provisions hereof. Nothing herein shall be construed as prohibiting the Home from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages, provided that the Home shall not pursue any remedy against the Receiver for any actions the Receiver takes or does not take pursuant to any court order, or any recommendation by the IHM.

2.12. The Receiver shall not incur any obligation or make borrowings secured by the Home or any part of the Home or the Home's assets, or undertake any transaction which would place an encumbrance upon the assets of the Home during the Term of Receivership without the prior written approval of the Home, not to be unreasonably withheld, conditioned or delayed, and the Department; with the exception that the Receiver may collateralize Facility loans secured by the Receiver including working capital lines of credit during the Term of Receivership with Facility accounts receivable accruing on or after commencement of the Term of Receivership. In the event any execution or attachment is issued against the Receiver and/or the Home, the Facility or its property, relating to obligations which accrued

during the Term of Receivership, such encumbrance shall be cured or removed by the Receiver within twenty-one (21) days after notice in writing to the Receiver of such encumbrance or cured or removed within a reasonable time in the event that the same cannot be cured or removed with reasonable diligence within such twenty-one (21) day period. In no event shall any lien or encumbrance be permitted to continue for more than sixty (60) days. Notwithstanding the forgoing, it is agreed by the parties that the Receiver may lease equipment and/or furnishings in any amount as it may determine, provided that the quality of care delivered by the Facility is not adversely impacted by the same.

2.13. Receiver is authorized to execute and perform this Agreement and neither the execution nor delivery of this Agreement nor compliance with its terms and conditions will constitute a breach or violation of any agreement or instrument to which it is bound.

2.14. For any period on and after the Receivership Date, the Receiver shall lend its name to such administrative and/or judicial rate appeals as the Home, in good faith and as applicable, deems appropriate to file under the Medicaid, Medicare, or any other third-party reimbursement or insurance program. The Receiver shall in good faith cooperate with the Home, in preparing, filing and prosecuting such appeals before the appropriate administrative or judicial bodies. The conduct of such actions or proceedings relating to periods prior to the Receivership Date shall lie within the exclusive discretion of the Home. It is expressly understood that the Receiver, at its own cost and expense, may file such rate appeals as it may deem appropriate arising from its operation. Monies generated by all appeals shall be retained by the Receiver in accordance with Paragraph 2.10 herein.

2.15. During the Term of Receivership, the Receiver shall keep and maintain accurate records of the time its personnel devote to the management and operation of the Facility, indicating in reasonable detail the nature and extent of the matters on which they worked so that the time may properly be allocated to appropriate cost centers.

2.16. It shall be deemed an event of default hereunder, if the Receiver shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or shall file any petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation,

dissolution or similar relief under the present or any future Federal, State or other statute or law, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Receiver or of the Home, and such appointment shall not have been vacated or stayed, on appeal or otherwise, or if within twenty (20) days after the expiration of any such stay, such appointment shall not have been vacated.

2.17. It shall be deemed an event of default hereunder, if the Receiver is convicted of a felony in connection with any activity or program subject to the regulations, supervision or administration of the New York State Department of Health, or in violation of the New York State Public Officers Law, in a court of competent jurisdiction or of a crime outside of the State which, if committed within the State, would have been such a felony.

2.18. The Receiver shall elect in its discretion which contracts, leases and agreements referred to in Paragraph 3.6 of this Agreement it wishes to assume, and any such agreements (or any other agreements of the Home) not so elected shall not be assumed by the Receiver.

2.19. Nothing in this Agreement shall be construed to diminish any rights that any person or entity not a party to this Agreement may have to proceed against the Receiver with respect to obligations arising out of transactions or events exclusively occurring on or after the Receivership Date and during the period the Receiver acts as such, subject to the terms of this Agreement. The Receiver hereby agrees to and does indemnify, defend and hold harmless the Home from and against any and all losses, damages, costs and expenses, including but not limited to reasonable attorneys' fees, penalties and fines, arising from, relating to or incurred by the Home in connection with any and all of the same.

2.20. There is no action, suit, or other legal, administrative, arbitration or other proceeding or governmental investigation pending or, to the knowledge of the Receiver, threatened with respect to the Receiver.

2.21. The agreements, representations, warranties and obligations of the Receiver set forth in this Article 2 or elsewhere in this Agreement shall survive the expiration or termination of this Agreement.

2.22. The Home shall be entitled to access to all of the books and records relating to the operation of the Facility during the Receivership, at the Facility, during normal business hours upon two (2) days prior notice to the Receiver and upon the condition that this does not interfere with the operation of the Facility.

2.23. Notwithstanding the provisions of this or any other agreement to the contrary, the Receiver shall not add a new member, transfer or otherwise dispose of any membership interests or voting rights, or modify the management or legal structure of the Receiver during the term of this Agreement, without the prior written approval of the Department.

2.24. The Receiver shall devote whatever time is necessary, including on-site presence, to accomplish its duties and responsibilities.

## ARTICLE 3: REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF THE HOME

The Home represents, warrants and agrees as follows:

3.1.  It has full power and authority to execute and perform this Agreement, subject to approval of the United States Bankruptcy Court for the Southern District of New York ("Court") where its Chapter 11 bankruptcy Case No. 25-22002 ("Bankruptcy Case") is pending, and shall fully cooperate with the Receiver as and when requested by the Receiver in connection with the Receiver's duties hereunder.

3.2.   The Home hereby makes available to Receiver all items of tangible personal and real property and equipment belonging to or leased by the Home on the Receivership Date and used in the operation of the Facility and all permits and licenses of the Home relating to the Facility, to the extent permitted by applicable law and any such leases previously delivered by the Home to Receiver, and all of the Home's possessory interest therein, including, but not limited to, all of its accounts receivable, whether existing as of the date hereof or hereafter arising, and all of its cash as well as all prepayments received by the Home with respect to services to be rendered by the Facility on or after the Receivership Date and the use of the Premises by the Receiver (which Premises are owned by the Home). Until an Establishment Application is filed by the Receiver, or by another bona fide purchaser, and is approved by the Public Health and Health Planning Council, and such transaction closes, the existing concession in which Cold Spring Acquisition and Cold Spring Realty arranged with each other as related parties and have operated, whereby Cold Spring Acquisition pays no rent to Cold Spring Realty, and instead  pays only the debt-service on the mortgage for the real property directly to the mortgagee and/or its servicer, shall continue.

3.3.   It shall not incur any additional obligations or make additional borrowings secured by the Facility or any part of the Facility or the Home's or Facility's assets or undertake any new transaction which would cause a lien, security agreement or other encumbrance to be placed upon the assets of the Receiver or the Facility during the Term of Receivership without the prior written approval of the Receiver and the Department.  In the event any execution or attachment is issued against the Receiver and/or the Home or its property, relating to obligations which accrued prior to the Receivership Date or obligations unrelated to the operation of the Facility, such encumbrance shall be cured or removed within twenty-one (21) days after notice in writing to the Home of such encumbrance, or cured or removed within a reasonable time in the event that the same cannot be cured or removed with reasonable diligence within such twenty-one (21) day period.  In no event shall any lien or encumbrance be permitted to continue for more than sixty (60) days.

3.4.   It shall not be entitled to any compensation for entering into this Agreement or the Receivership arrangements contemplated herein.

3.5.   The Home and its members shall not retain any authority over the operation of the Facility after appointment of the Receiver, and shall not attempt to exercise any direction over the Receiver with respect to such operation.

3.6.   If the Home has not already done so, within ten (10) days hereof, the Home shall submit to the Receiver a true and correct list of all material contracts and agreements to which the Facility is a party or to which it may be bound, which relate to the Facility, its property or its operation including, without limitation, service contracts, and union agreements.  The Home represents that no unfair labor practice proceedings have been filed or are pending against it at the National Labor Relations Board. Nothing herein contained shall be construed to authorize cancellation of any contract or agreement in contravention of law. Notwithstanding anything to the contrary, the Receiver shall evaluate the Facility's contract with any related party and re-negotiate a fee that reflects the amount that a prudent buyer would pay in an arms-length transaction pursuant to Medicare Cost Report Guideline 2135.2.

3.7.   The Home shall remain liable for any Medicaid or Medicare overpayments determined by audit to have been made relating to any period prior to the effective date of this Agreement.

3.8.   The Home shall keep the Receiver apprised with respect to any potential settlements of rate disputes with the Department, and the Receiver shall keep the Home apprised of any such settlements.

3.9.   The Home shall remain liable for any liabilities relating to any period prior to the effective date of this Agreement.

3.10. Nothing in this Agreement shall be construed to diminish any rights that any person or entity not a party to this Agreement may have to proceed against the Home with respect to financial obligations arising out of transactions occurring prior to the date hereof.

3.11. To the best of its knowledge, other than as disclosed to Receiver and the Department in writing, there is no action, suit, or other legal, administrative, arbitration or governmental investigation pending or, to the knowledge of the Home, threatened with respect to the Home or the Facility.

3.12. The Home represents that the lease of the real estate is non-arm's length and that, pursuant to paragraphs 1.2 and 3.2 above, no rent will accrue or be charged to the Receiver, other than the amount required to pay debt service on the Facility HUD insured loan, for the duration of this Agreement.

3.13. The Home represents, warrants and agrees that it has not encumbered the real estate of the Facility in any way not heretofore disclosed to the Receiver and the Department in writing, and that it shall not during the term of the Receivership encumber the real estate or any lease relating to the Facility in any way without the prior consent of the Receiver and the Department.

3.14. Neither the execution or delivery of this Agreement will constitute a breach of any contract or agreement entered into by the Home.

3.15. It is acknowledged that the Receiver will not have an adequate remedy at law in the event of a breach or threatened breach by the Home of any of its obligations hereunder and the Receiver shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement, or to compel compliance with and enforce the provisions hereof without the necessity of posting a bond or security. Nothing herein shall be construed as prohibiting the Receiver from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages. The prevailing party in any dispute concerning this Agreement shall be entitled to the reimbursement of its reasonable counsel fees incurred in connection with such dispute.

3.16. The Home shall turn over to the Receiver possession of all Facility assets, including but not limited to, all resident personal accounts along with an accounting thereof. The Home shall turn over access to, and management of, all Facility bank accounts and

electronic access codes and methods relating to the same for which the Receiver shall have access and control over all such assets and the Home further agrees to fully and timely cooperate with the Receiver in implementing the provisions of this Agreement including, but not limited to, providing the Receiver's representatives with authorizations to communicate with the Department in connection with this Agreement. Accounts receivable that accrued/arose from services from prior to the Receivership Date shall belong to the Home.

3.17. The Home represents that in the past six (6) months, there have been no extraordinary withdrawals of funds.

3.18. The Agreements, representations, warranties and obligations of the Home set forth in this Article 3 or elsewhere in this Agreement shall survive the expiration or termination of this Agreement and/or the Receivership.

## ARTICLE 4: POWERS, DUTIES, RIGHTS AND OBLIGATIONS OF THE RECEIVER

Except as limited in this Agreement with respect to fees or otherwise, the powers, rights, duties and obligations of the Receiver shall include those accorded a receiver appointed in an action to foreclose a mortgage on real property and in equity, and the Receiver shall also have the powers, duties, rights and obligations as if appointed under Section 2810(2) of the Public Health Law, unless otherwise limited herein, including, but not limited to, the following:

4.1. The Receiver may sue and be sued in its capacity as receiver for the Facility.

4.2. The Receiver shall use reasonable care, diligence and prudence in the use and maintenance of the Facility and the building in which the Facility is located.

4.3. The Receiver shall maintain an appropriate system of financial accounts with respect to the operation of the Facility, shall meet all reporting requirements of the Department, and shall itemize receipts and expenditures in a current and business-like

manner in accordance with New York State rules and regulations as well as the New York State RHCF Accounting and Reporting Manual. The Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the Term of Receivership.

4.4.   The Receiver may enter into and amend contracts, and incur reasonable expenses for the maintenance and operation of the Facility.

4.5.   The Receiver shall not be required to obtain a bond.

4.6.   The Receiver shall collect incoming payments from all sources and apply them to the costs incurred in the performance of its functions hereunder, except as otherwise set forth in this Agreement.

4.7.   In the event that the Department determines that deficiencies exist at the Facility, and in accordance with applicable law imposes a civil penalty, such penalty may be assessed against the Receiver.   During the Term of Receivership, the Home shall be responsible for deficiencies arising prior to the Receivership Date including but not limited to any reasonable costs and expenses necessary to ameliorate the same and any civil penalties which may be legally imposed by the Department or found to be due to a third party as a result of the same.

4.8.   The Receiver may hire and fire such personnel and consultants, including, but not limited to, professional consultants, as from time to time it may deem necessary or advisable, except as prohibited by law or regulation.   The Receiver may not hire in any capacity, retain as a consultant or in any other way utilize the services of any member of the Home.   Consultants shall be required to keep and maintain accurate records of the time they devote to the management and operation of the Facility indicating in reasonable detail the nature and extent of the matters on which they worked so that their time may properly be allocated to appropriate cost centers.   The Department, at this time, takes no position as to the reimbursability of such expenses under the Medicaid program.

4.9.   The Receiver may either at its expense: (i) continue the Home's and/or Facility's malpractice and general liability insurance and other forms or types of insurance coverages and may secure malpractice and general liability insurance and other forms and types of insurance coverages in its own name and/or it may be added by endorsement to the Home's and/or Facility's malpractice and general liability insurance policies or (ii) obtain other malpractice and/or general liability insurances and other forms and types of insurance coverages from other sources and in such other amounts as it may determine.  The Receiver shall cause the Home to be listed as an additional insured on any such insurance provided in this Section.   The Department, at this time, takes no position with respect to the reimbursability of such expenses under the Medicaid program.

4.10. Prior to making any capital or leasehold improvement, except in the case of an emergency, the Receiver shall advise the Home of its plans.  The Home's consent shall not be required.

4.11. The Receiver represents that it has no employment, consulting agreements or other business agreements of any kind whatsoever with the Home or any principal of the Home and no agreement of such kind will be entered into during the term of this Agreement.

## ARTICLE 5: OPERATION OF THE FACILITY

5.1.   The Department shall not be responsible for any debts and obligations incurred in the operation of the Facility by the Receiver during the Receivership.

5.2.   The Receiver shall operate the Facility and enter into the functions and responsibilities hereunder on the Receivership Date.

5.3.   The books and records of the Facility shall be in the exclusive possession and control of the Receiver, and the Home shall have reasonable access to same.  The Receiver shall prepare and make available to the Home upon request monthly accountings of pre-Receivership accounts receivable collected, to which the Home has retained ownership under this Agreement.   Nothing herein shall be deemed to transfer ownership of the books

and records to the Receiver.  Upon termination of the Receivership, the Receiver and the Home shall have access and a right to the books and records of the Receivership.

5.4.  The Receiver and the Home shall make all books and records, accounts, agreements and documents of whatsoever nature, or copies thereof, relating to the Facility available to the Department upon demand.  There will be no charge to the Department for any copies made.

## ARTICLE 6: SPECIAL PROVISIONS RELATING TO THE HOME

6.1.  No provision contained herein shall be deemed to relieve the Home from any civil or criminal liability incurred or imposed by law by reason of acts or omission of the Home prior to the appointment of the Receiver.  The Home waives no right with respect to disputing or contesting any asserted liability.

## ARTICLE 7: RELATING TO THE DEPARTMENT

7.1.  An amended operating certificate shall be issued to the Receiver as of the Receivership Date or, as soon as is practicable. Such operating certificate shall remain in effect during the period the Receiver serves as Receiver of the Home hereunder. Upon termination of the receivership pursuant to Paragraph 1.3 herein, the Receiver shall surrender the amended operating certificate to the Department.

7.2.  The Department shall promulgate a Medicaid reimbursement rate for the Receiver in accordance with Subpart 86-2.  The Department, provided all conditions of participation in Title XVIII and Title XIX are met, agrees to recommend to the United States Department of Health and Human Services that a Title XVIII Provider Agreement be issued to the Receiver and to issue a Title XIX Provider Agreement to the Receiver.

## ARTICLE 8: MISCELLANEOUS

8.1.  This Agreement may be executed in any number of original, facsimile or pdf counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement.

8.2.   This Agreement shall be binding upon the parties hereto.  Nothing contained in this Agreement is intended to or shall be construed to confer any rights or remedies on any person or entity not a party to this Agreement.

8.3.   In the event a dispute arises between the Home and Receiver out of or with respect to this Agreement, its application or interpretation, such dispute shall be submitted to arbitration as follows:

Upon seven (7) days' notice in writing from one party to the other, each shall select one (1) person and the two (2) people so selected shall select a third person, to serve as a panel of three (3) to hear and decide such dispute.  In the event the two (2) selected arbitrators cannot agree upon the third arbitrator, the parties shall submit to the American Arbitration Association for the selection of the third arbitrator.  The hearing shall be held within a period of two (2) weeks from the time of such written notice.  The panel shall not be bound by the rules of evidence and its decision, from which there shall be no appeal, may be legal or equitable in nature or a combination of both or may represent a compromise which the panel deems fair and equitable under all the facts and surrounding circumstances then prevailing. The award of the panel may be entered, in accordance with the provisions of the Civil Practice Law and Rules, as an award and judgment in any court of competent jurisdiction.

Such award, in any event, shall not in any manner bind the Department.

8.4.   In case any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect as may be determined by a court of competent jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected or impaired thereby in any manner.

8.5.   The parties agree to execute and deliver any and all necessary documents to give full force and effect to this Agreement.

8.6.   Article headings in this Agreement are for convenience only and are not a part of this Agreement.   Such headings shall not affect the meaning or construction of any

provision herein.  Inappropriate gender references in this Agreement shall be deemed to be correct.

8.7.   Any notice required or permitted to be given pursuant to this Agreement shall be sufficient if given in writing and delivered personally or by registered or certified mail, return receipt requested postage prepaid, and sent by email as follows:

If to the Receiver, to it at the Facility with a copy to:

Eliezer Jay Zelman
4 Gladwyne Court
Spring Valley, New York 10977
Email: jzelman@ehmllc.com

With a copy to:

NBC Law LLP
675 Third Avenue, 8th Floor
New York, New York 10017
Att'n. Edward H. Burnbaum, Esq.
Email:eburnbaum@nbclaw.com


If to the Home, to:

Cold Spring Acquisition, LLC d/b/a Cold Spring Hills Center
    for Nursing and Rehabilitation
378 Syosset-Woodbury Road
Woodbury, New York 11797
Att'n. Edline Severe-Joseph, Administrator
Email: ejoseph@coldspringcare.com

With a copy to:

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 600
Great Neck, New York 11021
Att'n. Judith Eisen, Esq.
Email: jeisen@garfunkelwild.com


If to the Department, to:

Kathy Marks
General Counsel
New York State Department of Health
Nelson A. Rockefeller Empire State Plaza
Erastus Corning Tower
24th Floor
Albany, New York 12237
Attn: Marthe JB Ngwashi, Senior Counsel


8.8.  Nothing herein contained shall be deemed to change the Medicaid reimbursement policies, rules and regulations of the New York State Department of Health.

8.9.  Nothing herein shall be construed to mean that, as of the date of this Agreement, the Department has approved any Purchase Agreement.

8.10.  This Agreement constitutes the entire Agreement between the Home and the Receiver relative to the Receivership of the Facility.  Any agreement between the Home and Receiver relative to the Receivership of the Facility entered into subsequent to the date of this Agreement shall be null and void unless approved by the Department.  This Agreement may only be modified by a written agreement executed by all of the parties hereto.

8.11.  Nothing contained herein shall be construed in any way to alter or abridge the right and authorities of the Department or the Public Health and Health Planning Council as provided for in the Public Health Law, except to the extent that the Department has expressly agreed to be bound herein.

8.12.  This Agreement is for the exclusive benefit of the parties hereto.  Nothing contained herein shall be construed as granting, vesting, creating or conferring any right of action or any other right or benefit upon any person or entity that is not a party to this Agreement.  This Agreement shall be construed under and governed by the laws of the State of New York, without regard to its principles of conflicts of laws.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed, all as of the day and year first above written.

*[Signature pages follow]*

NEW YORK STATE DEPARTMENT OF HEALTH


By: _____
Name: _____
Title: _____

Dated: _____


COLD SPRING ACQUISITION, LLC d/b/a COLD SPRING HILLS CENTER FOR NURSING AND REHABILITATION


By:_____
Name: _____
Title: _____

Dated: _____


378SYWOOD LLC


By: _____
Name:     Eliezer Jay Zelman
Title:     Managing Member

Dated: _____

# **EXHIBIT 2**

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**dated as of**

**December 18, 2024**

**by and between**

**COLD SPRING ACQUISITION, LLC D/B/A COLD SPRING HILLS CENTER FOR NURSING AND REHABILITATION**

**and**

**378SYWOOD LLC**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into and effective as of December 18, 2024 (the "Receivership Date") by and between COLD SPRING ACQUISITION, LLC D/B/A COLD SPRING HILLS CENTER FOR NURSING AND REHABILITATION, a New York limited liability company (the "Company"), and 378SYWOOD LLC, a New York limited liability company ("Buyer"; and, together with the Company, the "Parties").

## RECITALS:

**WHEREAS**, the Company owns and operates Cold Spring Hills Center for Nursing and Rehabilitation, a licensed 588 bed skilled nursing facility located at 378 Syosset-Woodbury Road, Woodbury, New York 11797 (the "Facility"; Company's business and the conduct of the ownership and operations of the Facility shall hereinafter be referred to as the "Business");

**WHEREAS**, simultaneously with the execution of this Agreement, Company and Buyer intend that Company, Buyer (or its Affiliate) and the New York State Department of Health ("DOH") will enter into that certain Receiver Agreement (the "Receiver Agreement") providing for Buyer (or its Affiliate) (the "Receiver") to be appointed as the interim operator of the Business (the "Receivership");

**WHEREAS**, the Company desires to sell and convey, and Buyer desires to purchase and assume, the Purchased Assets (as defined below) and the Assumed Liabilities (as defined below) for the consideration and on the terms set forth in this Agreement; and

**WHEREAS**, the Parties have approved this Agreement and the consummation of the transactions contemplated herein, upon the terms and subject to the conditions set forth herein.

## AGREEMENT:

In consideration of the mutual promises contained herein and intending to be legally bound, the Parties agree as follows:

## ARTICLE I
### DEFINITIONS

Section 1.1    Definitions. Capitalized terms used herein shall have the meaning set forth in Exhibit A hereto.

## ARTICLE II
### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchased Assets. Subject to the terms and conditions set forth in this Agreement, at the Closing, the Company shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from the Company, "as is," "where is" and, subject only to the representations and warranties contained in Section 5.1, all of the Company's right, title and interest in all of its assets, be they personal, tangible or intangible, including, to the extent of

1

Company's right, title, and interest therein (if any), all of the following assets to the extent owned, used or held primarily in the conduct of the Business, as of the Closing Date, but excluding the Excluded Assets (collectively, the "Purchased Assets"):

(a)     Equipment;

(b)     the supplies and inventories of every kind and nature whatsoever (specifically including, but not limited to, all pharmacy supplies, nursing supplies, medical supplies, housekeeping supplies, laundry supplies, maintenance supplies, office supplies, dietary supplies, other supplies and food) located at and used in connection with the operation of the Facility which are owned by the Company;

(c)     Buyer shall negotiate in good faith any contracts, agreements, leases, purchase orders, insurance policies and other arrangements, whether oral or written, to the extent transferable, that Buyer desires to assume, including any union contracts (collectively "Contracts") excluding, however, rights, claims or responsibilities thereunder existing and relating to the period of time prior to the Receivership Date. To the extent Buyer expressly assumes such Contracts ("Assumed Contracts"), Buyer may terminate any Assumed Contract in accordance with their terms from the Receivership Date forward. Any Contracts not assumed will be terminated by Buyer, at the Buyer's sole expense;

(d)     to the fullest extent permitted by applicable law and subject to any necessary third-party or governmental consents or approvals, the Company's Medicare and Medicaid provider numbers and agreements set forth on **Schedule 2.1(d)**; provided, however, alternatively, Buyer may elect to obtain new Medicaid provider numbers, in which case, Buyer will not assume the Company's Medicaid provider numbers;

(e)     to the fullest extent permitted by applicable law and subject to any necessary third-party or governmental consents of approvals, all of Company's right, title and interest in licenses, certifications, permits, certificates of occupancy, and approvals relating to the Business and the Purchased Assets, if any, issued to or on behalf of the Company by any Government Entity and/or other accrediting agencies;

(f)     except as set forth below, all right, title and interest of Company in and to any trade names and all variations thereof connected with the Business, which are set forth on **Schedule 2.1(f)**;

(g)     reserved;

(h)     all rights, but not liabilities arising from the period prior to the Receivership Date, to lien waivers, surety agreements, bonds, warranties, guaranties, utility use agreements, covenants, and commitments owned by Company as of the date of this Agreement or hereafter acquired, which can be legally transferred or assigned and which relate directly to the ownership and operation of the Facility;

(i)     all administrative records, financial books and records, employee and payroll records, including, but not limited to, all books, records, files, computer software, data or

2

databases, correspondence, memoranda, notes and other documents or papers and other evidence thereof relating to the operation of the Business ("Books and Records"). The Company represents that, without regard to where the same are stored, all Books and Records relating to the Business are the property of the Company and are being transferred herein;

(j)     custody of all Patient Medical Records, medical staff records and medical/administrative libraries;

(k)     copies of all other books and records of or relating to the Business;

(l)     all accounts receivable generated on and after the Receivership Date;

(m)     reserved; and

(n)     any and all other items of personal property, tangible and intangible, owned or leased by Company on the Receivership Date and used in or that are necessary for the operation, leasing and maintenance of the Facility (collectively, the "Personal Property"), and any goodwill of Company associated with the Business operated at the Facility.

Section 2.2     Excluded Assets. The following assets, rights and properties of the Company are specifically excluded from the Purchased Assets and shall be retained by the Company (collectively, the "Excluded Assets"):

(a)     all accounts receivable and other rights to payment from residents, customers and clients of the Company, including all accounts receivable representing amounts receivable in respect of material sold or services rendered to residents, customers or clients of the Business, for dates of service prior to the Receivership Date (the "Company Receivables");

(b)     all the rights of the Company pursuant to the Transaction Documents;

(c)     the Company's corporate records;

(d)     the Company's rights, claims, causes of action, benefits and rights to reimbursement available under the Company's or any of its Affiliates' insurance policies that accrued or result from events occurring prior to the Receivership Date;

(e)     any personnel records and other records that the Company is required by Law to retain in its possession; provided, however, that, to the extent permitted by applicable privacy Laws, copies of such records relating to the Buyer Employees shall be provided to Buyer at the Closing;

(f)     any credits, prepaid expenses, deferred charges, advance payments, security deposits and prepaid items of the Company prior to the Receivership Date;

(g)     the name "Cold Spring Hills Center for Nursing and Rehabilitation" and any and all rights to the Intellectual Property of the Company;

3

(h)     all assets of the Employee Plans;

(i)     any Permits of the Company issued by a Governmental Entity that are not related solely to the Business;

(j)     all Tax credits, refunds, recoveries, and similar benefits of the Company or in respect of any Taxes paid by the Company for periods prior to the Receivership Date;

(k)     any right to receive or expectancy of the Company in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate);

(l)     the assets, properties and rights that are not Purchased Assets; and

(m)     all cash, cash equivalents, bank accounts, certificates of deposit, interest bearing accounts and other cash items and investment accounts of the Company prior to the Receivership Date.

Section 2.3     Assumed Liabilities. At the Closing, Buyer shall assume from the Company and thereafter perform and pay in accordance with the terms thereof only the following liabilities (collectively, the "Assumed Liabilities"):

(a)     all of the claims, liabilities and obligations of any kind or nature (including accounts payable and Healthcare Program Liabilities) incurred in the conduct of the Business or the use of the Purchased Assets, whether absolute, contingent, accrued, known or unknown, arising from and related to periods on and after the Receivership Date;

(b)     all liabilities and obligations of the Company under all Assumed Contracts on and after the Receivership Date;

(c)     all vendor liabilities, trade accounts payable obligations and known Healthcare Program Liabilities ("Known Healthcare Program Liabilities") with respect to or arising exclusively from the operations of the Business on and after the Receivership Date;

(d)     all outstanding payables of the Company incurred in the conduct of the Business from on and after the Receivership Date that are essential to the operations of the Business in the reasonable discretion of the Buyer with prior written notice to the Company;

(e)     the Company's obligations with respect to vacation time, personal days and sick time attributable to the Buyer Employees from and after the Receivership Date, fully bundled and burdened.

Section 2.4     Liabilities Not Assumed. Notwithstanding anything to the contrary contained herein, each of the Parties hereto hereby acknowledge and agree that Buyer shall not assume, take subject to or be or become liable for, any liability or obligation of the Company other than the Assumed Liabilities (the "Excluded Liabilities").

4

Section 2.5    Overpayments and Adjustments.

(a)    Responsibility for Overpayments and Audits. Company is, and shall remain liable after Closing, for any and all Healthcare Program Liabilities, including any overpayments or audit liabilities due to Medicare, Medicaid or any other health care reimbursement or payment intermediary or third party payor, and all Cash Receipts Assessments relating to such revenues, and all other third party payor liabilities with respect to services provided at the Facility prior to the Receivership Date. On and after the Receivership Date, Buyer shall be liable for all overpayments, audit liabilities or other liabilities due to Medicare, Medicaid or any other health care reimbursement or payment intermediary or third party payor and all Cash Receipts Assessments relating to such revenues and all other third party payor liabilities, all with respect to services provided at the Facility exclusively arising from on and after the Receivership Date.

(b)    Retroactive Payment Adjustments. If any retroactive adjustment in payments is made as a result of an audit, rate appeal or otherwise, with respect to Medicaid or Medicare rate payments, Cash Receipts Assessments or other liabilities to the State of New York, HHS or any other third party reimbursement paid or owing relating to the rates in effect or the Service Delivery by the Business before the Receivership Date for any reason other than the Healthcare Program Liabilities set forth in Section 2.6(a), above, and such adjustment is made by increasing or decreasing the Medicare, Medicaid or other third party payments made by such payor to Buyer for the Business on or after the Receivership Date, then:

  i.    in the case of an increase, the monies received by Buyer attributable to such increase relating to the rates in effect or the Service Delivery during any period of time before the Receivership Date shall belong to Company and Buyer shall pay the same to Company within ten  (10) business days of the receipt thereof by Buyer; and

  ii.    in the case of a decrease, as a result of which money is withheld or otherwise recovered from payments due to Buyer, the Company shall pay the Receiver, or, if the Closing shall have occurred, to the Buyer, the amount withheld within ten (10) business days after receipt of notice from Receiver or Buyer, as applicable, of such withholding, together with all statements and supporting documentation relating thereto.

(c)    Right to Appeal.

  i.    The Company shall retain the sole and absolute right to protest, contest or appeal any Medicaid or Medicare rate determinations or any other third party reimbursement and to make all filings necessary to recoup all assessments or amounts withheld relating solely to the rates in effect or the Service Delivery by the Business prior to the Receivership Date, solely to the extent prior to the Closing Date, and to receive and retain any additional reimbursement resulting therefrom.

5

ii.    For any period on or after the Receivership Date, the Receiver shall lend its name to protest, contest or appeal any Medicaid or Medicare rate determinations or any other third party reimbursement as the Company, in good faith, deems appropriate to file under the Medicaid, Medicare, or any other third party reimbursement or insurance program. The Receiver shall in good faith cooperate with the Company, in preparing, filing and prosecuting such appeals before the appropriate administrative or judicial bodies.

iii.    The Buyer shall retain the sole and absolute right to protest, contest or appeal any Medicaid or Medicare rate determinations or any other third party reimbursement and to make all filings necessary to recoup all assessments or amounts withheld relating solely to the rates in effect or the Service Delivery by the Business on or after the Closing, and to receive and retain any additional reimbursement resulting therefrom.

(d)    The provisions of <u>Section 2.3</u>, <u>Section 2.4</u>, and <u>Section 2.5</u> shall survive Closing indefinitely.

## ARTICLE III
Reserved

## ARTICLE IV
THE CLOSING

**Section 4.1    <u>Date of Closing</u>.** The consummation of the transactions contemplated hereby (the "**Closing**") shall take place at the New York office of Buyer's lender's counsel, if any, and otherwise at the office of Garfunkel Wild, P.C. (or at such other place as the parties may designate) on the first (1st) business day of the calendar month that is not less than thirty (30) days immediately following the date each of the conditions specified in <u>Article X</u> has been satisfied (or waived by the Party entitled to waive such condition), but the Closing Date shall in no event be later than eighteen (18) months from the Receivership Date under the Receiver Agreement; provided, however, that if by the date of the expiration of the aforesaid eighteen (18) month period the conditions to close have not been satisfied, the Company and Buyer shall extend the closing date so that Closing occurs twenty-four (24) months from the Receivership Date (the "<u>Outside Closing Date</u>"). The date on which the Closing takes place is referred to in this Agreement as the "<u>Closing Date</u>." The Closing shall be effective at 12:01AM on the Closing Date. At the Closing, the Parties shall execute and deliver the documents referred to in <u>Section 4.2</u> and <u>Section 4.3</u>.

**Section 4.2    <u>Deliveries by the Company</u>.** On the Closing Date, the Company shall deliver to Buyer each of the following:

(a)    a general bill of sale in the form set forth as **<u>Exhibit B</u>** duly executed by the Company (the "<u>Bill of Sale</u>");

(b)    such document(s) as may be necessary to assign the Assumed Contracts and Assumed Liabilities from the Company to Buyer as mutually agreed by the Parties;

6

(c)  A Medical Records Custody Agreement (the "Medical Records Custody Agreement"), in a form attached as **Exhibit C**, executed by Company;

(d)  a certified copy of the resolutions adopted by the Company's members authorizing the execution, delivery and performance of this Agreement and the consummation of all of the transactions contemplated by this Agreement;

(e)  the certificate referred to in Section 10.2(d); and

(f)  such other instruments, certificates or other documents as Buyer may reasonably request to consummate the transactions contemplated hereby.

Section 4.3  Deliveries by Buyer. On the Closing Date, Buyer shall deliver to the Company each of the following:

(a)  the Bill of Sale, duly executed by the Buyer;

(b)  such document(s) as may be necessary to assign and assume the Assumed Contracts and Assumed Liabilities from the Company to Buyer as mutually agreed by the Parties;

(c)  the Medical Records Custody Agreement, executed by Buyer;

(d)  a certified copy of the resolutions adopted by Buyer's members authorizing the execution, delivery and performance of this Agreement and the consummation of all of the transactions contemplated by this Agreement;

(e)  a completed CMS Form 855 for a change of ownership of Company's Medicare provider number;

(f)  the certificate referred to in Section 10.3(d); and

(g)  such other instruments, certificates or other documents as the Company may reasonably request to consummate the transactions contemplated hereby.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.1  Representations and Warranties of the Company. Except as otherwise indicated on the Disclosure Schedules and except as otherwise set forth below, the Company represents and warrants as follows, as of the Receivership Date and as of the Closing Date:

(a)  Organization and Related Matters. The Company is a limited liability company duly formed and validly existing under the Laws of the State of New York. The Company has all necessary corporate power and authority to execute, deliver and perform this Agreement, and to own and lease and operate its properties and assets and carry on the Business as conducted.

7

(b)    <u>Authorization; No Conflicts</u>. The execution, delivery and performance by the Company of this Agreement has been duly and validly authorized by the members of the Company and by all other necessary limited liability company action. This Agreement constitutes a legally valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws and equitable principles relating to or limiting creditors' rights generally. The execution, delivery and performance by the Company of this Agreement will not: (i) violate, or constitute a breach or default (whether upon lapse of time and/or the occurrence of any act or event or otherwise) under the articles of organization or operating agreement of the Company; (ii) result in the imposition of any Lien against any material assets or properties of the Company; (iii) violate any Law; or (iv) result in a breach of, or default under (or give rise to a right of termination, cancellation, material modification or acceleration) under any Assigned Contract.

(c)    <u>Authority; Actions</u>. Except as set forth in <u>Schedule 5.1(c)</u>, there is no Order or Action pending or, to the knowledge of the Company, threatened in writing, against the Company or any of its Affiliates, that questions the validity of this Agreement or any action taken or to be taken by the Company in connection herewith, or which seeks to enjoin the consummation of the transactions contemplated herein. To the Company's knowledge, other than the approval of the Receiver and the CON Approval, no consent, approval, order, or authorization of or notification, registration, declaration or filing with any Governmental Entity or Third Party is required in connection with the execution and delivery of this Agreement by Company or the consummation of the transactions contemplated hereby or thereby.

(d)    <u>Financial Statements</u>. Attached hereto are true, complete, and correct copies of the Financial Statements.  Except as set forth in <u>Schedule 5.1(d)</u>, all the Financial Statements, to the knowledge of the Company, are: (1) true, correct, and complete, (2) have been prepared in accordance with GAAP consistently applied throughout the periods indicated and (3) have been derived from and prepared in all material respects in accordance with the books and records of the Company.  The Company has disclosed to the Company all material facts related to the preparation of the Financial Statements. To the knowledge of the Company, the Financial Statements fairly present the financial position of the Company as of the dates thereof, and the results of operations for the periods ended on the dates thereof.

(e)    <u>Compliance with Law</u>. The Company and the Seller, their respective members and Affiliates are operating their businesses in compliance with all applicable Laws, including but not limited to Healthcare Reimbursement Program Laws, and there are no violations of applicable Laws which: (i) would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the business, operations, assets or financial condition of Buyer; or (ii) could not reasonably be expected to have a material adverse effect on Buyer's ability to perform this Agreement.  The Company and the Seller have no Healthcare Reimbursement Program Liabilities and there has been no Action commenced or Order issues against the Company or Seller asserting violations of Healthcare Reimbursement Program Laws.

8

(f)     No Brokers or Finders. No agent, broker, finder, or investment or commercial banker, or other Person or firm engaged by or acting on behalf of the Company or its Affiliates in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any broker's or finder's or similar fee or other commission arising in connection with this Agreement or such transactions.

(g)     Licenses and Permits. The Company is currently established and licensed by DOH, pursuant to the Public Health Law of the State of New York, to operate the Business as a 588 bed skilled nursing facility. The Company's beds are certified under both the Medicare and Medicaid programs. The Company possesses all material Permits required for the occupancy and operation of the Business as currently operated. Except to the extent noted in Schedule 5.1(f), to the knowledge of the Company, there are no material violations of Law or Permits affecting the Business or its operations.  To the Company's or Seller's knowledge, no such violations are threatened nor are there any conditions that would reasonably give rise to any such violations. The Business participates as a provider in the Medicare and Medicaid programs pursuant to Medicare and Medicaid provider agreements and is in compliance with those provider agreements in all material respects.

(h)     Notices. Except as set forth on Schedule 5.1(g), the Company has not been served with any notice which: (i) requires the performance of any material work or alterations for the Real Property, or in the streets bounding thereon; or (ii) orders the installation, repair or alteration of any improvements on the Real Property or the streets bounding thereon, in each case including, but not limited to notices received under the Americans with Disabilities Act of 1990, as amended.

(i)     Name. Schedule 5.1(h) sets forth all names by which the Business has been known for the past ten (10) years.

(j)     Collective Bargaining Agreements. Except for the collective bargaining agreements identified on Schedule 5.1(i) (the "Collective Bargaining Agreements"), the Company is not a signatory to or obligated under any other collective bargaining agreement.

(k)     Employee Benefit Plans. Except as set forth on Schedule 5.1(j), there are no Employee Plans.

(l)     No Other Sale Agreements. There are no outstanding contracts or options or rights to purchase or related to any of the Purchased Assets or the Real Property other than the Receiver Agreement and Real Estate Contract, and there are no other pending certificate of need applications relating to the Business.

Section 5.2   Representations and Warranties of Buyer. Buyer represents and warrants as follows:

(a)     Organization and Related Matters. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New York.

The DOO is currently and shall be the managing member/manager of Buyer subject to the terms of Section 6.3(b). Buyer has the necessary corporate power and authority to execute, deliver and perform this Agreement. Buyer has all necessary corporate power and authority to carry on the Business as now being conducted.

(b)     Authorization; No Conflicts. The execution, delivery and performance of this Agreement by Buyer have been duly and validly authorized by the members of Buyer and by all other necessary limited liability company action on the part of Buyer. This Agreement constitutes a legally valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws and equitable principles relating to or limiting creditors' rights generally. The execution, delivery and performance of this Agreement by Buyer, will not: (i) violate, or constitute a breach or default (whether upon lapse of time and/or the occurrence of any act or event or otherwise) under the articles of organization or operating agreement of Buyer or any of its members or any Contract to which Buyer or any of its members is a party; (ii) result in the imposition of any Lien against any material assets or properties of Buyer or any of its members; or (iii) violate any Law.

(c)     Approvals.  Except as otherwise set forth in Section 5.2(c), no consent, approval, order, or authorization of, or notice or registration with any Governmental Entity is required in connection with the execution and delivery by execution and delivery of this Agreement by Buyer.

(d)     Actions. There is no Order or Action pending or, to the knowledge of Buyer or any of its members, threatened against or affecting Buyer or any of its members that individually or when aggregated with one or more other Orders or Actions has or could reasonably be expected to have a material adverse effect on Buyer's ability to perform this Agreement.

(e)     Compliance with Law. Buyer, its members and its Affiliates are operating their businesses in compliance with all applicable Laws, except for violations of applicable Laws which: (i) would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the business, operations, assets or financial condition of Buyer; or (ii) could not reasonably be expected to have a material adverse effect on Buyer's ability to perform this Agreement.

(f)     No Brokers or Finders. No agent, broker, finder or investment or commercial banker, or other Person or firms engaged by or acting on behalf of Buyer or its Affiliates in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any broker's or finder's or similar fees or other commissions arising in connection with this Agreement or the transactions contemplated herein.

(g)     Availability of Funds. Buyer currently has or will at the Closing have immediately available funds in cash, which are sufficient to consummate the transactions contemplated by this Agreement.

4899-7664-2824v.3

(h)  Approvals. To the knowledge of Buyer, no fact, issue, concern or other matter, either past or present, exists that would materially adversely affect Buyer's ability to obtain the Approvals set forth in Section 10.3(c).

(i)  Buyer Information. To the knowledge of Buyer, all of the information provided to the Company in connection with the transactions contemplated by this Agreement is complete, true and accurate in all material respects.

## ARTICLE VI
### COVENANTS WITH RESPECT TO THE PERIOD PRIOR TO CLOSING

Section 6.1  Compliance with Receivership Agreement. From the execution of this Agreement and the Receiver Agreement to the Closing Date, the Receiver shall maintain the conditions and fund all operations and liabilities of the Facility in accordance with the terms and conditions of the Receiver Agreement.

Section 6.2  CHOW Application. Within ten (10) business days after the Receivership Date, the Buyer will promptly file a "change of ownership," "change of operator," or similar licensure applications ("CHOW Application") with the DOH. The Buyer shall provide Company with all correspondence and materials in connection therewith.  The principal of the applicant shall always be the DOO except that: (i) if such principal fails DOH's character and competence review, Buyer may substitute a Person for such principal; and (ii) Buyer may add to the Persons listed in the Application with the consent of the Company, which shall not be unreasonably withheld.

Section 6.3  Efforts; No Inconsistent Action.

(a)  Subject to the terms and conditions hereof, Buyer and the Company shall cooperate and use their commercially reasonable, good faith efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement and to cause the conditions to each other's obligation to close the transactions contemplated hereby as set forth in Article X to be satisfied. In addition, each of Buyer and the Company will give notice to one another of, and a reasonable opportunity to participate in, any discussions with any Governmental Entity regarding notices and applications required to consummate and make effective the transactions contemplated by this Agreement. Buyer and the Company shall cooperate with each other to the extent reasonable in connection with the foregoing.

(b)  In furtherance and not in limitation of the foregoing, Buyer and the Company shall, at their own respective cost and expense, use their commercially reasonable, good faith efforts to file their respective applications or filings with any applicable Governmental Entity whose Approval is required in connection with the consummation of the transactions contemplated by this Agreement as promptly as practicable following the Receivership Date.

(c)  Buyer and the Company shall cooperate and use their respective commercially reasonable, good faith efforts to obtain any Approvals required for the Closing, to respond

11

to any requests for information from a Governmental Entity, and to contest and resist any Action and to have vacated, lifted, reversed or overturned any Order (whether temporary, preliminary or permanent) that restricts, prevents or prohibits the consummation of the transactions contemplated by this Agreement. To the extent permitted by applicable Law, Buyer and the Company shall provide the other the opportunity to make copies of all material correspondence, filings or communications (or memoranda setting forth the substance thereof) between such party or its representatives, on the one hand, and any Governmental Entity, on the other hand, with respect to this Agreement or the transactions contemplated by this Agreement. Buyer and the Company acknowledge that all such information provided pursuant to the foregoing sentence shall be subject to the terms of any confidentiality agreement.

(d)     Buyer and the Company shall notify and keep the other advised as to: (i) any material communication from any Governmental Entity, including any "30-day letters," regarding any of the transactions contemplated hereby; and (ii) any Action pending and known to such Party or, to its knowledge, threatened, which challenges the transactions contemplated hereby. Buyer and the Company shall not take any action inconsistent with their obligations under this Agreement that would materially hinder or delay the consummation of the transactions contemplated by this Agreement.

(e)     Prior to the Closing, the Parties shall use commercially reasonable, good faith efforts to obtain (and cooperate with the other Party hereto in obtaining) all consents, Permits, authorizations, Approvals of, and exemptions by, any third party necessary for the consummation of the transactions contemplated by this Agreement; provided, however, that the Company shall have no obligation to give any guarantee or other consideration of any nature in connection with the receipt of any such waiver, consent, approval or authorization required to be obtained by the Buyer, and Buyer shall have no obligation to give any guarantee or other consideration of any nature in connection with the receipt of any waiver, consent, approval or authorization required to be obtained by the Company.

(f)     All documents required to be filed by any of the Parties with any Governmental Entity in connection with this Agreement or the transactions contemplated by this Agreement will comply in all material respects with the provisions of applicable Law.

Section 6.4     <u>Supplemental Disclosure</u>. The Company shall have the right from time to time prior to the Closing to supplement any Disclosure Schedule with respect to any matter that arises or becomes known by the Company after the date hereof and that would have been required or permitted to be set forth or described in the Disclosure Schedules had such matter existed or been known to the Company as of the date of this Agreement. Any such supplemental disclosure will be deemed to have cured the breach of any representation or warranty made in this Agreement with respect to such disclosed matter only if such supplemental disclosure does not result in a Material Adverse Effect on the Business (it being understood that the consummation of the Closing after the supplemental disclosure will be deemed to constitute a waiver of any such breach).

Section 6.5     <u>Prior Knowledge</u>. If Buyer or the Company had knowledge prior to the execution of this Agreement that any representation or warranty of the other Party contained in this Agreement was not true and correct as of the date hereof, Buyer or the Company, as the case may

12

be, may not assert such breach of a representation and warranty as a basis not to consummate the transactions contemplated by this Agreement. In the event the Closing occurs, Buyer and the Company hereby expressly waive, relinquish and release any right or remedy available to it at Law, in equity or under this Agreement to make a Claim against the other Party for damages that such Party may incur, or to rescind this Agreement and the transactions contemplated hereby, as the result of any of the other Party's representations or warranties being not true or correct, if such Party knew that such representation or warranty was not true or correct at the time of the Closing, as demonstrated by written confirmation.

Section 6.6    New Accounts. Within five (5) Business Days after the Receivership Date, the Company shall establish a new operating bank account (the "**New Operating Account**") and a new payroll bank account (the "**New Payroll Account**"), both of which shall be under the control of the Receiver (the "**New Accounts**") and over which the DOO or another employee of the Company designated by the DOO, and another person designated by the Receiver, shall have signature authorization. From the Receivership Date through the Closing, all payments received for services provided by the Business shall be transferred from the Company's existing operating account and/or deposited into the New Operating Account within three (3) Business Days. The Company and Buyer shall take all reasonable action necessary to effectuate the foregoing. This provision shall survive the Closing. Notwithstanding the provisions of this Section, the Company shall be permitted to transfer or dispose of any Excluded Assets at any time and in any manner it desires in its sole discretion.

Section 6.7    Resident Assets.

(a)    At the Closing, the Company shall deliver to Buyer: (i) a schedule of all resident funds held by the Business with all such funds designated on a patient-by patient basis; (ii) a check or checks drawn on the residents' accounts maintained by the Business for the full amount of each resident's account(s) which shall be deposited by Buyer in a new residents' Allowance Account to be maintained by it; (iii) a schedule of all bank accounts maintained by the Business on behalf of its residents; (iv) all bank books and other assets belonging to residents of the Business maintained in the custody of the Business together with a schedule listing such assets and the name of the residents for whom they are being held; and (v) a schedule of all resident security deposits and prepayments held by the Business, designated on a patient-by-patient basis, together with a check or checks in the amount of the security deposits and unexpended prepayments (such amounts described in (i) to (v), are referred to collectively herein as the "**Residents Assets**"). Any liabilities for insufficiency, inaccuracy, or legal violations with respect to Residents Assets arising, accruing, or related to the period before the Receivership Date shall be the responsibility of the Company and any liability for periods on and after the Receivership Date shall be the responsibility of Buyer.

(b)    The Company and Buyer shall promptly give all notices required by Law in connection with the transfer of the Resident Assets.

13

# ARTICLE VII
## CONTINUING COVENANTS

Section 7.1    <u>Cooperation; Legal Privileges</u>.

(a)    After the Closing Date, upon the Company's request (at the Company's expense for out-of-pocket expenses incurred by Buyer) and without necessity of subpoena or any other legal process, Buyer will, and will cause its representatives and counsel to, reasonably cooperate with the Company and its representatives and counsel for purposes of permitting the Company to address and respond to any matters that arise as a result of or otherwise related to the Company's prior ownership of the Business, whether or not related to this Agreement, including any assets, liabilities or other matters related to the Company that are retained by the Company and any claims made by or against the Company or any of its Affiliates, whether involving any Governmental Entity or third party.

(b)    Such reasonable cooperation under <u>Section 7.1(a)</u> shall include: (i) upon prior written notice to Buyer, reasonable access during normal business hours to Buyer's officers, directors, employees, auditors, counsel, representatives, properties, books, records and operating instructions and procedures all limited exclusively to the Business; (ii) assisting at no cost to Buyer, the Company in connection with any Actions, including preparation for any Actions such as discovery, depositions and similar activities; (iii) the right to make and retain copies of all pertinent documents and records relating to any such matters; and (iv) the right to request an independent audit of Buyer's books and records in relation to any matters relevant to this Agreement. Buyer's obligations under this Section are in addition to Buyer's other obligations to reasonably cooperate with the Company contained in this Agreement.

(c)    Buyer shall retain, for seven (7) years after the Closing Date, all books, records and other documents pertaining to the Business and its assets that relate to the period prior to the Closing Date that Buyer has assumed under this Agreement and make the same available to the Company or its Affiliates without charge after the Closing Date for inspection at Buyer's offices and copying by the Company or its Affiliates or their agents at the Company's expense, during regular business hours without significant disruption to Buyer and upon reasonable request and upon reasonable advance written notice. At and after the expiration of such period, if the Company or any of its Affiliates has previously requested in writing that such books and records be preserved, Buyer shall either preserve such books and records for such reasonable period as may be requested by the Company or any of its Affiliates or transfer, at the Company's cost and expense, such books and records to the Company or its designated Affiliate. The Company agrees that such records will be kept strictly confidential; provided such books and records may be used for purposes of litigation or as required by any Governmental Entity.

(d)    At Buyer's request, following the Receivership Date, the Company will, at no cost to Company, reasonably cooperate with the Buyer and its representatives and counsel for purposes of permitting the Buyer to facilitate the assignment and assumption of the HUD Loan by Real Estate Buyer.

14

(e)    Any Books and Records, including, but not limited to the policy and procedures manual and any personnel records relating to the Buyer Employees, to the extent available, shall be left at the Facility or electronically transferred to Buyer and Receiver in accordance with applicable Law.

Section 7.2    <u>Acknowledgment of Limitation of Warranties</u>.

(a)    Buyer hereby acknowledges that, for purposes of enabling it to give this acknowledgement:

> i.    it is an informed and sophisticated participant in the transactions contemplated hereby;

> ii.    it has been afforded the opportunity for full and complete investigations, examinations and inspections of the Purchased Assets, the Business and the Assumed Liabilities;

> iii.    the Property Information delivered or made available to Buyer, Buyer's Affiliates, Buyer's Representative and/or their respective agents or representatives, including, without limitation, their contractors, engineers, attorneys, accountants, consultants, brokers or advisors, by the Company or the Company's Affiliates or any of their agents or representatives may have been prepared by third parties and may not be the work product of the Company and/or any of the Company's Affiliates;

> iv.    except as expressly set forth in <u>Section 5.1</u> of this Agreement, the Property Information delivered or made available to Buyer, Buyer's Representative, Buyer's Affiliates and/or their respective agents or representatives, including, without limitation, their contractors, engineers, attorneys, accountants, consultants, brokers or advisors, is furnished to each of them at the request, and for the convenience of, Buyer;

> v.    except as expressly set forth in <u>Section 5.1</u> of this Agreement, neither the Company, any of the Company's Affiliates, nor any of their respective agents or representatives, including, without limitation, their contractors, engineers, attorneys, accountants, consultants, brokers or advisors, has made any independent investigation or verification of, or has any knowledge of, the accuracy or completeness of, the Property Information;

> vi.    except as expressly set forth in <u>Section 5.1</u> of this Agreement, Buyer is relying solely on its own investigations, examinations and inspections of the Purchased Assets, the Business and the Assumed Liabilities and is not relying in any way on the Property Information furnished by the Company, any of the Company's Affiliates, or their agents or representatives, including, without limitation, their contractors, engineers, attorneys, accountants, consultants, brokers or advisors; and

15

vii.    the New York State Attorney General lawsuit and all issues with any union, have been fully disclosed to the Buyer.

Accordingly, Buyer hereby agrees that except as expressly set forth in <u>Section 5.1</u> of this Agreement and in any disclosure schedules delivered in conjunction with this agreement, the Purchased Assets and Assumed Liabilities are transferred "AS IS," "WHERE IS" AND, SUBJECT ONLY TO THE REPRESENTATIONS AND WARRANTIES CONTAINED IN <u>SECTION 5.1</u>, AND IN ANY DISCLOSURE SCHEDULES DELIVERED OR SUPPLEMENTED IN CONNECTION WITH THIS AGREEMENT WITH ALL FAULTS AND WITHOUT ANY OTHER REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE WHATSOEVER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, AND IN PARTICULAR, WITHOUT ANY IMPLIED WARRANTY OR REPRESENTATION AS TO:

    A.    CONDITION, VALUE, MERCHANTABILITY OR FITNESS OR SUITABILITY FOR ANY SPECIFIC PURPOSE AS TO ANY OF THE ASSETS OR PROPERTIES OF THE BUSINESS;

    B.    THE OPERATION OF THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING IN ANY MANNER OTHER THAN AS USED AND OPERATED BY THE COMPANY; OR

    C.    THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR PURCHASED ASSETS BY BUYER AFTER THE CLOSING.

(b)    Buyer acknowledges and agrees that except for the representations and warranties contained in <u>Section 5.1</u> of this Agreement, neither the Company nor any of its Affiliates, officers, directors, employees, agents, representatives, nor any other Person, makes or shall be deemed to make any representation or warranty to Buyer, express or implied, at Law or in equity, on behalf of the Company with respect to the Business, the Purchased Assets or otherwise, including with respect to any other information provided to Buyer, whether on behalf of the Company or such other Persons. The Company hereby disclaims any representation or warranty except for the representations and warranties contained in <u>Section 5.1</u> of this Agreement and in any Disclosure Schedules delivered in connection with this Agreement, whether made by or attributed to the Company, or any of its Affiliates, officers, directors, employees, agents, representatives or any other Person, notwithstanding the delivery or disclosure to Buyer or any of its officers, directors, employees, agents or representatives or any other Person of any documentation or other information by or purportedly by the Company or any of its Affiliates, officers, directors, employees, agents, representatives or any other Person.

(c)    The provisions of this Section shall survive the termination of this Agreement and the Closing.

16

Section 7.3    Intellectual Property. Following the Closing, except as otherwise agreed by the Company or any Affiliate of the Company, Buyer agrees that neither Buyer nor any of its Affiliates will use the name "Cold Spring Hills Center for Nursing and Rehabilitation" or any similar name or acronym or any Intellectual Property of the Company or its Affiliates set forth in Schedule 7.3 in its operation of the Business. Without limiting the foregoing, Buyer agrees to change all relevant signage on the Real Property on the Closing Date or as soon as reasonably possible thereafter. This provision shall survive the Closing.

Section 7.4    Cost Reports.  Company shall prepare and file cost reports with respect to the Business for periods prior to the Receivership Date. For periods on and after the Receivership Date, the cost reports shall be prepared by Buyer and shall be presented to Company for review, adjustment and comment prior to filing.

## ARTICLE VIII
## EMPLOYEES AND EMPLOYEE BENEFIT MATTERS

Section 8.1    Business Employees.

    (a)    Intentionally Omitted.

    (b)    Employment of Business Employees.

        i.    Subject to the following sentence and to any obligations of the Collective Bargaining Agreement and any obligations under WARN, Buyer may make offers of employment to those Business Employees that Buyer elects to retain on such terms as Buyer shall determine (those Business Employees who accept employment and report for work with Buyer after the Closing, the "**Buyer Employees**").

        ii.    This Section shall not require Buyer to continue the employment of a Buyer Employee for any particular period of time after the Closing; provided that Buyer shall bear all liability for any such termination of employment or modification of terms and conditions of employment following the Receivership Date with respect to Buyer Employees. Company shall bear any liability for termination of employees prior to Receivership Date that Buyer does not elect to retain.

        iii.    Buyer shall be solely responsible for all rights and benefits of Buyer Employees earned or accrued on or after the Receivership Date, including (i) claims for welfare benefits and for workers compensation, and (ii) claims relating to COBRA coverage attributable to "qualifying events" with respect to any Buyer Employee and his or her beneficiaries and dependents.

        iv.    Buyer shall provide a healthcare plan to Buyer Employees, who are not members of the bargaining unit covered by the Collective Bargaining Agreement, who shall be eligible to participate in Buyer's plan immediately after the Receivership Date without having to satisfy any waiting period.

17

v.      To the extent permitted by applicable law, Buyer will amend its 401(k) plan, if need be, or take other action so that loans made under the Company's 403(b) plan may be rolled over to Buyer's plan as part of a distribution from the Company's 403(b) Plan after the Receivership Date and, following such distribution and roll over, Buyer's plan will permit participants in the Company's plan with outstanding loan balances to be able to continue to make loan payments under Buyer's plan.

vi.     (A) With respect to all accrued vacation time, accrued sick time, and personal days to which any Buyer Employee is entitled, as of the Receivership Date, pursuant to the policy applicable to such Buyer Employees immediately prior to the Receivership Date, Buyer shall, to the maximum extent permitted by applicable local Law, assume the liability for such unused vacation time, sick time, and personal time, "fully burdened and bundled" with all taxes, including Social Security and other applicable taxes, and all employer benefit plan contributions that Company would be required to make with respect to such vacation time and personal days upon payment thereof and allow such Buyer Employee to use such accrued vacation time and personal days, all as set forth in a detailed schedule, delineated by each Buyer Employee, to be delivered by Company at Closing. Buyer shall indemnify and hold Company harmless with respect to any liability for claims by a Buyer Employee in any way relating to such accrued and assumed vacation time and personal days, fully burdened and bundled as aforesaid, that may arise on or after the Receivership Date.

vii.    Buyer shall be responsible for compliance with WARN and comparable New York State legislation with respect to events that occur on or after the Receivership Date. The Company reserves the right to send notices it deems appropriate under WARN and comparable New York State legislation in connection with the Closing. During the period prior to the Closing, the Buyer shall not act in any manner that way trigger WARN.

viii.   The Company and its Affiliates shall retain the right to enforce any and all agreements relating to Intellectual Property retained by the Company or any of its Affiliates with respect to the Buyer Employees after the Closing.

(c)     No Duplicate Benefits. Nothing in this Agreement shall require or cause duplicate benefits to be paid or provided to or with respect to a Buyer Employee under any employee benefit policies, plans, arrangements, programs, practices or agreements with respect to the same period of service.

Section 8.2    Employee Rights; No Third Party Beneficiaries. Nothing expressed or implied in this Article shall confer upon any employee of the Company or its Affiliates or upon any Buyer Employee or upon any legal representative of such employee, any rights or remedies, including any right to employment or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement. Nothing in this Agreement, express or implied,

18

4899-7664-2824v.3

shall create a third party beneficiary relationship or otherwise confer any benefit, entitlement, or right upon any person or entity other than the parties hereto.

Section 8.3    Union Contract. Buyer recognizes that SEIU 1199 Health Care Employees ("**Union**") is the bargaining agent for Buyer Employees and agrees to negotiate a Collective Bargaining Agreement with the union in good faith. From and after the Receivership Date Buyer agrees to continue contributions to the 1199 SEIU Health Care Employees Pension Fund ("**Pension Fund**") with respect to the Buyer Employees, as may be modified in good faith negotiations with the Pension Fund.

Section 8.4    Withdrawal Liability. Buyer and the Company intend to satisfy the obligations under Section 4204 of ERISA and to take any other actions required or desirable so that no withdrawal liability (pursuant to Section 4201 et seq. of ERISA) is imposed upon the Company as a result of the transactions contemplated by this Agreement. To that end:

(a)    Buyer shall be obligated to contribute to the Pension Fund for substantially the same number of contribution base units (as defined in Section 4001(a)(11) of ERISA) for which the Company had an obligation to contribute to the Pension Fund in respect of the Business prior to the Closing.

(b)    Buyer shall provide to the Pension Fund, for the first plan year of the Pension Fund (the "**Plan Year**"**,** which is the calendar year) beginning after the Closing and for each of the four (4) Plan Years thereafter, a bond or escrow (or letter of credit or other security that is acceptable to the Pension Fund) that complies with Section 4204(a)(1)(B) of ERISA, in an amount equal to the greater of:

   i.    the average annual contribution required to be made to the respective Pension Fund by the Company with respect to the Business for the three (3) Plan Years preceding the Plan Year in which the Closing occurs, or

   ii.    the annual contribution required to be made to the respective Pension Fund by the Company with respect to the Business for the last Plan Year completed before the Plan Year in which Closing occurs.

(c)    The cost of the bond or escrow (or letters of credit or other security) required under Section 4204(a)(1)(B) of ERISA and subsection (b), above, and any fees and costs associated therewith, shall be paid by the Buyer.

(d)    Any such bond or escrow (or letter of credit or other security) shall provide (i) that it shall be paid to the Pension Fund if Buyer withdraws from the Pension Fund, or fails to make a contribution to the Pension Fund when due, at any time during five (5) full plan years beginning after the Closing, and (ii) that it will be released or returned to Buyer under all other circumstances.

(e)    The parties hereto shall cooperate and jointly apply to each Pension Fund before the first day of the first Plan Year beginning immediately after the Closing to obtain an exemption or variance from each of the bond/escrow requirements of Section 4204(a)(l)(B)

19

of ERISA and the sale contract language of Section 4204(a)(1)(C) of ERISA, to the extent an exemption or variance is available with respect to each. The cost of any such application shall be borne by the Buyer.

(f)     To the extent provided in Section 4204(a)(1)(C) of ERISA, if Buyer withdraws from either Pension Fund in a complete withdrawal, or there occurs a partial withdrawal from either Pension Fund with respect to the Business within such five (5) years, the Company will be secondarily liable for any withdrawal liability (pursuant to Section 4201 et seq. of ERISA) that it would have had with respect to the Business, but for this Agreement, if the liability of Buyer with respect to the Pension Fund is not paid by Buyer; provided, however, that the preceding language will be void and of no effect, if the parties obtain an exemption or variance from the requirements of Section 4204(a)(1)(C) of ERISA.

(g)     The Company shall comply with its obligations, if any, under Section 4204(a)(3) of ERISA.

(h)     Each Party agrees to indemnify and hold the other Party harmless from and against any and all losses, costs, liens, claims, liabilities or damages (including, but not limited to, reasonable attorneys' fees and disbursements) arising from or relating to a breach of such Party's obligations under this Section or any act or omission of such Party or any affiliate thereof in connection with the obligations that such Party has under this Section.

Section 8.5     Assistance. The Company and Buyer agree to cooperate fully with respect to the actions necessary to effect the transactions contemplated in this Article, including (subject to applicable Law) the provision of records (including payroll records) and information as each may reasonably request from the other.

## ARTICLE IX
## TAX MATTERS

Section 9.1     Liability for Taxes and Related Matters.

(a)     The Company shall be liable for Taxes and shall prepare or cause to be prepared all Tax Returns relating to the Purchased Assets for periods ending prior to the Receivership Date and the Buyer shall be liable for periods ending on or after the Receivership Date.

(b)     Buyer shall be liable for Taxes and shall prepare and file all Tax Returns relating to the Purchased Assets for periods ending after the Receivership Date.

Section 9.2     Cooperation. Buyer and the Company agree to furnish or cause their Affiliates to furnish, to each other, upon written request, as promptly as practicable, such information and assistance relating to the Purchased Assets or the Business (including, access to books and records) as is reasonably necessary for the filing of all Tax Returns and other Tax filings, the making of any election related to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return. Buyer and the Company shall cooperate, or cause their Affiliates to cooperate, with each other in the conduct of any audit or other proceeding related to Taxes. Buyer and the Company shall provide, or cause

20

their Affiliates to provide, timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Purchased Assets or the Business for any taxable period for which the other Party may have liability under this Agreement. Buyer and the Company shall furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any taxing authority in connection with any Tax Audit or information request with respect to any taxable period for which the other Party or its Affiliates may have liability under this Agreement.

**ARTICLE X**
CONDITIONS OF PURCHASE

Section 10.1    <u>General Conditions</u>. The obligations of Buyer and the Company to effect the Closing shall be subject to the following conditions, unless waived in writing by each of the Parties, that at the Closing Date:

(a)      no Law or Order shall have been enacted, entered, issued, promulgated or enforced by any Governmental Entity that prohibits any of the transactions contemplated hereby; and

(b)      no Action shall have been commenced by any Governmental Entity that seeks to prohibit or enjoin the transactions contemplated hereby.

Section 10.2    <u>Conditions to Obligation of Buyer</u>. The obligation of Buyer to effect the Closing shall be subject to the following conditions, except to the extent waived in writing by Buyer:

(a)      <u>Representations and Warranties of the Company</u>. The representations and warranties of the Company contained herein shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except as otherwise contemplated by this Agreement), except to the extent that the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have or reasonably be expected to have a Material Adverse Effect.

(b)      <u>Covenants of the Company</u>. The Company shall not be in breach or default in any material respect of its obligations and shall have complied in all material respects with all covenants set forth in this Agreement that are required to be performed or complied with by it at or prior to the Closing.

(c)      <u>Approvals</u>. All Approvals required by applicable Law to be obtained from any Governmental Entity to consummate the transactions contemplated hereby shall have been received or obtained on or prior to the Closing Date; specifically including, but not limited to, Buyer shall have obtained non-contingent final approval from PHHPC and the Commissioner of DOH for Buyer to operate the Business.

(d)      <u>Officer's Certificate</u>. Buyer shall have received a certificate of the Company signed by an authorized officer of the Company to the effect that the conditions in <u>Section 10.2(a)</u>, <u>10.2(b)</u> and, to the extent such Approvals must be obtained by the Company, <u>10.2(c)</u> have been satisfied.

21

(e)     <u>Closing Deliveries</u>. Buyer shall have received the documents referred to in <u>Section 4.2</u>.

(f)     <u>Lease</u>. The Receiver shall have either (i) entered into a new lease or a lease amendment with the Real Estate Seller and shall have performed all obligations thereunder; or (ii) assumed Company's obligations and performed all obligations under the Existing Lease prior to the Closing.

(g)     <u>Real Property</u>. The Real Estate Buyer shall, on or prior to the Closing Date, have acquired the Real Property pursuant to the Real Estate Contract.

Section 10.3   <u>Conditions to Obligation of the Company</u>. The obligation of the Company to effect the Closing shall be subject to the following conditions, except to the extent waived in writing by the Company:

(a)     <u>Representations and Warranties of Buyer</u>. The representations and warranties of Buyer contained herein shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except as otherwise contemplated by this Agreement), except to the extent that the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have or reasonably be expected to have a material adverse effect on the benefit of this Agreement and the Real Estate Contract to the Company.

(b)     <u>Covenants of Buyer</u>. Buyer shall not be in breach or default in any material respect of its obligations and shall have complied in all material respects with all covenants set forth in this Agreement that are required to be performed or complied with by it at or prior to the Closing.

(c)     <u>Approvals</u>. All Approvals required by applicable Law to be obtained from any Governmental Entity to consummate the transactions contemplated hereby shall have been received or obtained on or prior to the Closing Date; specifically including, but not limited to, Buyer shall have obtained non-contingent final approval from PHHPC and the Commissioner of DOH for Buyer to operate the Business on terms and conditions that will not have a material adverse effect on the operations of the Company or its Affiliates.

(d)     <u>Officer's Certificate</u>. The Company shall have received a certificate of Buyer signed by an authorized officer of Buyer to the effect that the conditions in <u>Section 10.3(a), 10.3(b), and 10.3(c)</u>, have been satisfied.

(e)     <u>Lease</u>. The Receiver shall have either (i) entered into a new lease or lease amendment with the Real Estate Seller and shall have performed all obligations thereunder; or (ii) assumed Company's obligations and performed all obligations under the Existing Lease prior to the Closing.

(f)     <u>Real Property</u>. The Real Estate Buyer shall, on or prior to the Closing Date, have acquired the Real Property pursuant to the Real Estate Contract.

22

(g)     Closing Deliveries. The Company shall have received the payments and documents referred to in Section 4.3.

## ARTICLE XI
## TERMINATION OF OBLIGATIONS

Section 11.1    Termination of Agreement. Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time before the Closing as follows and in no other manner:

(a)     Mutual Consent. By mutual consent in writing of Buyer and the Company.

(b)     Material Breach:

   i.    Default by Buyer. In the event that the Buyer has materially breached, defaulted or failed to fulfill any representation, warranty or covenant of this Agreement prior to Closing, and the continuance of such material breach, default or failure by the Buyer which continues for thirty (30) days following the receipt by the Buyer of written notice from the Company specifying the material breach, default or failure within which to cure such material breach, default or failure, the Company shall be entitled to terminate this Agreement by written notice to Buyer.

   ii.   Default by the Company. In the event that the Company has materially breached, defaulted or failed to fulfill any representation, warranty or covenant of this Agreement prior to Closing, and the continuance of such default or failure by the Company which continues for thirty (30) days following the receipt by the Company of written notice from the Buyer specifying the material breach, default or failure within which to cure such material breach, default or failure, the Buyer shall be entitled to terminate this Agreement by written notice to Company.

   iii.  Material Adverse Event. In the event of a Material Adverse Event, Buyer shall have the right to terminate this Agreement or to seek to specifically enforce this Agreement (without the posting of a bond).

(c)     CON Application.

   i.    In the event that: (i) Buyer fails to prosecute the Application diligently (as evidenced by Buyer's responsiveness to requests from DOH for further information within deadlines imposed by DOH) and in good faith; or (ii) a member of Buyer fails DOH's character and competence review, and Buyer has exercised any right to substitute such Person listed in the CHOW Application pursuant to Section 6.2, and after such substitution Buyer's Application is not approved due to a character and competence issue or an inability to demonstrate sufficient financial resources, then Buyer shall be deemed to be in default pursuant to Section 11.1(b)(i).

       ii.       In the event that DOH informs either party in writing of a final, non-contingent, unconditional and unappealable determination that CON Approval will not or cannot be granted, then any one of either the Buyer or the Company may send written notice to the other that this Agreement shall terminate.

    (d)    <u>Closing Not Consummated by Fixed Dates</u>. If the Closing has not occurred on or before the Outside Closing Date either Party may terminate this Agreement upon written notice to the other; provided that if the Closing has not occurred due to the breach of this Agreement on the part of a Party, then the breaching Party may not terminate this Agreement pursuant to this subsection.

    (e)    <u>Termination of Real Estate Contract or the Receiver Agreement</u>. This Agreement shall terminate upon any termination of the Real Estate Contract or the Receiver Agreement.

**Section 11.2**  <u>Effect of Termination</u>. Upon termination all obligations of the Parties under this Agreement shall terminate without further liability of any Party to another; provided that the obligations of the Parties contained in this <u>Article XI</u>, <u>Article XII</u>, and <u>Sections 7.2, 13.1, 13.2, 13.5, 13.8, 13.10, 13.11, 13.13, 13.14, 13.15, 13.18 and 13.19</u>, and all provisions of this Agreement necessary for the interpretation and enforcement thereof and any confidentiality agreement shall survive any such termination and the provisions regarding the payment of the Deposit shall survive any termination of this Agreement. A termination under <u>Section 11.1</u> shall not relieve any Party of any liability for an intentional breach of any material covenant or agreement under this Agreement or be deemed to constitute a waiver of any available remedy (including specific performance if available) for any such breach.

## ARTICLE XII
### INDEMNIFICATION; SURVIVAL

**Section 12.1**  <u>Obligations of the Company</u>. Effective as of the Closing, the Company shall indemnify and hold harmless Buyer, and each of its directors, officers, employees, Affiliates, agents and assigns from and against any and all Indemnifiable Losses based upon, relating to or arising from: (a) the Excluded Liabilities; (b) breach by the Company of any representations, warranties or covenants contained herein; (c) liabilities of the Business arising from or relating to any period prior to the Receivership Date, other than Assumed Liabilities; (d) the Resident Assets to the extent that the Company's schedules delivered in connection therewith at Closing are inaccurate and/or the proper amounts are not transferred to Buyer; and (e) Company's failure to file Tax Returns as required by <u>Section 9.1</u>.

**Section 12.2**  <u>Obligations of Buyer</u>. Effective as of the Receivership Date, Buyer shall indemnify and hold harmless the Company and each of its directors, officers, employees, Affiliates, agents and assigns from and against any and all Indemnifiable Losses based upon, relating to or arising from: (a) the Assumed Liabilities; (b) breach by Buyer of any representations, warranties or covenants contained herein; (c) liabilities of the Business exclusively arising from or relating to any period on and after the Receivership Date; (d) the Resident Assets to the extent such assets are properly transferred by the Company to Buyer; (e) liability for claims by Buyer Employees for

24

vacation time or personal days from and after the Receivership Date; (f) failure by Buyer to satisfy Buyer's obligations as required by <u>Section 8.4</u>; (g) liability for charges to the Company's employer's unemployment insurance account for unemployment insurance benefits awarded to Buyer Employees terminated within six (6) months after the Closing Date; and (h) failure by Buyer to pay Transfer Tax as required by <u>Section 9.1</u>.

Section 12.3    <u>Procedure</u>. The following procedures shall apply with respect to Indemnifiable Claims:

(a)    <u>Notice of Claims</u>. Any Party seeking indemnification of any Indemnifiable Loss or potential Indemnifiable Loss arising from a claim asserted by a Party or by a third party shall give written notice to the Party from whom indemnification is sought. Written notice to the Indemnifying Party of the existence of a third-party claim shall be given by the Indemnified Party promptly after its receipt of an assertion of liability from the third-party, and in any event within twenty (20) days of such assertion.

(b)    <u>Defense</u>. In the case of a third-party claim, the Indemnifying Party may, at its option, control the defense of an Indemnifiable Claim. Notwithstanding the foregoing, the Indemnified Party shall have the right to retain counsel of its choice at its own expense and participate in the defense of the Indemnifiable Claim. If the Indemnifying Party does not assume such defense or the Indemnifying Party notifies the Indemnified Party within thirty days that it will not assume such defense, the Indemnified Party may control the defense of such claim and may settle the claim on behalf of and for the account and risk of the Indemnifying Party, who shall be bound by the result. In all cases, the Party without the right to control the defense of the Indemnifiable Claim may participate in the defense at its own expense.

(c)    <u>Settlement Limitations</u>. Notwithstanding anything in this Section to the contrary, neither the Indemnifying Party nor the Indemnified Party shall, without the written consent of the other Party, settle or compromise any Indemnifiable Claim or permit a default or consent to entry of any judgment, unless such settlement or compromise includes a complete release of the Indemnified Party with respect to liability related to such Indemnifiable Claim. Notwithstanding the preceding sentence, if a settlement offer solely for money damages is made by the applicable third-party claimant, and the Indemnifying Party notifies the Indemnified Party in writing of the Indemnifying Party's willingness to accept the settlement offer and pay the amount called for by such offer without reservation of any rights or defenses against the Indemnified Party, the Indemnified Party may continue to contest such claim, free of any participation by the Indemnifying Party and the amount of any ultimate liability with respect to such Indemnifiable Claim that the Indemnifying Party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the Indemnified Party declined to accept plus the Indemnifiable Losses of the Indemnified Party relating to such Indemnifiable Claim through the date of its rejection of the settlement offer, or (B) the aggregate Indemnifiable Losses of the Indemnified Party with respect to such claim. If the Indemnifying Party makes any payment on any claim, the Indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the indemnified Party to any insurance benefits or other claims of the Indemnified Party with respect to such claim.

25

Section 12.4    <u>Limitation on Indemnification.</u>

     (a)    In all cases, any amounts for which a Party shall be entitled to indemnification hereunder shall be net of any insurance proceeds received by such Party (less any deductible) for such matter; provided, however, that the Party seeking indemnification hereunder shall not be required to seek recourse against any insurance company before pursuing remedies under this Agreement or otherwise.

     (b)    Unless provided expressly in other sections of this Agreement, the remedies in this Article XII shall be the sole and exclusive remedies of the Parties with respect to the matters arising out of this Agreement, absent fraud or intentional misrepresentation; provided, however, that this Section 12.04(b) shall not limit a Party's right to seek and obtain equitable remedies, including, without limitation, specific performance, with respect to any covenant or agreement contained in this Agreement.

     (c)    Notwithstanding anything in this Agreement to the contrary, except as otherwise provided in this Agreement, a Party shall not be entitled to indemnification under section 12.1 or Section 12.2 until the total of all its otherwise Indemnifiable Damages hereunder exceeds in the aggregate twenty-five thousand dollars ($25,000), (the "<u>Basket</u>"), at which point the full amount of all the Party's Indemnifiable Damages shall be recoverable from the other Party. Further, the Company's indemnification obligations under Section 12.1 shall in the aggregate not exceed one million dollars ($1,000,000.00).

Section 12.5    <u>Survival</u>. This <u>Article XII</u>, <u>Article IX</u>, <u>Article XIII</u>, and <u>Sections 2.3, 2.4, 2.5, 6.5, 6.7(b), 7.1, 7.2, 7.3, 8.1(b), 8.2, and 8.4</u> shall survive the Closing and shall remain in effect indefinitely. Unless otherwise indicated elsewhere herein, the representations and warranties of the Company and Buyer set forth in this Agreement shall survive for a period of eighteen (18) months from the Closing Date. Any matter as to which a claim has been asserted by written notice setting forth in reasonable detail the nature of such claim to the other Party that is pending and unresolved at the end of any applicable limitation period shall continue to be covered by this Article notwithstanding any applicable limitation period (which the Parties hereby waive) until such matter is finally terminated or otherwise resolved by the Parties under this Agreement or by a court of competent jurisdiction and any amounts payable hereunder are finally determined and paid.

Section 12.6    <u>Tax Consequences</u>. Notwithstanding anything in this Agreement to the contrary, Buyer shall not be indemnified or reimbursed for any tax consequences arising from the receipt or accrual of an indemnity payment hereunder.

Section 12.7    <u>Remedies Exclusive</u>. This Article is effective from and after the Closing. Except as otherwise provided in this Agreement, the remedies provided for in this Article shall be exclusive and shall preclude assertion by any Indemnified Party of any other rights or the seeking of any and all other remedies against the Indemnifying Party for claims subject to this Article. Each Party hereby waives any provision of Law to the extent that it would limit or restrict the agreement contained in this Section.

26

Section 12.8    Mitigation. The Parties shall cooperate with each other with respect to resolving any claim or liability with respect to which one Party is obligated to indemnify the other Party hereunder, including by making commercially reasonable efforts to mitigate or resolve any such claim or liability. Each Party shall use commercially reasonable efforts to address any claims or liabilities that may provide a basis for an Indemnifiable Claim such that each Party shall respond to any claims or liabilities in the same manner it would respond to such claims or liabilities in the absence of the indemnification provisions of this Agreement. In the event that any Party shall willfully fail to make such commercially reasonable efforts to mitigate or resolve any claim or liability, then notwithstanding anything else to the contrary contained herein the other Party shall not be required to indemnify any Person for any Indemnifiable Loss that could reasonably be expected to have been avoided if such Party, as the case may be, had made such efforts.

## ARTICLE XIII
### GENERAL

Section 13.1    Usage. All terms defined herein have the meanings assigned to them herein for all purposes, and such meanings are equally applicable to both the singular and plural forms of the terms defined. "Include," "includes" and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import. "Writing," "written" and comparable terms refer to printing, typing, lithography and other means of reproducing words in a visible form. Any instrument or Law defined or referred to herein means such instrument or Law as from time to time amended, modified or supplemented, including (in the case of instruments) by waiver or consent and (in the case of any Law) by succession of comparable successor Laws and includes (in the case of instruments) references to all attachments thereto and instruments incorporated therein. References to a Person are, unless the context otherwise requires, also to its successors and assigns. Any term defined herein by reference to any instrument or Law has such meaning whether or not such instrument or Law is in effect. "Shall" and "will" have equal force and effect. "Hereof," "herein," "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto. References to "the date of this Agreement," "the date hereof" or words of like import shall mean the Receivership Date. References in an instrument to "Article," "Section" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section or subdivision of or an attachment to such instrument.

Section 13.2    Amendments; Waivers. This Agreement and any Disclosure Schedule or Exhibit attached hereto may be amended only by agreement in writing of all Patties, except as set forth in Section 6.4 with respect to the Disclosure Schedules. No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby shall be effective unless in writing and signed by the Party to be bound and then only to the specific purpose, extent and instance so provided.

Section 13.3    Disclosure Schedules; Exhibits. Each Disclosure Schedule and Exhibit delivered pursuant to the terms of this Agreement shall be in writing and shall constitute a part of this Agreement, although the Disclosure Schedules need not be attached to each copy of this Agreement. The mere inclusion of an item in a Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission by the Company that such item

27

represents an exception or material fact, event or circumstance or that such item is reasonably likely to have a Material Adverse Effect. Further, any fact or item which is disclosed on any Disclosure Schedule to this Agreement in such a way as to make its relevance or applicability to information called for by another Disclosure Schedule or other Disclosure Schedules to this Agreement overtly apparent shall be deemed to be disclosed on such other Disclosure Schedule or Disclosure Schedules, as the case may be, notwithstanding the omission of a reference or cross-reference thereto.

Section 13.4   <u>Further Assurances</u>. Each of Buyer and the Company will use commercially reasonable, good faith efforts to cause all conditions to its and the other Party's obligations hereunder to be timely satisfied and to perform and fulfill all obligations on its part to be performed and fulfilled under this Agreement. Each of Buyer and the Company shall execute and deliver both before and after the Closing such further certificates, agreements and other documents and take such other actions as the other Party may reasonably request to consummate or implement the transactions contemplated hereby or to evidence such events or matters. With respect to the securing of any requisite Approvals after Closing, the Parties shall timely and promptly make all filings which may be required for the securing of such Approvals. In furtherance and not in limitation of the foregoing, each of Buyer and the Company shall use commercially reasonable efforts to file notification and report forms and similar applications with any applicable Governmental Entity whose Approval may be required following the Closing Date. Buyer and the Company shall cooperate and use their respective commercially reasonable efforts to respond to any requests for information by any Governmental Entity in connection with such post-Closing Approvals.

Section 13.5   <u>Governing Law; Consent to Jurisdiction; Waiver of Jury Trial</u>.

(a)   This Agreement and the legal relations between the Parties shall be governed by and construed in accordance with the Laws of the State of New York applicable to contracts made and performed in such State and without regard to conflicts of law doctrines (other than New York General Obligations Law, Section 5-1401). Each of the Parties hereto (i) consents to submit itself to the personal jurisdiction of any Federal court located in New York County of the State of New York or any New York state court in New York County in connection with any dispute that arises out of this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (iii) agrees that it will not bring any action relating to this Agreement or any other agreement contemplated hereby or any of the transactions contemplated hereby or thereby in any court other than a Federal court or a New York state court sitting in New York County unless venue would not be proper under rules applicable in such courts.

(b)   <u>Waiver of Jury Trial</u>. Each Party hereby waives, to the fullest extent permitted by applicable Law, any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction contemplated hereby. Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, and (ii) acknowledges that it

28

and the other Parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 13.5(b).

(c)    Dispute Resolution.  The Parties hereto agree that with respect to all disputes, problems or claims arising out of or in connection with this Agreement and all other agreements or other instruments executed in connection herewith (collectively "Disputes"), the Parties hereto shall, in good faith, use their reasonable best efforts to resolve the Dispute.  If after such efforts the parties hereto are unable within ten (10) Business Days of the arising of the Dispute to resolve the Dispute in good faith, then either party may submit such Dispute to binding arbitration pursuant to a Din Torah by a Beth Din (Jewish Court Arbitration Panel) Rabbinical Court.  Such Beth Din shall be selected by mutual agreement of the Parties. In the event that the Parties fail to agree on such selection, then each such Party will propose a dayan (judge), and shall promptly provide notice of such dayan (judge) so proposed to the other Party. A third dayan (judge) shall be selected by the mutual agreement of the two dayanim (judges) so proposed by the Parties, which third dayan (judge), with the dayanim (judges) proposed by each Party, shall serve as the Beth Din for such dispute or disagreement (referred to herein as the "Designated Beth Din"). The determination of the Designated Beth Din shall be binding upon the Parties and may be entered as a judgment in any court of competent jurisdiction. Notwithstanding  the foregoing, the parties acknowledge that the Designated Beth Din shall have the power to adjudicate issues of liability only; all issues pertaining to enforcing the Designated Beth Din's ruling will be handled and enforced in a State or Commonwealth court of competent jurisdiction in accordance with applicable State law, and the parties acknowledge and agree that this constitutes a "heter" (permission under religious Jewish law) to pursue collection and to enforce the decision of the Designated Beth Din in a legal proceeding in such State or Commonwealth court under applicable State or Commonwealth law.  Each Party shall pay for and bear the cost of its/his own expenses in such arbitration (including, without limitation, the cost of its/his own experts, evidence and attorneys' fees), except that in the discretion of the arbitrator any award may include the attorneys' fees of a party if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or in bad faith.

Section 13.6    Headings. The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 13.7    Counterparts. This Agreement and any amendment hereto or any other agreement (or document) delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts. All of such counterparts shall constitute one and the same agreement (or other document) and shall become effective (unless otherwise provided therein) when one or more counterparts have been signed by each Party and delivered to the other Party, including by facsimile or electronic mail, it being understood that all Parties need not sign the same counterpart. The parties agree that "PDF" and photocopies of signed counterparts may be used in lieu of original signatures.

Section 13.8    Parties in Interest. This Agreement shall be binding upon and inure to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to confer upon any

other Person (except the Real Estate Buyer to the extent provided herein) any rights or remedies of any nature whatsoever under or by reason of this Agreement. Nothing in this Agreement is intended to relieve or discharge the obligation of any third person to any Party to this Agreement.

Section 13.9    Waiver. No failure on the part of any Party to exercise or delay in exercising any right hereunder shall be deemed a waiver thereof, nor shall any single or partial exercise preclude any further or other exercise of such or any other right.

Section 13.10    Severability. If any provision of this Agreement is determined to be invalid, illegal or unenforceable by any Governmental Entity, the remaining provisions of this Agreement to the extent permitted by Law shall remain in full force and effect; provided that the essential terms and conditions of this Agreement for both Parties remain valid, binding and enforceable; and provided that the economic and legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party. In event of any such determination, the Parties agree to negotiate in good faith to modify this Agreement to fulfill as closely as possible the original intents and purposes hereof. To the extent permitted by Law, the Parties hereby to the same extent waive any provision of Law that renders any provision hereof prohibited or unenforceable in any respect.

Section 13.11    No Punitive Damages. Notwithstanding anything to the contrary elsewhere in this Agreement, no Party (or its Affiliates) shall, in any event, be liable to the other Party (or its Affiliates) for any consequential, special, exemplary or punitive damages, including loss of future revenue or income, or loss of business reputation or opportunity relating to the breach or alleged breach or nonperformance or alleged nonperformance of this Agreement.

Section 13.12    Knowledge Convention. Whenever any statement herein or in any Disclosure Schedule, Exhibit, certificate or other document delivered to any Party pursuant to this Agreement is made "to its knowledge" or words of similar intent or effect of any Party or its representative, the Person making such statement shall be accountable only for those facts, circumstances or events, which as of the date the representation is given, are actually known to the Person making such statement, which, with respect to the Company, means the persons identified on Schedule 13.12 hereto, and with respect to Buyer, means the knowledge of the DOO.

Section 13.13    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section):

If to Buyer, addressed to:

378Sywood LLC

4 Gladwyne Court
Spring Valley, NY 10977
Attention: Eliezer Zelman
Email: jzelman@ehmllc.com

With an additional copy to:

NBC Law LLC
675 3rd Ave 8th Floor
New York, NY 10017
Attention: Edward H. Burnbaum, Esq.
Telephone: (646) 912-7544
Email: eburnbaum@nbclaw.com

If to the Company addressed to:

Cold Spring Acquisition, LLC
d/b/a Cold Spring Hills Center for Nursing and Rehabilitation
378 Syosset-Woodbury Road
Woodbury, New York 11797
Attention: Avi Philipson
Email: APhilipson@graphgroup.com

With an additional copy to:

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 600
Great Neck, New York 11021
Attention: Andrew J. Schulson, Esq.
Telephone: (516) 393-2234
Email: aschulson@garfunkelwild.com

Section 13.14 <u>Publicity and Reports</u>. Prior to the Closing, the Company and Buyer shall coordinate all publicity relating to the transactions contemplated by this Agreement and no Party shall issue any press release, publicity statement or other public notice relating to this Agreement, or the transactions contemplated by this Agreement, without the prior written consent of the other Party; provided that to the extent that a particular action is required by applicable Law, the Parties shall be obligated only to use commercially reasonable efforts to consult with the other Party prior to issuing any such press release, publicity statement or other public notice. Notwithstanding anything to the contrary, the restrictions contained hereinabove shall not apply to the Application, filings or processes seeking any required Approvals nor shall they apply to any Action.

Section 13.15 <u>Integration</u>. This Agreement, the Receiver Agreement, and the other Transaction Documents, together with the Disclosure Schedules and Exhibits thereto, (a) constitute the entire agreement among the Parties pertaining to the subject matter hereof and (b) supersede all prior agreements and understandings of the Parties in connection therewith, except for any confidentiality agreement, which shall remain in full force and effect.

Section 13.16 <u>Expenses</u>. Except as otherwise provided in this Agreement or in <u>Section 7.1</u> herein, the Company and Buyer shall each pay its own expenses incident to the evaluation of the Company and the Business and the negotiation, preparation and performance of this Agreement and the transactions contemplated hereby, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

Section 13.17 <u>No Assignment</u>. Neither this Agreement nor any rights or obligations under it are assignable by Buyer except that Buyer may, with notice to the Company, assign its rights hereunder to any wholly owned subsidiary of Buyer or to a substitute CHOW applicant under <u>Section 6.2</u>. Buyer shall remain liable to the Company for obligations of Buyer hereunder notwithstanding a permitted assignment. The Company may assign its rights, under this Agreement to any Affiliate of the Company upon advance written notice to the Buyer. The Company shall remain liable to the Buyer for obligations of the Company hereunder notwithstanding a permitted assignment.

Section 13.18 <u>Representation by Counsel; Interpretation</u>. The Parties each acknowledge that each Party has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of Law or any legal decision that would require interpretation of any claimed ambiguities in any portions of this Agreement against the Party that drafted it has no application and is expressly waived. If any provision of this Agreement is, in the judgment of the trier of fact, ambiguous or unclear, that provision shall be interpreted in a reasonable manner to effect the intent of the Parties.

Section 13.19 <u>No Third Party Beneficiaries</u>. This Agreement is not intended to, and shall not be construed to, confer upon any Person other than the Parties any rights or remedies hereunder.

Section 13.20 <u>Recording</u>. Neither this Agreement nor any memorandum thereof shall be recorded and any attempted recordation hereof shall be void and shall constitute a default.

*[Remainder of Page Intentionally Left Blank; Signatures Follow]*

32

*{Signature Page to Asset Purchase Agreement}*

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

**<u>BUYER</u>:**

**378SYWOOD LLC**,
a New York limited liability company

By: _____
Name: Eliezer Jay Zelman
Title: Member

**<u>COMPANY</u>:**

**COLD SPRING ACQUISITION, LLC D/B/A
COLD SPRING HILLS CENTER FOR
NURSING AND REHABILITATION**,
a New York limited liability company

By: _____
Name: Avi Philipson
Title: Authorized Signatory

*{Signature Page to Asset Purchase Agreement}*

      IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

**BUYER:**

**378SYWOOD LLC**,
a New York limited liability company


By: _____
Name: Eliezer Jay Zelman
Title: Member


**COMPANY:**

**COLD SPRING ACQUISITION, LLC D/B/A
COLD SPRING HILLS CENTER FOR
NURSING AND REHABILITATION**,
a New York limited liability company


By: _____
Name: Avi Philipson
Title: Authorized Signatory

## Exhibit A

### Definitions

For all purposes of this Agreement and the Exhibits and Disclosure Schedules delivered pursuant to this Agreement, and except as otherwise expressly provided, the following definitions shall apply:

"**Action**" means any action, complaint, petition, investigation, suit or other proceeding before any Governmental Entity.

"**Patient Medical Records**" means any current patients and/or residents receiving services at the Facility or any records for residents that received services from the Facility in the two (2) years prior to the Receivership Date.

"**Affiliate**" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the specified Person. For the purposes of this definition, "control" means the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Agreement, as amended or supplemented, together with all Exhibits and Disclosure Schedules attached hereto or expressly incorporated herein by reference.

"**Application**" means the Certificate of Need application seeking the approval of DOH for the establishment and licensure of Buyer as the operator of the Business.

"**Approval**" means any approval, authorization, consent, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, required to be obtained from, or any notice, statement or other communication required to be filed with or delivered to, any Governmental Entity, including but not limited to CON Approval (as herein defined).

"**Assumed Contracts**" has the meaning set forth in Section 2.1(c).

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Bill of Sale**" has the meaning set forth in Section 4.2(a).

"**Business**" has the meaning set forth in the Recitals.

"**Business Day**" means a day (excluding Saturday and Sunday) on which banks generally are open for the transaction of business in New York, New York.

"**Business Employee**" and "**Business Employees**" means certain individuals employed by Company in connection with the Business as of the Receivership Date.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer Employees**" has the meaning set forth in Section 8.1(b)(i).

"**Buyer's Representative**" has the meaning set forth in <u>Section 6.2(r)</u>.

"**Cash Receipts Assessment**" means the payment required to be made to DOH pursuant to New York Public Health Law§ 2807(d)(6).

"**Claim**" means any and all liabilities, losses, damages, deficiencies, demands, claims, fines, penalties, interest, assessments, judgments, Liens, charges, orders, decrees, rulings, dues, assessments, Taxes, actions, injunctions, proceedings and suits of whatever kind and nature and all costs and expenses relating thereto, including fees and expenses of counsel, consultants and other experts, and other expenses of investigation, remediation, and litigation.

"**Closing**" has the meaning set forth in <u>Section 4.1</u>.

"**Closing Date**" has the meaning set forth in <u>Section 4.1</u>.

"**Collective Bargaining Agreement**" has the meaning set forth in <u>Section 5.1(n)</u>.

"**Company**" has the meaning set forth in the Preamble.

"**CON Approval**" means certificate of need approval by the DOH of the Application to operate the Facility that is not subject to any contingencies that must be satisfied prior to Closing.

"**Contract**" means any binding written agreement, arrangement, purchase and sale order, bond, commitment, franchise, indemnity, indenture or lease.

"**Disclosure Schedules**" means the disclosure schedules delivered pursuant to <u>Article V</u> of this Agreement contemporaneously herewith or on or before the Closing Date relating to this Agreement, as they may be amended from time to time in accordance with the terms of this Agreement.

"**DOH**" means the Department of Health of the State of New York.

"**DOO**" means Eliezer Jay Zelman.

"**Equipment**" shall mean all furniture, fixtures, equipment, machinery, vehicles, inventory, and other personal property now or hereafter attached to or appurtenant to and/or used or usable in connection with and relating to the ownership and operation of the Facility and the assets and owned by the Company.

"**Employee Plans**" means all of the employee benefit, fringe benefit, supplemental unemployment benefit, bonus, incentive, profit sharing, termination, change of control, pension, retirement, health, welfare, medical, dental, disability, life insurance and similar material plans, programs, arrangements or practices relating to the Business that are maintained sponsored or contributed to by the Company or its Affiliates for the benefit of the Business Employees, whether funded or unfunded, insured or self-insured, registered or unregistered, in effect on the date hereof.

"**Environment**" means soil, land, air including indoor air, and water including drinking water, and other environmental media or natural resources and buildings and construction materials.

"**Environmental Laws**" means any applicable federal, state, or local statutes, regulations, ordinances, orders, decrees, or requirements or common law relating to pollution or protection of the Environment or human health or safety, including the environment inside buildings, including those relating to the generation, use, storage, handling, transportation, treatment, or Release to the Environment of Hazardous Materials, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. § 9601 *et seq*., the Resource Conservation and Recovery Act, as amended, 42 U.S.C, § 6901, *et seq.,* the Clean Air Act, 42 U.S.C. § 7401, *et seq.,* and the Clean Water Act, 33 U.S.C., § 1251, *et seq*.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**Existing Lease**" shall mean that certain Agreement of Lease between Real Estate Seller and Company, dated as of September 29, 2014.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board or in such other statement by such other entity as may be approved by a significant segment of the accounting profession in the United States, consistently applied.

"**Governmental Entity**" means any government or any agency, bureau, board, commission, court, department, official, tribunal or other instrumentality of any government, whether federal, state or local, that has, in each case, jurisdiction over the matter in question, including DOH.

"**Hazardous Materials**" means any substance, material or waste regulated by or providing the basis for liability pursuant to federal, state or local Law, or common law including, without limitation, any substance, material or waste which is defined as a "pollutant," "contaminant," "solid waste," "hazardous waste," "hazardous material," "hazardous substance," "toxic waste" or "toxic substance" under any provision of Environmental Law and including but not limited to petroleum and petroleum products, asbestos and asbestos containing materials, natural gas, radon gas, urea formaldehyde foam insulation, electromagnetic fields, bio wastes, and polychlorinated biphenyls.

"**Healthcare Program Liabilities**" means, with respect to any debt, liability, obligation or assessment under any Healthcare Reimbursement Program Laws, (a) any obligations for settlement and retroactive adjustments relating to the Business under the Medicare and Medicaid programs, (b) any obligations or liabilities arising by reason of any failure to comply with the rules and regulations of any Healthcare Reimbursement Program which is attributable to the rates in effect for the Business or the Service Delivery, (c) all obligations which may hereafter exist with

respect to any payment or reimbursement owed to any Healthcare Reimbursement Program or other payor which is attributable to the rates in effect for the Business or the Service Delivery, and (d) any debt, liability, obligation or assessment to or by any Healthcare Reimbursement Program for overpayments and other financial obligations arising from adjustments or reductions in reimbursement attributable to certain events, transactions, circumstances, or conditions.

"**Healthcare Reimbursement Program**" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any other state sponsored reimbursement program, and any other health care reimbursement program, payment intermediary, Third Party payor or other private payor.

"**Healthcare Reimbursement Program Laws**" means the Laws governing the Healthcare Reimbursement Programs, including but not limited to: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b and 1395nn; the False Claims Act (31 U.S.C. § 3729 *et seq.);* the False Statements Act (18 U.S.C. § 1001 *et seq.);* the Program Fraud Civil Penalties Act (31 U.S.C.§ 3801 *et seq.);* the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347; 18 U.S.C. § 669; 18 U.S.C. § 1035; 18 U.S.C.§ 1518); and similar or the corresponding provisions, including, but not limited to, fraud and abuse, false claims and anti-self-referral Laws of any other Governmental Entity.

"**HHS**" means the United States Department of Health and Human Services.

"**Indemnifiable Claim**" means any claim of an Indemnifiable Loss for or against which any Party is entitled to indemnification under this Agreement.

"**Indemnifiable Loss**" means any cost, damage, disbursement, expense, liability, loss, deficiency, penalty or settlement, including but not limited to reasonable legal, accounting and other professional fees and expenses and amounts paid in settlement, that are actually imposed on or otherwise actually incurred or suffered by the specified Person.

"**Indemnified Party**" means the Party entitled to indemnification hereunder.

"**Indemnifying Party**" means the Party obligated to provide indemnification hereunder.

"**Intellectual Property**" means all patents, patents pending, applications for patents patent rights, Trademarks, trademark rights, trade names, trade name rights, copyrights (other than copyrights in 'off-the-shelf computer programs) and copyright registrations, all applications and registrations for any of the foregoing, trade secrets and other intangible proprietary rights, and all goodwill associated with the foregoing.

"**Known Healthcare Program Liabilities**" has the meaning set forth in Section 2.3(c).

"**Law**" means any applicable constitutional provision, statute, law, regulation, Order or ordinance.

"**Lender**" shall mean the current holder of that certain mortgage loan made by Greystone Funding Corporation and insured by the U.S. Department of Housing and Urban Development

("**HUD**") in the original principal amount of Seventy-Eight Million Five Hundred Thirty-Three Thousand Five Hundred Dollars ($78,533,500.00) (the "**HUD Loan**").

"**Lien**" and "**Liens**" means, individually and collectively as the context may require, any lien, pledge, charge, assessment, mortgage, hypothecation, deed of trust, collateral assignment, attachment, agreement or levy that creates a security interest or other encumbrance of any kind, whether incurred voluntarily or arising under any applicable Law.

"**Material Adverse Effect**" means: (a) a material adverse effect on the results of operations or financial condition of the Business taken as a whole, or (b) a material adverse effect on the financial performance of the Facility the extent of which can be reasonably calculable and exceeds the sum of $1,000,000.00; provided, however, that in no event shall any of the following facts, circumstances, events, change, occurrences or effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there is a Material Adverse Effect: (i) any change in general economic, business, financial, credit or market conditions internationally, nationally or locally (in New York, New York); (ii) any action taken by the Company that is expressly permitted or required by this Agreement; (iii) any occurrence generally affecting the residential health care industry, including any changes to reimbursement methodology; (iv) any change in GAAP or applicable Law or the interpretation thereof; (v) any act of terrorism, war (whether or not declared), national disaster or any national or international calamity affecting the United States; (vi) any losses arising or incurred in the ordinary and usual course of operating the Business; or (vii) any effect resulting from the execution of this Agreement, the announcement of this Agreement, the consummation of the transactions contemplated hereby, the identity of Buyer or any breach by Buyer of any provision hereof.

"**Medical Records Custody Agreement**" has the meaning set forth in Section 4.2(c).

"**Medicaid**" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"**Medicare**" means the health insurance program administered under Title XVIII of the Social Security Act.

"**New Accounts**" has the meaning set forth in Section 6.6.

"**New Operating Account**" has the meaning set forth in Section 6.6.

"**New Payroll Account**" has the meaning set forth in Section 6.6.

"**Order**" means any binding and enforceable decree, injunction, judgment, order, ruling, assessment or writ issued by a Governmental Entity.

"**Parties**" has the meaning set forth in the Preamble.

"**Pension Fund**" has the meaning set forth in Section 8.3.

"**Permit**" means any license, permit, franchise or certificate or order and any extension, modification, amendment or waiver of the foregoing, required to be issued by any Governmental Entity.

"**Person**" means an association, a corporation, an individual, a partnership, a limited liability company, an unlimited liability company, a limited liability partnership, a trust or any other entity or organization.

"**PHHPC**" means the New York State Public Health and Health Planning Council.

"**Property Information**" shall mean: (i) all information and documents in any way relating to the Purchased Assets, the Assumed Liabilities and/or the Business, the operation thereof or the sale thereof furnished to, or otherwise made available for review by, Buyer, Buyer's Representative, Buyer's Affiliates or their agents or representatives, including, without limitation, their contractors, engineers, attorneys, accountants, consultants, brokers or advisors, by the Company, any of the Company's Affiliates or their agents or representatives, including, without limitation, their contractors, engineers, attorneys, accountants, consultants, brokers or advisors, other than the Disclosure Schedules and (ii) all analyses, compilations, data, studies, reports or other information or documents, other than any Disclosure Schedules, prepared or obtained by Buyer, Buyer's Representative, Buyer's Affiliates or their agents or representatives, including, without limitation, their contractors, engineers, attorneys, accountants, consultants, brokers or advisors, containing or based, in whole or in part, on the information or documents described in the preceding clause (i), or otherwise reflecting their review or investigation of the Purchased Assets, the Assumed Liabilities and/or the Business.

"**Purchased Assets**" has the meaning set forth in Section 2.1.

"**Real Estate Buyer**" means Woodbury Heights Rehabilitation Center Realty LLC.

"**Real Estate Closing Date**" or "**Real Estate Closing**" means the date of closing under the Real Estate Contract.

"**Real Estate Contract**" means that certain Purchase and Sale Agreement, dated of even date herewith, by and among the Real Estate Buyer and Real Estate Seller.

"**Real Estate Seller**" means Cold Spring Realty Acquisition LLC, LLC, a New York limited liability company as seller pursuant to the Real Estate Contract.

"**Real Property**" means Property as such term is defined in the Real Estate Contract.

"**Receivership Date**" has the meaning set forth in the Preamble of this Agreement and is the date on which the Receiver is authorized to act as receiver of the Facility.

"**Release**" means release, spill, leak, discharge, dispose of, pump, pour, emit, empty, inject, leach, dump or allow to escape into the Environment.

"**Resident Assets**" has the meaning set forth in Section 6.7.

"**Service Delivery**" means delivery by the Business of medical or healthcare related services or any other service and/or the supply of goods related to any of such services.

"**Tax**" or "**Taxes**" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, abandoned property, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"**Tax Returns**" means all returns, reports, forms, declarations, schedules and information statements (including amendments thereto) required to be filed with any Governmental Entity relating to Taxes.

"**Trademarks**" means trademarks, applications for trademark registration, service marks, applications for service mark registration and all goodwill associated therewith.

"**Transaction Documents**" means all agreements and documents to facilitate the acquisition of the Purchased Assets and the Property and the transaction of the Facility operations to Buyer, including, without limitation, this Agreement, the Receiver Agreement, the Real Estate Contract, the Bill of Sale, and any confidentiality agreement.

"**Transfer Tax**" or "**Transfer Taxes**" shall mean any federal, state, county, local, foreign and other sales, use, transfer, conveyance, documentary transfer, recording or other similar tax, fee or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to tax or interest with respect thereto.

"**WARN**" means the Worker Adjustment and Retraining Notification Act and any similar state or local law.

**Exhibit B**

**Bill of Sale**

<u>**BILL OF SALE**</u>

 **THIS BILL OF SALE** is made and executed as of the [___] day of [_____] from **COLD SPRING ACQUISITION, LLC D/B/A COLD SPRING HILLS CENTER FOR NURSING AND REHABILITATION**, having an address at 378 Syosset-Woodbury Road, Woodbury, New York 11797 (the "<u>**Company**</u>"), to **378SYWOOD LLC,** having an address at _____ (the "<u>**Buyer**</u>").

 **FOR AND IN CONSIDERATION** of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the Company does hereby bargain, sell, convey, deliver, assign, transfer, set over and grant to the Buyer, and to their successors and assigns, all right, title and interest of the Company in and to any and all fixtures, machinery, equipment, furniture and other tangible personal property (collectively, "<u>**Personalty**</u>") comprising Purchased Assets pursuant to that certain Asset Purchase Agreement, entered into as of December 18, 2024, by and between the Company and Buyer (as amended to date, the "<u>**APA**</u>").

 Title to all such Personalty shall pass to the Buyer upon delivery of this Bill of Sale free and clear of all claims, liens or encumbrances of any kind (except as such as may be permitted by the terms of the APA, if any). Any sales tax, if any, payable in respect of the Personalty shall be the sole responsibility of the Buyer.

 The Company makes no warranties or representations whatsoever, including, without limitation, with respect to quality, fitness or merchantability of the Personalty; the Personalty is being transferred "**AS IS**" physical condition and this Bill of Sale is made without recourse to the Company except that the Company represents and warrants that as of the date hereof, the Company owns all such Personalty free and clear of all claims, liens and encumbrances of any kind (except as such as may be permitted by the terms of the APA, if any).

 This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

*[Signature Page Follows]*

     IN WITNESS WHEREOF, the Company has executed this Bill of Sale as of the day and year first written above.

                      **COLD SPRING ACQUISITION, LLC D/B/A COLD SPRING HILLS CENTER FOR NURSING AND REHABILITATION**

                      By: _____

                          Name:

                          Title:

**Exhibit C**

**Medical Records Custody Agreement**

**MEDICAL RECORDS CUSTODY AGREEMENT**

This Medical Records Custody Agreement (the "Agreement") is made and entered into this [____] day of [_____] by and between **COLD SPRING ACQUISITION, LLC**, a New York limited liability company (**"Seller"**) and **378SYWOOD LLC** ("Buyer").

**WHEREAS**, Seller and Buyer entered into an Asset Purchase Agreement, dated as of December 18, 2024 ("APA") pursuant to which Seller agreed to sell, and Buyer agreed to purchase, certain assets of Seller in connection with the Facility and its Business (as such terms are defined in the APA), located at 378 Syosset-Woodbury Road, Woodbury, New York (the "Assets") pursuant to the terms and conditions of the APA and effective upon the Closing Date (as defined in the APA);

**WHEREAS**, Seller wishes to ensure the continuation of necessary health care services for residents of the Facility (as defined in the APA) to provide for the smooth transfer of the Resident Records (as defined below) to Buyer so that the Resident Records may be accessed readily by health care providers that will provide continuing treatment to the residents; and

**WHEREAS,** Buyer has also agreed to assume the custody and storage of the Resident Records pursuant to applicable law.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Transfer and Custody of Resident Records.

a.      Upon the Closing Date, Seller will transfer to Buyer the resident records, including without limitation, resident medical records, resident charts, films in such form as are maintained by the Seller, including without limitation, paper records and digital media records (the "Resident Records") for individuals who have been treated at the Facility prior to the Closing Date.  Seller hereby appoints Buyer, and Buyer agrees to serve during the term of this Agreement, as custodian for the maintenance, safekeeping, inspection and copying of the Resident Records.

b.      The parties agree that the Resident Records are being transferred for custodial purposes to Buyer hereunder for purposes of the care and treatment of residents by Buyer, its employees and staff (including, without limitation its medical staff), the billing activities of Buyer related to such care and the operations of the Facility as operated by Buyer.

c.      Buyer shall store and maintain the Resident Records in accordance with applicable Federal, State and local laws, rules and regulations, including those laws, rules and regulations governing the confidentiality of resident protected health information, and Buyer shall take reasonable measures to protect the Resident Records from theft, loss, unauthorized destruction and unauthorized access.

d.    All Resident Records transferred to Buyer hereunder shall be retained by Buyer for a period of the longer of seven (7) years from the Closing Date (as defined in the APA) or the time period required by applicable law or regulation.

Notwithstanding the foregoing, in the event that Seller notifies Buyer of an actual or potential claim, investigation or litigation regarding a particular resident, Buyer shall retain the Resident Records for that individual until Seller notifies Buyer that such Resident Records can be destroyed.  Subject to the last sentence, nothing herein shall prohibit Buyer from transferring the Resident Records to off-site storage facilities and/or destroying the Resident Records following the end of the applicable minimum retention period specified in this Section 1(d).

2.    Patient Communication and Access.

a.    Buyer shall provide timely access to, and photocopies of, the Resident Records to residents and their legal representatives to the extent required by laws, rules or regulations applicable to the parties, and to other individuals, entities, and governmental agencies that have the right to access and/or receive photocopies of Resident Records.  Such access and copies shall be provided within the time periods required by applicable laws, rules and regulations.  Buyer may charge appropriate copying fees, consistent with its then-existing policies and procedures and the requirements of applicable laws, rules and regulations.  The form of authorization/release for Resident Records which shall be utilized for such purpose shall be compliant with applicable federal and state law.

b.    Buyer shall promptly provide Seller with access to the Resident Records upon request as reasonably required during regular business hours, at no cost to Seller.  Buyer shall provide copies of Resident Records to Seller upon written request at the cost of 0.50 cents per page.  Seller shall not request access to or copies of any Resident Records, or portions thereof, which Seller is not entitled to receive from Buyer in accordance with applicable state and federal law and regulations in effect as of the time of request.

3.    Legal Compliance.  Buyer acknowledges that the Resident Records being transferred hereunder are confidential.  In the event that a resident or other appropriate person under applicable laws, rules or regulations (including, without limitation, a committee for an incompetent, a conservator, or other person pursuant to court order) requests that a copy of a resident's Resident Records be provided to such person or to another health care provider, Buyer shall promptly forward, or shall cause its designee to forward, a copy of the Resident Records; provided, however, that in all instances, Buyer or its designee shall comply with all provisions of applicable law, rules and regulations with respect to the confidentiality of such Resident Records.  With respect to the Resident Records transferred to Buyer hereunder, Buyer shall abide by all applicable laws, rules and regulations applicable to such records, including, without limitation, the Federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104 191, the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009, and the related regulations thereto.

4.    Term and Termination.

a.      This Agreement shall take effect upon execution by the parties hereto and shall remain in effect for as long as Buyer retains custody of the Resident Records transferred hereunder.

b.      This Agreement may be terminated at any time by the mutual written agreement of the parties.

5.      Miscellaneous.

a.      Buyer may assign this Agreement to any entity succeeding to Buyer as the licensed Article 28 operator of the Facility, as applicable.  No other assignment of this Agreement may occur without the express prior written consent of the other party, which consent shall not be unreasonably withheld or delayed, and any attempt to assign this Agreement without such consent shall be void.

b.      Neither party shall be authorized to act as agent for the other or to incur any liability in the name of or on behalf of the other, unless specifically authorized in this Agreement or in a writing executed by the party that would be responsible for the obligation.

c.      This Agreement shall be interpreted in accordance with the laws of the State of New York, without regard to principles of conflicts of law.  Each party to this Agreement hereby agrees and consents that any legal action or proceedings with respect to this Agreement shall only be brought in the courts of the State of New York with venue exclusively in Nassau County.  By execution and delivery of this Agreement, each such party hereby: (i) accepts the jurisdiction of the aforesaid courts; (ii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue set forth above; and (iii) further waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

d.      Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than a party hereto any rights, remedies, obligations or liabilities whatsoever.

e.      The recital clauses set forth above shall be deemed a part of this Agreement as though set forth verbatim and at length herein.  Any capitalized terms not defined herein shall have the meaning ascribed to such term in the APA.

f.      This Agreement and the APA are the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements, whether written or oral, concerning the subject matter hereof.  This Agreement shall not be changed or modified, except by a writing signed by both of the parties hereto or their respective successors.  Except as otherwise provided herein, all rights and remedies set forth in this Agreement shall be in addition to and not exclusive of any other rights or remedies now or hereafter existing at law or in equity.

g.      Any notice, request, instruction or document to be given hereunder by any party to another shall be in writing and delivered personally, transmitted by facsimile or email transmission, or mailed, first class registered or certified mail, postage prepaid, or by a nationally recognized overnight courier, to the parties and at the addresses specified herein or to such other address or to such other person as either party shall have last designated by such notice to the other party, and shall be deemed given when so delivered personally, when transmitted electronically,

upon confirmation of such transmission, or if by nationally recognized overnight courier, upon receipt. Any notice or other communication hereunder shall be delivered pursuant to the Notice requirements set forth in the APA. Each party shall have the right to give notice to any other party changing its address as stated above and such address shall thereupon be deemed to be changed accordingly.

h.      If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held to be legally invalid, inoperative or unenforceable, then the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefits of the remaining portions of this Agreement to the other party or parties.

i.      Any consent or waiver executed in writing by a party hereto shall be binding upon such party from and after the date of execution thereof unless a later or earlier date is specified therein.  No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right, or an acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature.

j.      All headings and captions in this Agreement are for convenience only.  They shall not be deemed part of this Agreement and shall in no way define, limit, extend or describe the scope or intent of any provisions hereof.

k.      The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may reasonably be necessary or appropriate to achieve the purposes set forth in this Agreement.

l.      This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

m.      This Agreement may be executed in counterparts and each such counterpart, when taken together, shall constitute a single and binding agreement.  Any counterpart signature page delivered by facsimile transmission and/or electronic mail shall be deemed to be and have the same force and effect as an originally executed signature page.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, this Medical Records Custody Agreement is signed as of the day and year first above written.

**378SYWOOD LLC**                                    **COLD SPRING ACQUISITION, LLC**


By: _____            By: _____
    Name:                                                    Name:
    Title:                                                    Title: